## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 23-cv-02355-CNS-KAS

ESTATE OF LEROY "NICKY" TAYLOR, by and through DEREK TAYLOR, Personal
Representative;

      Plaintiff,

v.

DENVER HEALTH AND HOSPITAL AUTHORITY; a political subdivision of the State of
Colorado;
PETER CRUM, M.D., in his individual capacity;
MELISSA BROKAW, RN, in her individual capacity;
BERNICE CHAVARRIA TORRES, LPN, in her individual capacity;
ISAAC KARUGU, RN, in his individual capacity;
ALICE MUKAMUGEMANYI, LPN, in her individual capacity;
JOHN DOES 1-20, in their individual and official capacities;

      Defendants.

---

## FIRST AMENDED COMPLAINT AND JURY DEMAND
---

Plaintiffs, by and through their attorneys Ciara M. Anderson, Matthew Cron, Qusair

Mohamedbhai, and Edward C. Hopkins Jr. of RATHOD MOHAMEDBHAI LLC, and Chris Gilbert of

CHRISTOPHER K. GILBERT, ESQ., LLC., allege as follows:

### I.      INTRODUCTION

1.      On February 9, 2022, Mr. Leroy "Nicky" Taylor died in his cell in the Downtown

Denver Van Cise-Simonet Detention Center as a result of Denver Health and Hospital Authority

doctors and nurses' deliberate indifference to his known serious medical needs.

2.      For more than a week leading up to Mr. Taylor's preventable death, Denver Health

medical staff in the jail ignored Mr. Taylor's ongoing and severe symptoms, including chest pain,

vomiting, diarrhea, and his feet and hands turning blue. Guards reported their observations that Mr. Taylor was "barely breathing," seemed "delirious," and needed help from other prisoners to use the restroom. Other prisoners reported that Mr. Taylor "was dehydrated," "could not swallow," and could barely speak. Mr. Taylor's distressed voice was apparent on numerous recorded phone calls. Indeed, his obviously weakened voice alone prompted several people outside of the jail to report their concerns and begin advocating for him to receive proper medical care.

3.      While Denver Sheriff Department ("DSD") staff, prisoners, and civilians who spoke to Mr. Taylor on the phone all recognized Mr. Taylor's dire and deteriorating medical condition and advocated for him to receive treatment, one crucial cohort of persons failed to take Mr. Taylor's condition seriously: Denver Health medical staff.

4.      Denver Health medical staff, whose core function is to provide medical care to prisoners, openly disregarded Mr. Taylor's obvious life-threatening symptoms as well as the multiple complaints raised by DSD staff and prisoners. In so doing, they cruelly disregarded Mr. Taylor's dignity as a human being and allowed him to die alone in his cell. Had Mr. Taylor received timely medical care or minimal health screening, he would not have died on February 9, 2022.

## II.      JURISDICTION AND VENUE

5.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

6.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All events and omissions alleged herein occurred in Colorado. At the time of the events and omissions

giving rise to this litigation, all parties resided in Colorado.

### III.    PARTIES

7.      The decedent, Leroy "Nicky" Taylor, was a United States citizen and Colorado resident. Derek Taylor, personal representative of the Estate of Leroy Taylor, is Leroy Taylor's son and heir, a United States citizen, and a Colorado resident.

8.      Defendant Denver Health and Hospital Authority, D/B/A "Denver Health Medical Center" and "Denver Health" (hereinafter "Denver Health"), is a political subdivision of Colorado with its principal office address at 777 Bannock Street, Denver, Colorado 80204. At all relevant times, Denver Health, its agents, and its employees were acting under color of state law.

9.      Defendant Peter Crum, M.D., at all relevant times, was a physician licensed to practice medicine in Colorado, was employed in that capacity by Defendant Denver Health at the Van Cise-Simonet Detention Center, and was acting under color of state law.

10.      Defendant Melissa Brokaw, RN, at all relevant times, was a registered nurse with a principal place of business at Defendant Denver Health, served as a nurse at the Van Cise-Simonet Detention Center, and was acting under color of state law.

11.      Defendant Bernice Chavarria Torres, LPN, was a licensed practical nurse with a principal place of business at Defendant Denver Health, served as a nurse at the Van Cise-Simonet Detention Center, and was acting under color of state law.

12.      Defendant Alice Mukamugemanyi, LPN, was a licensed practical nurse with a principal place of business at Defendant Denver Health, served as a nurse at the Van Cise-Simonet Detention Center, and was acting under color of state law.

13.      Defendant Isaac Karugu, RN, at all relevant times, was a registered nurse with a

3

principal place of business at Defendant Denver Health, served as a nurse at the Van Cise-Simonet

Detention Center, and was acting under color of state law.

14.    Defendants John Does 1-20, R.N., at all relevant times, were employees of

Defendant Denver Health with a principal place of business at Defendant Denver Health, served

as medical personnel involved in the treatment or lack thereof of Mr. Taylor at the Van Cise-

Simonet Detention Center, and were acting under color of state law.

## IV.    FACTUAL ALLEGATIONS

15.    Nicky Taylor was a strong-willed, kind, and beloved father, brother, cousin, and

friend who is missed dearly by his family and community.

16.    On November 7, 2021, Mr. Taylor, then seventy-one-years-old, began serving a 90-

day sentence at the Denver Van Cise-Simonet Detention Center ("DDC").

17.    While incarcerated, on or about January 24, 2022, Mr. Taylor tested positive for

COVID-19.

18.    Five days later, on January 29, 2022, Denver Health staff determined that Mr.

Taylor had a "resolved positive" COVID-19 case.

19.    Given his "resolved positive" status, Mr. Taylor was placed in "low risk housing"

in the general population 5-D unit.

20.    But Mr. Taylor was not well upon his return, and his need for medical attention and

care was clear and obvious to other prisoners in the 5-D unit.

21.    On February 2, 2022, several prisoners in the general population unit approached

DSD Deputy Robert Ortiz and informed him that Mr. Taylor was extremely sick, vomiting, and

having diarrhea in his bunk.

4

22. Deputy Ortiz immediately requested medical attention for Mr. Taylor, and Denver Health Nurse Nikia Rabon ("Nurse Rabon") evaluated Mr. Taylor soon after.

23. Nurse Rabon recorded Mr. Taylor's symptoms, including that Mr. Taylor appeared ill, was vomiting, making bowel movements on himself, and that swallowing his own sputum made him have the urge to continually vomit.

24. Mr. Taylor reported that he had been experiencing this abnormal combination of symptoms for approximately two days.

25. Nurse Rabon was unable to auscultate (examine by listening to heart, lungs, or other organs with a stethoscope) clearly with her stethoscope.

26. Nurse Rabon was aware that Mr. Taylor had tested positive for COVID-19, approximately one week prior.

27. Nurse Rabon contacted the doctor who was onsite, Defendant Peter Crum, M.D. ("Dr. Crum"), and informed him of Mr. Taylor's symptoms.

28. Mr. Taylor was transferred from his general population pod to a medical unit, known as "3-medical."

29. All reasonably trained healthcare workers are aware that ***anyone*** who complains of chest discomfort, shortness of breath, fatigue, weakness, vomiting, and diarrhea for days must be immediately medically evaluated by a doctor and that evaluation should consist of an EKG, bloodwork, and targeted imaging, at a minimum.

30. For patients like Mr. Taylor, who are elderly and have other medical conditions, it is even more important for a doctor to do a proper initial examination immediately.

31. In the medical unit, Mr. Taylor's vitals were checked, and he only received

5

medication to treat nausea and vomiting. He did not receive any specific cardiovascular evaluation or medication to treat his chest pains.

32.     Dr. Crum and Nurse Rabon failed to take the combination of the following deadly symptoms as seriously as they should have: Mr. Taylor was an elderly man, was recently diagnosed with COVID-19, was complaining about multiple days of vomiting and diarrhea, and was suffering from chest pains.

33.     In addition to Mr. Taylor's visible symptoms, his blood pressure was 168/73 and his heart rate was 125 bpm when he was transferred to the medical unit.

34.     By merely ordering Denver Health staff to check Mr. Taylor's vital signs, Dr. Crum disregarded several serious symptoms that should have prompted additional tests for Mr. Taylor.

35.     Given Mr. Taylor's recent known COVID-19 infection, Dr. Crum knew that Mr. Taylor was at an elevated risk for cardiac or pulmonary complications, including but not limited to pneumonia, pulmonary embolism, pericarditis, and myocarditis, among others.

36.     Moreover, the decision to monitor Mr. Taylor and treat his symptoms with medications alone—rather than pursue additional testing, provide him with IV fluids, or consider oxygen therapy—showed complete disregard for Mr. Taylor's obvious symptoms.

37.     Though Dr. Crum failed to record a single note for Mr. Taylor, Denver Health Nurses Rabon and Weir both recorded that Dr. Crum directed them to call him if anything was abnormal.

38.     Based on this order, either (1) Nurse Rabon and Nurse Weir failed to identify Mr. Taylor's abnormal vital signs and therefore did not call Dr. Crum or (2) Dr. Crum was notified about Mr. Taylor's vital signs and failed to act reasonably based on this knowledge.

39.    Either way, Denver Health failed to provide adequate care that any reasonably trained and conscientious medical professional would have provided.

40.    There are no notes in Mr. Taylor's medical records reflecting his condition on February 3, 2022.

41.    On February 4, 2022 (five days before Mr. Taylor died), Mr. Taylor continued to experience persistent vomiting and diarrhea that lasted for several hours.

42.    Mr. Taylor had been experiencing these symptoms for longer than three days at this point.

43.    During those three days, Mr. Taylor's breathing had audibly decreased, and he had lost his ability to swallow, making it difficult for him to take medication and stay hydrated.

44.    Even though Mr. Taylor could not swallow his medication—and Denver Health medical staff knew it—none of the Denver Health staff considered changing the course of treatment (such as providing an IV). They did not even evaluate Mr. Taylor further.

45.    On February 4, 2022, a physician assistant recommended that Mr. Taylor continue taking prescribed medications for nausea, continue taking medications for diarrhea, and undergo a chest x-ray.

46.    Defendant Denver Health Nurse Melissa Brokaw ("Nurse Brokaw") acknowledged Mr. Taylor's treatment plan the same day at 4:24 p.m.

47.    Also on February 4, 2022, Mr. Taylor called his family and told them that he was still extremely sick. He specifically reported that he was not able to swallow the medication that he had been given.

48.    Denver Health staff knew or should have known that merely giving Mr. Taylor

medication and observing him was not reasonable given his ongoing deadly symptoms of decline.

49.     Dr. Crum and Nurse Brokaw knew that anti-nausea medicine could not treat, let alone cure, Mr. Taylor's underlying conditions and that the medicine had had no effect on Mr. Taylor during the past several days.

50.     Mr. Taylor's persistent symptoms should have impelled further evaluation including an EKG, bloodwork, and abdominal imaging.

51.     Despite the serious nature of Mr. Taylor's known medical condition, Dr. Crum, Nurse Brokaw, and other Denver Health medical staff did not deviate from their plan to "wait and watch" Mr. Taylor.

52.     The following day, February 5, 2022, Nurse Brokaw saw and assessed Mr. Taylor's condition again at approximately 8:00 a.m. At that time, Nurse Brokaw recorded that Mr. Taylor had a pulse of 101, oxygen saturation of 96%, and a blood pressure of 121/55, indicating hypotension.

53.     On February 6, 2022, Mr. Taylor had to submit a written request for Tylenol due to a very bad headache, another symptom, when combined with all other symptoms on record at the time, that also signaled his deteriorating and perilous medical condition.

54.     The Denver Health nurse who ultimately provided Mr. Taylor with the Tylenol noted he had ongoing aches but incorrectly noted that Mr. Taylor was not experiencing any distress at the time and "encouraged [him] to keep hydrated."

55.     Mr. Taylor was experiencing significant distress and was unable to stay hydrated because he could not keep any food or liquids down due to his severe nausea, diarrhea, and struggle to swallow.

56.    On February 7, 2022, Mr. Taylor finally received the chest X-ray that the physician assistant had ordered three days prior.

57.    Based on the exam results, Dr. Victor Anaya-Baez recommended that Mr. Taylor receive a follow-up computerized tomography ("CT") scan.

58.    When the chest x-ray came back recommending a CT scan and Mr. Taylor continued to report shortness of breath with audible cough, a chest CT scan should have been done immediately.

59.    Several other tests should have also been done, and any reasonably trained and conscientious medical professional would have recognized that Mr. Taylor was in a life-threatening medical crisis that required immediate emergency medical care.

60.    Mr. Taylor never received the recommended follow-up CT scan or any other medical care.

61.    The deliberate failures to perform any follow-up tests in light of the recommendation to do so were blatant and egregious breaches of the standard of care by the medical team, including Dr. Crum and Nurse Brokaw.

62.    This clear violation of the standard of care occurred not just once but over and over again, over the course of several days.

63.    After days of Mr. Taylor's health continuing to rapidly decline, Denver Health Staff knew or should have known that Mr. Taylor required care and evaluation by a more qualified medical professional, and he needed to go to the emergency room.

64.    By Defendants' own admissions, they knew that there was nothing that they could do for Mr. Taylor in the jail.

9

65.     Dr. Crum and Nurse Brokaw completely abdicated their gatekeeper roles and recklessly refused to hospitalize Mr. Taylor outside of the jail, where he could receive the medical care that he obviously needed. They failed to hospitalize Mr. Taylor despite knowing that they had not obtained an EKG, and they had done nothing to rule out serious causes of his medical symptoms. They failed to hospitalize Mr. Taylor despite knowing that Mr. Taylor's treatment during the past several days was ineffective, and he needed medical care outside of the jail's ability. They failed to hospitalize Mr. Taylor despite knowing that Mr. Taylor was at serious risk of death if he did not immediately receive a proper assessment and treatment.

66.     Several recorded phone calls clearly convey Mr. Taylor's medical distress and contradict the repeated omissive notations in Mr. Taylor's medical records that he was not in medical distress.

67.     Mr. Taylor called his public defender and left a barely audible voicemail in which he desperately pleaded for help while describing how sick he had been for the past ten days:

> Um, good morning, Ms. Douglas, I need your help again. It's Leroy Taylor. I just got out of the hospital. They sent me to this hospital [the jail's medical unit]. And I tried to – make them – to keep – keep – me there, because three medical – guess you got a lot of people to take care of – **I need to get out of here before I die**. I – I will – if you can arrange it for me to get out of here and go to my own doctor, [rather] than stay in here, I will promise you and the judge to finish my sentence. I only have [*cough*] 13 days, then I wake up. And uh – and then I'm done. But, they keep on putting all these coughing and sick people [*cough*], in my cell . . . **I've been sick, I've been sick for ten days. And I don't feel any better.** I guess they got a of people to – [*gasp*] take care of . . . Anyway, could you set up a video visit, and if you talk to the judge or whatever . . . If you could set up a video, **see if the judge will allow me to go out of here to the hospital, see my own doctor, let me know, please**. **I feel like I'm dying in here [gasp].** There's only so much time in a day [*gasps*]. And – the nurses are probably overwhelmed. Please get in touch with me. Thank you. **I'm real sick.** Have a blessed day. Bye. Or you can call my sister too.

68.     Mr. Taylor's voicemail caused Ms. Douglas to be so concerned that she

immediately filed a motion with the court requesting Mr. Taylor's emergency release.

69.    Later the same day, Mr. Taylor called his sister. Mr. Taylor's voice is strained, and he can immediately be heard coughing and retching.

70.    The next day, on February 8, 2022, Mr. Taylor again called his sister. The recording of that call proves Mr. Taylor's condition had significantly worsened since their previous call.

71.    Throughout the call, Mr. Taylor's voice is strained, quiet, and inaudible at times. He gasps, chokes, and coughs throughout the entirety. They shared the following exchange:

| | |
|---|---|
| SISTER: | How are you? |
| MR. TAYLOR: | I'm worse. |
| SISTER: | You're worse? |
| MR. TAYLOR: | Yeah. Because – **I can't get no help down here.** [I've had] diarrhea – for fourteen hours. They said they couldn't help me. Hello? |
| SISTER: | They said they could not help you? |
| MR. TAYLOR: | Right. They're stretched out. So, I have to grin and bear it. |
| . . . . | |
| MR. TAYLOR: | I am so miserable. I can't eat anything. I got diarrhea. And they don't give a fuck. |
| SISTER: | It sounds like you need to be back in the hospital. |
| MR. TAYLOR: | I need to be – somewhere. **I feel like I'm going to die**. |
| SISTER: | How is your chest? |
| MR. TAYLOR: | It's hurting. **Everything is hurting** |

72.    Without ever seeing Mr. Taylor and only hearing his voice, which made his severe medical distress obvious to lay people, his attorney and family repeatedly attempted to get him medical attention.

73.    Although Mr. Taylor was showing both objective and subjective signs of a serious medical condition, which were so obvious that lay people perceived his dire need for medical care without setting eyes on him, Dr. Crum cleared Mr. Taylor to return to the jail's general population unit on February 8, 2022, at approximately 2:25 p.m.

11

74.     Nurse Brokaw recommended that Mr. Taylor be transferred to the general population, pursuant to Dr. Crum's order.

75.     Mr. Taylor was transferred to the general population unit pursuant to Nurse Brokaw's recommendation.

76.     By the time Mr. Taylor reached his bunk in general population on February 8, 2022, he was too infirm to use the phone on his own.

77.     Mere hours after Mr. Taylor returned to the general population unit, his cellmate, Mr. Pierce, called Mr. Taylor's sister to tell her that **no one was helping Mr. Taylor, and she needed to call the jail so that Mr. Taylor could get medical attention.** During that call, Mr. Pierce also described Mr. Taylor as "very, very sick" and "in a bad way."

78.     Mr. Pierce also told the sheriff deputies that Mr. Taylor needed to be housed in a unit where he could be monitored, but Denver Health staff in the jail refused to house Mr. Taylor in the medical unit where he could be monitored. Because Denver Health staff had cleared Mr. Taylor to return to general population, sheriff deputies could not move him to the medical unit where he could be more closely monitored.

79.     Then, sometime after 6:00 p.m. that same day, February 8, 2022, Mr. Taylor's sister went to DDC, spoke to deputies, and expressed her worries about Mr. Taylor's worsening condition because she feared the Denver Health medical staff in the jail were ignoring his obvious medical crisis.

80.     Still, none of the Denver Health medical staff in the jail escalated Mr. Taylor's medical care.

81.     On February 8, 2022, at approximately 11:16 p.m., Mr. Taylor complained to

Defendant Alice Mukamugemanyi, LPN ("Nurse Mukamugemanyi") that he was having difficulty breathing and was unable to swallow.

82.     Nurse Mukamugemanyi's progress note disregarded Mr. Taylor's complaints that he could not swallow or breathe, and she encouraged Mr. Taylor to wear a mask, use proper hand hygiene, and drink plenty of fluid.

83.     Rather than provide the appropriate treatment or evaluation for the symptoms with which he presented, Nurse Mukamugemanyi recklessly and erroneously concluded that Mr. Taylor had refused his medication. Given that she recorded that Mr. Taylor could not breathe, her notation that he refused to take the medication was clearly misleading and designed to excuse the lack of care given to Mr. Taylor.

84.     Mr. Taylor spent the evening of February 8, 2022, languishing in his cell, suffering from relentless diarrhea, and unable to swallow.

85.     In the early morning hours of February 9, 2022, Denver Health staff throughout the jail were fully aware of and ignored Mr. Taylor's dire medical condition.

86.     At 4:45 a.m., Mr. Taylor again complained to Nurse Mukamugemanyi that he was feeling very weak, nauseous, and was not able to swallow.

87.     Nurse Mukamugemanyi could not obtain Mr. Taylor's blood pressure "due to frequent movements."

88.     Nurse Mukamugemanyi contacted the Charge Nurse, Defendant Isaac Karugu, RN ("Nurse Karagu"), about Mr. Taylor's condition and asked whether Mr. Taylor could be housed in the medical unit, but Nurse Karugu refused to move Mr. Taylor.

89.     For this encounter, DSD Deputy Pachal reported:

13

I was assigned to 5 D as the POD officer on February 9th, in the briefing at 0600 by officer S16080 **I was told that inmate Taylor looked very sick and that the nurse said that inmate Taylor just wanted to come down to 3rd Floor Medical and that his issues have not been addressed**. On my rounds **I did notice that Inmate Taylor did not look good, he seem[ed] delirious, the other inmates were helping him out when he needed to use the bathroom.** I was approached by one of the inmates and he said that this behavior is not normal, he insisted that we talk to a nurse.

90.    For the same encounter, DSD Sergeant McGill reported that she spoke to Nurse Karugu regarding Mr. Taylor. Nurse Karugu informed Sergeant McGill that Dr. Crum had cleared Mr. Taylor even though Mr. Taylor requested to stay in the medical unit.

91.    In other words, Nurse Karugu knew about, but ignored, the reports that Mr. Taylor was delirious, needed help going to the bathroom, and appeared obviously sick.

92.    Nurse Karugu failed to evaluate Mr. Taylor and did not allow him to go to the medical unit for evaluation or treatment.

93.    Nurse Karugu continued Nurse Brokaw and Dr. Crum's deliberately indifferent practice of ignoring Mr. Taylor's obvious need for emergency medical treatment, even in the face of mounting objective proof that Mr. Taylor was in a life-threatening medical emergency.

94.    At approximately 8:24 a.m. on February 9, 2022, Mr. Taylor's cellmate helped him make another call to Mr. Taylor's sister to request her help with getting him the medical care he needed to stay alive. Mr. Taylor struggled to get words out of his mouth, "Tell her – It's emergency – I need to get out of here and go to the hospital. Be-because these guys are not helping me with any . . . [inaudible]."

95.    Mr. Taylor's cellmate had to speak to Mr. Taylor's sister on Mr. Taylor's behalf because he struggled to get the words out.

96.    Mr. Taylor repeated, as slowly and clearly as he could manage, "**I need to come**

14

**out of here and go to the hospital**."

97. The rest of Mr. Taylor's words on this call are difficult to discern and nearly inaudible.

98. Mr. Taylor's cellmate called Mr. Taylor's sister once more that morning and told her, "We've been up all night. I've been up all night with him, and they didn't do nothing for him. And he can't hold no water down. . . . Still, you need to call down here this morning and get on these people because he hasn't drunk, he's tried to drink water and everything, and he can't hold it down."

99. At approximately 11:22 a.m. on February 9, 2022, DSD Deputy Pachal documented Mr. Taylor's need for medical attention. He reported that earlier that morning, at about 10:20 a.m.:

> On my rounds I did notice that Inmate **Taylor did not look good, he seem[ed] delirious, the other inmates were helping him out when he needed to use the bathroom**. I was approached by one of the inmates and he said that this behavior is not normal, he insisted that we talk to a nurse. A nurse happened to be walking in as several inmate [were] talking to me about inmate Taylor, **Nurse Bernice said that her Charge Nurse said that inmate Taylor will not be going to Medical**. **I tried to explain to Bernice that inmate Taylors Hands and Feet are blue, Nurse Bernice said that there is nothing that she can do.** I called Sergeant McGill and told her the situation, Sergeant McGill immediately had Officer Goldsmith respond with a wheelchair, Sergeant McGill and Officer Goldsmith took inmate Taylor to Medical.

100. The Charge Nurse on duty that day to which Deputy Pachal refers was Defendant Nurse Brokaw.

101. Nurse Brokaw actively prevented Mr. Taylor from receiving medical care by refusing to accept him in the medical unit and instructing her subordinates that there was nothing they could or should do for Mr. Taylor.

102. Nurse Brokaw rejected Deputy Panchal's request for Mr. Taylor to receive medical

15

attention, insisting that there was absolutely nothing wrong with him even though he could barely talk, appeared delirious, could not move on his own, was audibly struggling to breathe, and had visibly blue hands and feet.

103.    Mr. Taylor had to run his hands under water to attempt to warm them because he was experiencing severe circulatory problems prior to being escorted back to the medical unit.

104.    Deputy Panchal's report establishes that Denver Health staff summarily dismissed obvious signs of Mr. Taylor's urgent need for medical care and would not provide him with medical care even when DSD Deputies pleaded with them to help Mr. Taylor.

105.    For example, Sergeant McGill reported:

On Wednesday, February 9, 2022, at approximately 1020 hours I was informed by 5D housing Deputy Pachal that Inmate **Taylor's hands and feet were blue and the inmates in 5D felt that he needed more care that was being given**. When I spoke to Charge Nurse Melissa [Brokaw] about Inmate Taylor she explained he was in 3MED last week and Dr. Crum cleared him yesterday. I went to speak to Classification to find out what options would be available for housing Inmate Taylor elsewhere. With Classification out on the floors I asked 3MED Sergeant Dionido if I could bring one down from 5D. He said they had a cell available. Myself and Deputy Goldsmith escorted Inmate Taylor from 5D to 3MED via wheelchair. He was temporarily held in a holding cell by the deputy's desk to be screened by the Doctors again.

At approximately 1345 hours Inmate Taylor was sent back to 5D from 3MED. At approximately 1515 hours I spoke to Charge Nurse Melissa [Brokaw] again regarding Inmate Taylor, **she stated there was nothing wrong with him, he will only get morning and evening medication**.

106.    When Sergeant McGill took Mr. Taylor to the medical unit, none of the Denver Health medical personnel—including Dr. Crum, Nurse Brokaw, and Defendant Nurse Bernice Chaverria Torres ("Nurse Chaverria Torres")—performed any assessment of Mr. Taylor even though he presented with blue hands and feet.

16

107. Dr. Crum merely peaked his head into the cell for less than forty seconds before he walked away.

108. Nurse Brokaw documented that Sergeant McGill requested that Mr. Taylor be housed in 3-medical "because of the disturbance he was creating in the pod."

109. The "disturbance" Nurse Brokaw referred to involved other prisoners pleading for medical help on Mr. Taylor's behalf. There was no actual disturbance. Sergeant McGill did not state that Mr. Taylor's behavior was causing a disturbance.

110. Nurse Brokaw falsely noted that Mr. Taylor was not reporting any medical issues to Sergeant McGill. Nurse Brokaw also noted that Dr. Crum cleared Mr. Taylor to return to the general population unit.

111. Nurse Chaverria Torres also noted that "Dr. Crum denied [Mr. Taylor] to stay in the current [medical] pod."

112. Mr. Taylor was obviously in the throes of a worsening medical emergency and desperately needed to be hospitalized. That Mr. Taylor was dehydrated, unable to breathe, and extremely ill were obvious to both DSD staff and prisoners. It was also obvious to the medical staff who continued to act with extreme deliberate indifference by refusing to provide him medical care while he suffered to death in jail on Denver Health medical staff's watch.

113. Dr. Crum, Nurse Brokaw, Nurse Chavarria Torres, Nurse Karugu, and other Denver Health Staff continued to abdicate their roles as medical caregivers and gatekeepers by refusing to send Mr. Taylor to the hospital where he could receive the emergency medical care he obviously and desperately needed. These failures trickled down from the highest chain of command and prove all of Dr. Crum and Nurse Brokaw's subordinates were deliberately indifferent to Mr.

17

Taylor's obvious need for immediate medical intervention.

114. For approximately five hours, Mr. Taylor stayed alone in the medical unit cell, dying painfully, without any observation or medical treatment by Denver Health medical staff.

115. Dr. Crum failed to so much as go into the cell to check Mr. Taylor's vital signs but nonetheless ordered Mr. Taylor to return to the general population unit at approximately 10:00 a.m.

116. Because Dr. Crum ordered that Mr. Taylor be returned to the general population unit, DSD staff had no choice but to return him to his cell in a wheelchair.

117. Upon his final return to his cell, Mr. Taylor told his cellmate that he did not receive medical care in the medical unit.

118. The other people housed in Mr. Taylor's general population unit were shocked, as were many of the deputies working in Mr. Taylor's pod.

119. Mr. Taylor's cellmate again called Mr. Taylor's sister to report that nothing was being done for Mr. Taylor by the medical staff.

120. Denver Health repeatedly and falsely declared that there was nothing wrong with Mr. Taylor despite his severe symptoms—which were obvious to other people in the general population unit.

121. These symptoms included blue hands, blue feet, noticeable weight loss, severe diarrhea, severe dehydration partly due to his severe diarrhea, trouble breathing, inability to move, inability to walk, inability to swallow, multiple days of severe vomiting, and more than a week of difficulty breathing, among other symptoms.

122. Less than an hour after Dr. Crum, Nurse Brokaw, and Nurse Chavarria Torres

carelessly determined that nothing was wrong with Mr. Taylor, and Dr. Crum cleared him to return to the general population without any medical evaluation, Mr. Taylor fell out of his bunk onto the floor of his cell.

123. DSD Deputy Kukoyi responded to Mr. Taylor's cell and announced a medical emergency over the radio at 4:06 p.m.

124. DSD Sergeant McGill and DSD Deputy West were the first to respond to Mr. Taylor's cell.

125. According to Sergeant McGill, she found Mr. Taylor lying on his side, unresponsive, and cold to the touch.

126. Mr. Taylor was not breathing.

127. Sergeant McGill and Deputy West began to perform emergency CPR on Mr. Taylor.

128. At the same time and over the next several minutes, numerous DSD employees flooded the area.

129. Once a medical emergency had been declared, prisoners and DSD staff alike expressed their frustration with medical staff not helping Mr. Taylor:

> a. **"We've been trying to get him saved all day."**
>
> b. **"This not the first time, this not the second time. This is the third time, and these medical staff said 'fuck him.'"**
>
> c. **"These medical staff and that doctor – fucked that man over, bro. We tried to save him on more than three occasions."**
>
> d. **"If y'all have any type of – soul – I'm talking man to man. Bro, they killed that man. . . I was here. . . them doctors said 'fuck him,' man . . . they said 'fuck him,' man. That's why this pod is up in an uproar."**

19

e.  Sergeant McGill stated that "she was confident that the medical staff at the DDC could have done a lot more to help Taylor. Sergeant McGill [stated that] medical personnel had done very little to assist him or move him to another unit."

f.  Christopher Wasnak, Willie Williams, and Floyd Kirkendall (prisoners who cared for Mr. Taylor) were all in Mr. Taylor's unit and observed Mr. Taylor's health rapidly decline in the week before his death. Mr. Wasnak reported that the day Mr. Taylor died, he could barely speak. Mssrs. Kirkendall, Williams, and Wasnak each stated that Mr. Taylor had been seen twice in two days by medical personnel at the jail, and nothing had been done for him.

g.  "The inmates kept asking for help for Mr. Taylor. At one point Mr. Taylor was in so much pain, he wanted [his cellmate] to step on his stomach, which he refused to do."

130.  Another prisoner explained to Captain Givens, "Listen Captain, this is not the first time, sir, they sent him back, this ain't the second time, **this is the third time – the third time that this medical staff said, 'fuck you.'**"

131.  At approximately 4:16 p.m., paramedics from Denver Health arrived and took over Mr. Taylor's medical care, including performing CPR and using a defibrillator on Mr. Taylor's chest.

132.  Emergency life-saving procedures were unsuccessful, and Mr. Taylor died in his cell.

133.  According to the results of his eventual autopsy, Mr. Taylor "died as a result of hypertensive and atherosclerotic cardiovascular disease. Contributing factors were pulmonary emphysema [and] chronic renal failure."

134.  While it is clear from numerous witness accounts that Mr. Taylor died at the at the jail in his cell, he was not pronounced dead until after he had been transported to the hospital.

135.  As a paramedic noted in Mr. Taylor's chart, "Given lack of pts response to CPR,

20

ending rhythm, and final end tidal CO2, I would traditionally have called for a pronouncement."

136. Still, DSD officials informed Mr. Taylor's family, in particular his sister, that Mr. Taylor had passed away at the hospital.

137. Mr. Taylor's short stay in jail turned into an agonizing, prolonged, and unconstitutional death sentence resulting from the deliberate indifference of Individual Defendants and Denver Health.

138. The Estate of Leroy Taylor has suffered significant damages, entitling it to recover compensatory and special damages, including for death, loss of enjoyment of life, loss of relationships, pain and suffering before death, loss of earnings based upon the probable duration of his life, and other damages, all in amounts to be proven at trial.

139. The estate of Leroy Taylor is entitled to compensation for all his extensive pre-mortem suffering. The final weeks of Mr. Taylor's life were dominated by preventable suffering that resulted in a painful and slow death. There were days and days of missed opportunities and "warnings" that his condition was deteriorating, from abnormal vital signs to his ongoing progressive complaints about his symptoms to warnings from other people housed in the general population unit.

140. Nothing in Mr. Taylor's documented medical records indicates that he ever received appropriate evaluations or testing to determine the causes of his ongoing deadly deterioration.

**Allegations Relating Denver and Denver Health's Unconstitutional Training, Policies, Practices, and Customs**

141. At all relevant times, Denver contracted with Denver Health to provide medical care and services to people jailed at DDC.

142.    Denver Health maintained constitutionally deficient policies at DDC and failed to adequately train and supervise its employees with respect to proper procedures for the evaluation and treatment of prisoners' serious medical needs.

143.    It is a common and recurring need in all jails that prisoners have medical conditions that require timely transport to hospitals for higher level assessment and higher acuity care.

144.    Evaluating and addressing the needs of prisoners with symptoms of chest pain, vomiting and diarrhea, abnormal vital signs, mental status changes, extremity discoloration, as well as associated medical conditions, is a usual and recurring task for Denver Health medical personnel in the DDC.

145.    Individual Defendants abandoned Mr. Taylor while he was suffering from an obvious medical crisis, recklessly determined that he should be housed in the general population without monitoring on approximately three separate occasions and recklessly failed to send him to the hospital no matter how sick he became, causing him to die alone in his cell. They did not obtain higher level evaluation and made reckless medical decisions.

146.    Even after Mr. Taylor's hands and feet turned blue and DSD felt compelled to bring him to the medical staff, Individual Defendants continued to follow their deliberately indifferent plan of refusing to provide emergency treatment. They all did this pursuant to Denver Health's custom of completely disregarding subjective complaints of prisoners.

147.    Each of the Individual Defendants violated Mr. Taylor's constitutional right to be free from deliberate indifference to his medical needs in essentially the same unconstitutional manner—failing to treat his significant medical problems, ignoring life-threatening symptoms, dismissing symptoms, and failing to refer him for higher level evaluation and treatment despite

22

knowing that failing to do so put him at significant risk of serious illness or death.

148.    Denver Health did not take any immediate corrective action against any Individual Defendant in response to Mr. Taylor's death. The only Denver Health staff to face any consequences for their indifference towards Mr. Taylor's dire medical condition was Nurse Brokaw, who had her access to the jail personally revoked by DSD Sheriff Elias Diggins.

149.    Defendant's woefully inadequate treatment of Mr. Taylor was pursuant to Denver and Denver Health's customs, policies and/or practices of unlawful conduct, including:

    a.  Taking a "wait and see" approach to providing medical care to people in prison who are suffering from obvious, serious medical needs that require immediate attention;

    b.  Failing to provide care based on automatic assumptions that prisoners, particularly Black prisoners, are lying about, faking, or exaggerating their symptoms;

    c.  Failing to provide care due to prioritizing convenience over necessary medical treatment;

    d.  Failing to discipline jail medical personnel, or even find that the jail medical personnel engaged in wrongdoing, in the face of obvious constitutional violations (thereby ensuring that medical personnel would repeatedly, and customarily, violate the constitutional rights of prisoners);

    e.  Failing to adequately train their jail medical providers; and

    f.  Failing to adequately staff its detention facilities.

150.    Pursuant to these customs, policies and/or practices Denver Health medical personnel delay necessary medical care for the people housed in the jail, causing them suffering, harm, and irreparable damage. Denver Health medical personnel customarily ignore prisoners' requests for medical care until it is too late.

151.    These customs, policies, and/or practices have caused Denver Health medical

23

personnel to provide deliberately indifferent medical care and have resulted in prisoner deaths, serious injuries, and unnecessary pain, suffering, humiliation, and emotional trauma.

152. The following examples are representative of Denver Health's customs, policies, and practices of: (1) taking a "wait and see" approach to providing medical care to prisoners who are suffering from obvious, serious medical needs that require immediate attention; (2) failing to provide care based on automatic assumptions that prisoners are lying about, faking, or exaggerating, their symptoms; (3) failing to provide care due to prioritizing convenience over necessary medical treatment. These customs, policies, and practices are caused, in whole or at the very least in part, by Denver and Denver Health's failure adequately train or to discipline officers and nurses or find them to have engaged in wrongdoing in the face of obvious constitutional violations.

153. In November 2015, Denver Health medical care providers were deliberately indifferent to the serious medical needs of Michael Marshall. Mr. Marshall was arrested and booked at DDC for the minor, non-violent offense of trespassing. He was held on just $100 bond. Mr. Marshall was homeless, 50 years old, 5′4″ tall, and weighed just 112 pounds at the time. On the evening of November 11, 2015, while Mr. Marshall was suffering from a non-violent mental health crisis, Denver deputies responded by forcibly restraining him. As Mr. Marshall choked and aspirated on his own vomit and lost consciousness, Denver Health medical personnel refused to provide him life-saving medical care. They instead strapped Mr. Marshall's limp body into a restraint chair and further restricted his breathing with a spit mask. Mr. Marshall was eventually taken to Denver Health Hospital, where he died because of DSD's excessive force and Denver Health medical personnel's failure to provide him with the medical care that he so obviously and

desperately needed. The Denver Coroner determined that Mr. Marshall's death was a homicide. The homicide of Michael Marshall provides yet another example of Denver's intractable custom, pattern, and practice of deliberate indifference to the constitutional rights of its citizens and Denver Health's failure to adequately train, supervise, and discipline jail medical providers regarding deliberate indifference to the obvious serious medical needs of prisoners/detainees.

154.    In October 2014, Denver Health medical personnel were deliberately indifferent to the serious medical needs of George Moore. Mr. Moore was arrested on October 9, 2014, and brought to intake at the DDC. During intake, Mr. Moore met with Denver Health Nurse Zimmer and informed her that he needed a cane or walker because of his stability issues. He further informed Nurse Zimmer that he was in tremendous pain standing up, sitting down, and walking, and that he was disabled as defined in Title II of the Americans with Disabilities Act. Nurse Zimmer told Mr. Moore she did not have time to verify his request because she had forty other prisoners to deal with and that he would have to "deal with it" upstairs on the floor where he would be staying. Mr. Moore asked to see Nurse Zimmer's supervisor, but Nurse Zimmer responded that her supervisor would also tell him to address his concerns upstairs. When Mr. Moore was moved upstairs that evening, a deputy informed him that medical was closed and he would not be allowed to see them at that time. The next day, Mr. Moore's left hip gave out and he collapsed to the floor, causing additional pain to his hip, groin, and lower back. Denver Health medical staff did not provide Mr. Moore with a walker until three hours after he fell. After falling, Mr. Moore consistently requested medical attention for his hip, but was denied any further medical attention until two months later. The doctor he saw outside the jail put in an order for Mr. Moore to get hip surgery, but medical staff at the DDC refused to schedule Mr. Moore for surgery because he was

25

a pretrial detainee, not serving a sentence. He never received surgery. Upon information and belief, no Denver Health medical staff was disciplined for their failure to provide constitutional care to Mr. Moore.

155.    In July 2012, Denver Health medical personnel were deliberately indifferent to the serious medical needs of Rebecca Trujillo. While in the Denver County Jail, Ms. Trujillo suffered a serious spinal cord injury. Despite exhibiting obvious, serious signs of a spinal cord injury, including chronic pain, loss of control of bowel movements, slowed speech, altered gait, and reduced ability to use her hands and legs, Denver Health medical personnel failed to ensure that Ms. Trujillo was provided with appropriate medical care. Following Ms. Trujillo's release, she received surgery for her spinal injuries and her surgeon told her that her injuries were exacerbated by Denver Health medical personnel's failure to ensure she was provided with appropriate medical treatment. Upon information and belief, no Denver Health nurse was disciplined for their failure to provide constitutional care to Ms. Trujillo.

156.    On July 9, 2010, Denver Health medical care providers were deliberately indifferent to the serious medical needs of Marvin Booker. Mr. Booker was killed in DDC, after five DSD deputies piled on top of him and implemented multiple use of force techniques on him simultaneously. Two Denver Health nurses witnessed much of the deputies' interaction with Mr. Booker, including the use of the carotid chokehold and taser but left the scene during the physical restraint to attend to some unrelated paperwork. The nurses had to be summoned three times before they were willing to provide any medical assistance whatsoever to Mr. Booker. At least one nurse testified that Mr. Booker was "acting like" he was unconscious, and another nurse stated in her IAB interview that prisoners pretend like they are unresponsive to get attention. None of the

26

Denver Health medical personnel involved in the death of Mr. Booker were disciplined for the failure to provide constitutional care to Mr. Booker. A jury returned a verdict of $4.65 million, finding that Denver deputies had violated Mr. Booker's constitutional rights. Prior to trial, Denver stipulated to *Monell* liability, and Denver Health settled claims against it.

157.    These cases provide only representative examples of the rampant deliberate indifference to serious medical needs by Denver Health medical personnel, and the lack of adequate training or supervision on the part of the Denver and Denver Health to prevent these dangerous and unlawful patterns of conduct.

158.    The lawsuits and other incidents involving deliberate indifference to serious medical needs and cover ups identified above are illustrative of the culture and customs, policies, and practices that existed during the incident outlined in this Complaint, were the result of Denver Health's conscious and deliberate policy choices and were the moving force behind the injuries inflicted on Mr. Taylor.

159.    The cases set forth above are by no means the only examples of Denver's culture of unconstitutional disregard for people housed in DDC's wellbeing and safety.

160.    Denver Health's unconstitutional conduct toward Mr. Taylor is also part of a larger custom, policy, and practice of racial discrimination and disparate healthcare treatment for Black patients. Indeed, racial discrimination permeates healthcare systems, leading to worse outcomes for Black individuals due to medical personnel neglecting, disbelieving, or actively discriminating against patients. That is precisely what Denver Health did here and in many other cases.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Eighth Amendment – Failure to Provide Medical Care and Treatment
### (Against All Defendants)

161.    Plaintiff Estate hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

162.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

163.    Mr. Taylor was a citizen of the United States and Individual Defendants are persons under 42 U.S.C. § 1983, who at all times relevant to this claim, were acting under color of state law in their actions and inactions.

164.    Mr. Taylor was a convicted prisoner.

165.    As a prisoner, Mr. Taylor was protected under the Eighth Amendment from unnecessary and wanton infliction of harm, including deliberate indifference to serious medical needs.

166.    Each Individual Defendant knew or should have known of the high risk to Mr. Taylor's life given the severity of the symptoms he was experiencing and the dangerous consequences of not properly treating that medical condition.

167.    Nevertheless, with deliberate indifference to Mr. Taylor's constitutional right not to be denied necessary medical care, each Individual Defendant failed properly to examine, monitor, treat, and care for Mr. Taylor. Each Individual Defendant so failed despite their

28

knowledge of Mr. Taylor's serious medical needs, placing him at risk of substantial physical injury.

168.    The actions and omissions of each Individual Defendant were conducted within the scope of their official duties and employment.

169.    The actions and omissions of each Individual Defendant were the legal and proximate cause of Mr. Taylor's injuries and death.

170.    The actions or omissions of each Individual Defendant caused Mr. Taylor damages in that he suffered significant physical and mental pain as his condition worsened.

171.    The actions or omissions of the Individual Defendants as described herein intentionally deprived Mr. Taylor of his right to be free of cruel and unusual punishment and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused him other damages.

172.    All of the Individual Defendants named in this Complaint personally participated in the constitutional deprivations described herein.

173.    Individual Defendants, as private actors working in a jail, are not entitled to qualified immunity.

174.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, prejudgment interest and costs as allowable by federal law.

175.    Plaintiff is also entitled to punitive damages against these Defendants, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

## SECOND CLAIM FOR RELIEF
**42 U.S.C. § 1983—Unconstitutional Policies, Customs, Trainings, and Failure to Supervises**
(Denver Health)

176.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

177.    At all times relevant to this claim, Denver Health Defendants were acting under the color of state law as the functional equivalent of a municipality providing medical care to prisoners.

178.    Denver Health Defendants' deliberately indifferent policies, customs, and practices as described herein were moving forces and proximate causes of the violation of Mr. Taylor's constitutional rights.

179.    Denver Health Defendants were on general notice that their deliberately indifferent policies, which include those incentivizing not providing life-saving medical care, would result or had resulted in a pattern of not sending prisoners with serious medical needs to obtain necessary emergency services.

180.    Denver Health Defendants knew or should have known that their policy of not requiring medical staff to check on, stabilize, treat and/or hospitalize prisoners suffering from obvious life-threatening conditions would result in a failure to provide prisoners with medical care and treatment.

181.    Further, Denver Health Defendants failed properly to train and supervise their employees to provide medical care when needed to detainees at the DDC.

182.    Alarming deficiencies in screening, monitoring, and the adequate delivery of medical care were identified and otherwise known to Denver Health for years prior to Mr. Taylor's death.

30

183.    Denver Health Defendants knew or should have known that their failure to train and supervise their employees would cause such employees to fail to provide necessary medical assessment and care, in violation of detainees' constitutional rights.

184.    Denver Health Defendants' failure to train and supervise their employees was a moving force and proximate cause of the violation to Mr. Taylor's constitutional rights.

185.    The policies, customs, and practices of Denver Health Defendants as described herein deprived Mr. Taylor of his rights, privileges, liberties, and immunities secured by the United States Constitution, and caused him other damages.

186.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest, and costs as allowable by federal law. Plaintiff is also entitled to punitive damages against these Defendants, in that their actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in their favor and against each of the Defendants, and award Plaintiff all relief allowed by law, including but not limited to the following:

(a)  All appropriate relief at law and equity;

(b)  Declaratory relief and other appropriate equitable relief;

(c)  Economic losses on all claims as allowed by law;

(d)  Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

31

(e) Punitive damages on all claims allowed by law and in an amount to be determined at
trial;

(f) Attorneys' fees and the costs associated with this action, including expert witness fees,
on all claims allowed by law;

(g) Pre- and post-judgment interest at the appropriate lawful rate; and

(h) Any further relief that this court deems just and proper, and any other relief as allowed
by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted December 12, 2023.

RATHOD | MOHAMEDBHAI LLC

*s/ Ciara M. Anderson*
Ciara M. Anderson
Matthew Cron
Qusair Mohamedbhai
Edward C. Hopkins Jr.
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400 (p)
(303) 578-4401 (f)
ca@rmlawyers.com
mc@rmlawyers.com
qm@rmlawyers.com
eh@rmlawyers.com

CHRISTOPHER K. GILBERT, ESQ., LLC

*s/ Christopher K. Gilbert*
Christopher K. Gilbert
cgilbert@gilbert-law.com

*Attorneys for Plaintiff*