IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:23-cv-02355-CNS-KAS

ESTATE OF LEROY "NICKY" TAYLOR;
DEREK Z. TAYLOR, as Personal Representative and heir of Estate of Leroy Taylor; and
SHAWN HERRON, as heir of Leroy Taylor,

       Plaintiffs,

v.

DENVER HEALTH AND HOSPITAL AUTHORITY, a political subdivision of the State of
Colorado;
PETER CRUM, M.D., in his individual capacity;
MELISSA BROKAW, RN, in her individual capacity;
BERNICE CHAVARRIA TORRES, LPN, in her individual capacity;
ISAAC KARUGU, RN, in his individual capacity;
ALICE MUKAMUGEMANYI, LPM; and
JOHN DOES 1-20, in their individual and official capacities,

       Defendants.

---

## ORDER

---

      Before the Court is Defendants' Motion to Dismiss First Amended Complaint, filed

by Denver Health and Hospital Authority and the individual Defendants: Peter Crum,

M.D.; Melissa Brokaw, RN; Bernice Chavarria Torres, LPN; Isaac Karugu, RN; and Alice

Mukamugemanyi, LPN, all in their individual capacities. ECF No. 36. For the following

reasons, the motion to dismiss is DENIED.

## I.  BACKGROUND[1]

### A. Mr. Taylor's Death

Leroy "Nicky" Taylor experienced significant illness in the Downtown Denver Van Cise-Simonet Detention Center (DDC) that ultimately led to his death on February 9, 2022, at the age of 71. Plaintiffs allege that his death was the result of medical negligence on the part of the Denver Health and Hospital Authority (Denver Health) and the doctors and nurses responsible for providing care to Mr. Taylor (the individual Defendants).

Mr. Taylor was serving a 90-day sentence at the DDC that began on November 7, 2021. ECF No. 33, ¶ 16. Around January 24, 2022, Mr. Taylor tested positive for COVID-19. *Id.*, ¶ 17. His case was deemed a "resolved positive" COVID-19 case five days later. *Id.*, ¶ 18. He was housed in a general population unit. *Id.*, ¶ 19. On February 2, several prisoners in the unit reported to Denver Sheriff's Department (DSD) Deputy Robert Ortiz that Mr. Taylor was extremely sick and was experiencing diarrhea and vomiting, and Deputy Ortiz requested medical attention for Mr. Taylor. *Id.*, ¶¶ 21–22. Nurse Nikia Rabon evaluated Mr. Taylor soon after and recorded his symptoms: he was vomiting, making bowel movements on himself, and swallowing his sputum, which made him have the urge to continually vomit; he also generally appeared ill. *Id.*, ¶¶ 22–23. Mr. Taylor was also experiencing chest pains. *Id.*, ¶ 32. Mr. Taylor reported that he had been experiencing these symptoms for two days. *Id.*, ¶ 24.

---

[1] The background facts are taken from the well-pleaded allegations in the First Amended Complaint and Jury Demand. ECF No. 33. For purposes of this motion, the Court accepts as true, and views in the light most favorable to Plaintiffs, all factual allegations contained in the complaint. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

Nurse Rabon knew that Mr. Taylor had recently tested positive for COVID-19 and informed the on-site doctor, Defendant Peter Crum, M.D., of Mr. Taylor's symptoms. *Id.*, ¶ 27. Mr. Taylor also had a blood pressure of 168/73 and a heart rate of 125 bpm. *Id.*, ¶ 33. Mr. Taylor was transferred to the medical unit. *Id.*, ¶ 28. He was given medication to treat nausea and vomiting but was not given a specific cardiovascular evaluation or medication to treat his chest pains. *Id.*, ¶ 31.

Dr. Crum ordered Denver Health staff to check Mr. Taylor's vital signs and to call him if anything was abnormal.[2] *Id.*, ¶¶ 34, 37. Because Dr. Crum directed that Nurse Rabon and Nurse Weir call him if anything was abnormal, and they did not, Plaintiffs allege that either Nurses Rabon and Weir failed to identify Mr. Taylor's abnormal vital signs and did not call Dr. Crum, or that Dr. Crum was notified about Mr. Taylor's vital signs and failed to act reasonably. *Id.*, ¶ 38.

On February 4, 2022, Mr. Taylor continued to experience persistent vomiting and diarrhea (there are no notes in his medical records about his condition on February 3). *Id.*, ¶¶ 40–41. Additionally, Mr. Taylor's breathing had "audibly decreased" and he had lost his ability to swallow. *Id.*, ¶ 43. Because he had trouble swallowing, it was difficult for him to take his medication and to stay hydrated. *Id.* Plaintiffs allege that Denver Health medical staff knew that Mr. Taylor had difficulty swallowing and taking medications, yet did not change his course of treatment or further evaluate him. *Id.*, ¶ 44. Also on February 4, a physician assistant recommended that Mr. Taylor continue taking prescribed medications for nausea and diarrhea, and recommended a chest x-ray. *Id.*, ¶ 45.

---

[2] Dr. Crum did not record any notes about Mr. Taylor. *Id.*, ¶ 37.

Defendant Melissa Brokaw, RN acknowledged Mr. Taylor's treatment plan at 4:34 p.m. *Id.*, ¶ 46. At this point, Mr. Taylor could not swallow the medication that he was given, but Denver Health staff did not change his course of treatment. *Id.*, ¶ 44. Later that day, Mr. Taylor called his family and told them he was "extremely sick" and could not swallow his medications. *Id.*, ¶ 47.

On February 5, at around 8:00 a.m., Nurse Brokaw assessed Mr. Taylor and recorded that he had a pulse of 101, oxygen saturation of 96%, and blood pressure of 121/55, which indicates hypotension. *Id.*, ¶ 52.

On February 6, Mr. Taylor submitted a written request for Tylenol because of "a very bad headache," which Plaintiffs allege also signals his "deteriorating and perilous" medical condition. *Id.*, ¶ 53. The nurse who provided Mr. Taylor with Tylenol noted that he had ongoing aches but was not experiencing any distress, so the nurse encouraged him to stay hydrated. *Id.*, ¶ 54. Plaintiffs claim that this note was incorrect in stating that Mr. Taylor was not experiencing distress; rather, Mr. Taylor was experiencing severe distress because of his persistent nausea, diarrhea, and difficulty swallowing. *Id.*, ¶ 55.

On February 7, Mr. Taylor received the chest x-ray that the physician assistant had ordered on February 4. *Id.*, ¶ 56. Dr. Victor Anaya-Baez recommended that Mr. Taylor receive a computerized tomography (CT) scan, based on the x-ray results. *Id.*, ¶ 57. At the time, Mr. Taylor reported having shortness of breath and had an audible cough. *Id.*, ¶ 58. Because of these symptoms and the results of the chest x-ray, Plaintiffs allege that a CT scan should have been done immediately, along with several other tests. *Id.*, ¶¶ 58–59. Mr. Taylor never received the recommended CT scan nor any other medical care. *Id.*,

¶ 60. Plaintiffs allege that "any reasonably trained and conscientious medical professional would have recognized that Mr. Taylor was in a life-threatening medical crisis that required immediate emergency medical care," and that Denver Health staff "knew or should have known that Mr. Taylor required care and evaluation by a more qualified medical professional, and he needed to go to the emergency room." *Id.*, ¶¶ 59, 63.

Multiple phone calls convey Mr. Taylor's medical distress. He called his public defender on February 7 and left a "barely audible" voicemail, saying

> Um, good morning, Ms. Douglas, I need your help again. It's Leroy Taylor. I just got out of the hospital. They sent me to this hospital [the jail's medical unit]. And I tried to – make them – to keep – keep – me there, because three medical – guess you got a lot of people to take care of – **I need to get out of here before I die**. I – I will – if you can arrange it for me to get out of here and go to my own doctor, [rather] than stay in here, I will promise you and the judge to finish my sentence. I only have [cough] 13 days, then I wake up. And uh – then I'm done. But, they keep on putting all these coughing and sick people [cough], in my cell . . . **I've been sick, I've been sick for ten days. And I don't feel any better.** I guess they got a of people to – [gasp] take care of . . . Anyway, could you set up a video visit, and if you talk to the judge or whatever . . . If you could set up a video, **see if the judge will allow me to go out of here to the hospital, see my own doctor, let me know, please. I feel like I'm dying in here [gasp].** There's only so much time in a day [gasps]. And – the nurses are probably overwhelmed. Please get in touch with me. Thank you. **I'm real sick**. Have a blessed day. Bye. Or you can call my sister too.

*Id.*, ¶¶ 67, 70 (emphasis in complaint). Ms. Douglas, his public defender, immediately filed a motion requesting Mr. Taylor's emergency release. *Id.*, ¶ 68.

Mr. Taylor also called his sister the same day. In the call recording, Mr. Taylor's voice is "strained," and he can be heard coughing and retching. *Id.*, ¶ 69. On February 8,

Mr. Taylor called his sister again, and Plaintiffs state that the recording of that call "proves Mr. Taylor's condition had significantly worsened since their previous call." *Id.*, ¶ 70. His voice is "strained, quiet, and inaudible at times." *Id.*, ¶ 71. He "gasps, chokes, and coughs" throughout the call. *Id.* Plaintiffs include the following excerpts from the call:

| | |
|---|---|
| SISTER: | How are you? |
| MR. TAYLOR: | I'm worse. |
| SISTER: | You're worse? |
| MR. TAYLOR: | Yeah. Because – **I can't get no help down here.** [I've had] diarrhea – for fourteen hours. They said they couldn't help me. Hello? |
| SISTER: | They said they could not help you? |
| MR. TAYLOR: | Right. They're stretched out. So, I have to grin and bear it. |
| | . . . . |
| MR. TAYLOR: | I am so miserable. I can't eat anything. I got diarrhea. And they don't give a fuck. |
| SISTER: | It sounds like you need to be back in the hospital. |
| MR. TAYLOR: | I need to be – somewhere. **I feel like I'm going to die.** |
| SISTER: | How is your chest? |
| MR. TAYLOR: | It's hurting. **Everything is hurting** |

*Id.* (emphasis in complaint). His family and his attorney repeatedly attempted to get him medical care. *Id.*, ¶ 72. Instead, on February 8, at around 2:25 p.m., Dr. Crum cleared Mr. Taylor to return to the general population unit. *Id.*, ¶¶ 73–74. Pursuant to that order, Nurse Brokaw recommended that he be transferred, and so Mr. Taylor was transferred back to the general population unit. *Id.* By then, he was too infirm to use the phone on his own, so his cellmate, Mr. Pierce, called Mr. Taylor's sister to tell her that "no one was helping Mr. Taylor, and she needed to call the jail so that Mr. Taylor could get medical attention." *Id.*, ¶¶ 76–77. He described Mr. Taylor as "very, very sick" and "in a bad way." *Id.*, ¶ 77. He then told sheriff deputies that Mr. Taylor needed to be housed in a medical unit where

he could be monitored, but the jail staff refused to move him back to the medical unit because he had been cleared to return to general population. *Id.*, ¶ 78.

Around 6:00 p.m. on February 8, Mr. Taylor's sister went to the DDC and spoke with deputies, expressing her worries about Mr. Taylor's health because she feared that medical staff were ignoring his obvious medical crisis. *Id.*, ¶ 79. None of the Denver Health medical staff escalated Mr. Taylor's medical care. *Id.*, ¶ 80.

Also on February 8, at around 11:16 p.m., Mr. Taylor complained to Defendant Alice Mukamugemanyi, LPN, that he was having difficulty breathing and was unable to swallow. *Id.*, ¶ 81. Nurse Mukamugemanyi encouraged Mr. Taylor to wear a mask, use proper hand hygiene, and drink plenty of fluid. *Id.*, ¶ 82. Plaintiffs allege that Nurse Mukamugemanyi's notes "disregarded Mr. Taylor's complaints" and "recklessly and erroneously" concluded that Mr. Taylor had refused his medication. *Id.*, ¶¶ 82–83. Nurse Mukamugemanyi also recorded that he could not breathe, so Plaintiffs allege that her notation that he refused to take his medication was "clearly misleading and designed to excuse the lack of care given to Mr. Taylor." *Id.*, ¶ 83.

Mr. Taylor continued to suffer from relentless diarrhea and was unable to swallow throughout the evening of February 8. *Id.*, ¶ 84. Plaintiffs allege that, by February 9, Denver Health staff were "fully aware of and ignored" Mr. Taylor's "dire" medical condition. *Id.*, ¶ 85. At 4:45 a.m., Mr. Taylor complained to Nurse Mukamugemanyi that he was feeling "very weak, nauseous, and was not able to swallow." *Id.*, ¶ 86. Nurse Mukamugemanyi could not take Mr. Taylor's blood pressure, noting that it was due to "frequent movements." *Id.*, ¶ 87. Nurse Mukamugemanyi contacted the Charge Nurse,

Defendant Isaac Karugu, RN, and asked whether Mr. Taylor could be housed in the medical unit. *Id.*, ¶ 88. Nurse Karugu refused to move Mr. Taylor. *Id.*

Numerous prison staff members reported Mr. Taylor's deteriorating medical condition. DSD Deputy Pachal reported the following about Mr. Taylor:

> I was assigned to 5 D as the POD officer on February 9th, in the briefing at 0600 by officer S16080 **I was told that inmate Taylor looked very sick and that the nurse said that inmate Taylor just wanted to come down to 3rd Floor Medical and that his issues have not been addressed**. On my rounds **I did notice that Inmate Taylor did not look good, he seem[ed] delirious, the other inmates were helping him out when he needed to use the bathroom.** I was approached by one of the inmates and he said that this behavior is not normal, he insisted that we talk to a nurse.

*Id.*, ¶ 89 (emphasis in complaint). Similarly, DSD Sergeant McGill reported that she spoke to Nurse Karugu, and that Nurse Karugu told Sergeant McGill that Dr. Crum had cleared Mr. Taylor even though Mr. Taylor requested to stay in the medical unit. *Id.*, ¶ 90. Plaintiffs allege that DSD Sergeant McGill's report indicates that Nurse Karugu knew about, and ignored, the reports that Mr. Taylor was delirious, needed help going to the bathroom, and appeared obviously sick. *Id.*, ¶ 91. Nurse Karugu also failed to evaluate Mr. Taylor and did not allow him to go to the medical unit for treatment or evaluation. *Id.*, ¶ 92. Plaintiffs allege that Nurse Karugu's inaction also demonstrated deliberate indifference to Mr. Taylor's obvious need for emergency medical treatment. *Id.*, ¶ 93.

Around 8:24 a.m. on February 9, Mr. Taylor's cellmate helped him call his sister again. *Id.*, ¶ 94. Mr. Taylor told his cellmate, with difficulty getting his words out, to tell his sister "it's emergency—I need to get out of here and go to the hospital. Be-because these guys are not helping me with any . . ." *Id.*, ¶¶ 94–95. Mr. Taylor's words in the rest of the

call are inaudible. *Id.*, ¶ 96. In another call with Mr. Taylor's sister, his cellmate said,

"We've been up all night. I've been up all night with him, and they didn't do nothing for

him. And he can't hold no water down. . . . Still, you need to call down here this morning

and get on these people because he hasn't drunk, he's tried to drink water and everything,

and he can't hold it down." *Id.*, ¶ 98.

> At 11:22 a.m., Deputy Pachal reported that

> > On my rounds I did notice that Inmate **Taylor did not look good, he seem[ed] delirious, the other inmates were helping him out when he needed to use the bathroom**. I was approached by one of the inmates and he said that this behavior is not normal, he insisted that we talk to a nurse. A nurse happened to be walking in as several inmate [were] talking to me about inmate Taylor, **Nurse Bernice said that her Charge Nurse said that inmate Taylor will not be going to Medical**. **I tried to explain to Bernice that inmate Taylors Hands and Feet are blue, Nurse Bernice said that there is nothing that she can do.** I called Sergeant McGill and told her the situation, Sergeant McGill immediately had Officer Goldsmith respond with a wheelchair, Sergeant McGill and Officer Goldsmith took inmate Taylor to Medical.

*Id.*, ¶ 99 (emphasis in complaint).

Nurse Bernice is, presumably, Defendant Bernice Chaverria Torres, LPN. The

Charge Nurse at the time was Nurse Brokaw. *Id.*, ¶ 100. Nurse Brokaw rejected Deputy

Pachal's request for medical care for Mr. Taylor, stating that there was nothing wrong with

him. *Id.*, ¶ 102. At the time, Mr. Taylor could barely talk, appeared delirious, could not

move on his own, was audibly struggling to breathe, had visibly blue hands and feet, and

was experiencing circulatory problems, to the point that he ran his hands under water to

warm them up. *Id.*, ¶¶ 102–03. Plaintiffs allege that Nurse Brokaw "actively prevented Mr.

Taylor from receiving medical care by refusing to accept him in the housing unit and

instructing her subordinates that there was nothing they could or should do for Mr. Taylor.

*Id.*, ¶ 101.

Sergeant McGill also made a report about Mr. Taylor on February 9:

> On Wednesday, February 9, 2022, at approximately 1020 hours I was informed by 5D housing Deputy Pachal that Inmate **Taylor's hands and feet were blue and the inmates in 5D felt that he needed more care that was being given**. When I spoke to Charge Nurse Melissa [Brokaw] about Inmate Taylor she explained he was in 3MED last week and Dr. Crum cleared him yesterday. I went to speak to Classification to find out what options would be available for housing Inmate Taylor elsewhere. With Classification out on the floors I asked 3MED Sergeant Dionido if I could bring one down from 5D. He said they had a cell available. Myself and Deputy Goldsmith escorted Inmate Taylor from 5D to 3MED via wheelchair. He was temporarily held in a holding cell by the deputy's desk to be screened by the Doctors again. At approximately 1345 hours Inmate Taylor was sent back to 5D from 3MED. At approximately 1515 hours I spoke to Charge Nurse Melissa [Brokaw] again regarding Inmate Taylor, **she stated there was nothing wrong with him, he will only get morning and evening medication**.

*Id.*, ¶ 105 (emphasis in complaint). Sergeant McGill took Mr. Taylor to the medical unit.

*Id.*, ¶ 106. While there, none of the Denver Health medical personnel, including Dr. Crum,

Nurse Brokaw, and Nurse Chaverria Torres, thoroughly assessed Mr. Taylor. *Id.*, ¶ 106.

Dr. Crum spent less than 40 seconds examining Mr. Taylor from the cell doorway before

walking away. *Id.*, ¶ 107. Nurse Brokaw reported that Sergeant McGill requested that Mr.

Taylor be housed in the medical unit "because of the disturbance he was creating in the

pod." *Id.*, ¶ 108. This reported "disturbance" was caused by other prisoners pleading for

medical help for Mr. Taylor; Sergeant McGill did not state that Mr. Taylor's behavior was

causing a disturbance. *Id.*, ¶ 109.

Plaintiffs allege that Nurse Brokaw "falsely noted" that Mr. Taylor did not report having any medical issues to Sergeant McGill. *Id.*, ¶ 110. Nurse Brokaw and Nurse Chavarria Torres both noted that Dr. Crum had previously cleared Mr. Taylor to return to the general population unit. *Id.*, ¶¶ 110–11. Mr. Taylor remained alone in the medical unit cell for around five hours, without any observation or medical treatment. *Id.*, ¶ 114. Dr. Crum did not check on Mr. Taylor, but he ordered him to return to the general population unit at around 10:00 a.m. *Id.*, ¶ 115. DSD staff then returned Mr. Taylor to the general population unit, in a wheelchair; upon his return, Mr. Taylor told his cellmate that he did not receive any medical care. *Id.*, ¶¶ 116–17. The other prisoners and many of the deputies were "shocked." *Id.*, ¶ 117. Mr. Taylor's cellmate called his sister again, telling her that the medical staff did not provide any care to Mr. Taylor. *Id.*, ¶ 119.

Plaintiffs again allege that Denver Health "repeatedly and falsely" declared that nothing was wrong with Mr. Taylor. *Id.*, ¶ 120. At that time, Mr. Taylor was displaying symptoms that Plaintiffs describe as "obvious": blue hands, blue feet, noticeable weight loss, severe diarrhea, severe dehydration, trouble breathing, inability to move, inability to walk, inability to swallow, severe vomiting lasting multiple days, and difficulty breathing lasting more than a week. *Id.*, ¶ 121.

Around an hour after Dr. Crum cleared Mr. Taylor to return to general population—without a medical evaluation—Mr. Taylor fell out of his bunk onto the floor of the cell. *Id.*, ¶ 122. At around 4:06 p.m., a deputy announced a medical emergency over the radio. *Id.*, ¶ 123. Sergeant McGill, one of the responding officers, found Mr. Taylor lying on his side, unresponsive, cold to the touch, and not breathing. *Id.*, ¶¶ 124–25. Sergeant McGill and

the other responding officer, Deputy West, performed emergency CPR on Mr. Taylor. *Id.*, ¶ 127. At around 4:16 p.m., Denver Health paramedics arrived, performed CPR, and used a defibrillator on Mr. Taylor. *Id.*, ¶ 131. These emergency efforts were unsuccessful, and Mr. Taylor died. *Id.*, ¶ 132.[3]

Mr. Taylor's autopsy report states that he had "died as a result of hypertensive and atherosclerotic cardiovascular disease. Contributing factors were pulmonary emphysema [and] chronic renal failure." *Id.*, ¶ 133.

Numerous prisoners and DSD staff expressed frustration with the lack of medical care. Plaintiffs included numerous comments:

> e. Sergeant McGill stated that "she was confident that the medical staff at the DDC could have done a lot more to help Taylor. Sergeant McGill [stated that] medical personnel had done very little to assist him or move him to another unit."

> f. Christopher Wasnak, Willie Williams, and Floyd Kirkendall (prisoners who cared for Mr. Taylor) were all in Mr. Taylor's unit and observed Mr. Taylor's health rapidly decline in the week before his death. Mr. Wasnak reported that the day Mr. Taylor died, he could barely speak. Mssrs. Kirkendall, Williams, and Wasnak each stated that Mr. Taylor had been seen twice in two days by medical personnel at the jail, and nothing had been done for him.

> g. "The inmates kept asking for help for Mr. Taylor. At one point Mr. Taylor was in so much pain, he wanted [his cellmate] to step on his stomach, which he refused to do."

> h. "Listen Captain, this is not the first time, sir, they sent him back, this ain't the second time, **this is the third time—the third time that this medical staff said, 'fuck you.'**"

---

[3] Mr. Taylor was pronounced dead after he was transported to the hospital, and DSD officials informed Mr. Taylor's family that he had died at the hospital; however, numerous witnesses stated that he had died in his jail cell. *Id.*, ¶¶ 134–35.

*Id.*, ¶ 129 (emphasis in complaint). Nothing in Mr. Taylor's medical records indicates that he received appropriate evaluations or testing to determine the causes of his condition at any time while he was incarcerated. *Id.*, ¶ 140.

### B. Denver Health's History of Alleged Violations

The City of Denver contracted with Denver Health to provide medical care to people jailed at the DDC at all times relevant to this case. *Id.*, ¶ 141. Plaintiffs allege that Denver Health maintained a custom, policy, and practice of unlawful conduct, including taking a "wait and see" approach to providing medical care to people with obvious medical needs that require immediate attention; failing to provide care based on assumptions that prisoners, particularly Black prisoners, are exaggerating their symptoms; prioritizing convenience over providing necessary care; failing to discipline jail medical personnel in the face of constitutional violations, thereby enabling them to continue violating prisoners' constitutional rights; and failing to adequately staff detention facilities. *Id.*, ¶ 149. Denver Health did not take any immediate corrective action against any individual Defendant, with the exception of Nurse Brokaw, whose access to the jail was revoked by DSD Sheriff Elias Diggins. *Id.*, ¶ 148. Plaintiffs also allege that Denver Health failed to adequately train or discipline officers and nurses. *Id.*, ¶ 152.

Plaintiffs point to four prior adverse medical outcomes at the DDC allegedly caused by Denver Health's deliberately indifferent policies. *Id.*, ¶ 152. In November 2015, Michael Marshall suffered from a non-violent mental health crisis during which Denver deputies forcibly restrained him, causing him to choke, aspirate on vomit, and lose consciousness. *Id.*, ¶ 153. Denver Health medical personnel did not provide him with life-saving medical

care; instead, they strapped his body to a restraint chair and applied a spit mask, further restricting Mr. Marshall's breathing. *Id.* Eventually, Mr. Marshall was taken to Denver Health Hospital, where he died. *Id.* The Denver Coroner determined that Mr. Marshall's death was a homicide. *Id.*

In October 2014, George Moore was denied a necessary walker during intake because the nurse did not have time to verify his request due to the 40 other prisoners she had to evaluate. *Id.*, ¶ 154. The next day, Mr. Moore's hip gave out and he collapsed to the floor, injuring his hip, groin, and lower back. *Id.* Denver Health medical staff did not provide him with a walker until three hours after he fell. *Id.* Mr. Moore consistently requested medical attention for his hip, but was denied for two months. *Id.* A doctor he saw outside the jail put an order in for Mr. Moore to get hip surgery, but DDC medical staff refused to schedule it and he never received the surgery. *Id.*

In July 2012, Rebecca Trujillo suffered a serious spinal cord injury at the Denver County Jail and exhibited symptoms of the injury including pain, loss of control of bowel movements, slowed speech, altered gait, and reduced ability to use her hands and legs. *Id.*, ¶ 155. Denver Health medical personnel failed to ensure that she was provided with appropriate medical care; Ms. Trujillo's surgeon, upon her release, stated that her injuries were exacerbated by Denver Health medical personnel's failure to provide her with appropriate medical care. *Id.*

In July 2010, Marvin Booker was killed in the DDC after DSD deputies used multiple force techniques on him. *Id.*, ¶ 156. Two Denver Health nurses witnessed the interaction, but left without providing care. *Id.* They had to be summoned three times

before providing any medical assistance to Mr. Booker. One nurse testified that he was "acting like" he was unconscious, and another stated that prisoners pretend that they are unresponsive to get attention. *Id.* A jury rendered a $4.65 million verdict finding that Denver deputies had violated Mr. Booker's constitutional rights. *Id.* Plaintiffs characterize these cases as "representative examples of the rampant deliberate indifference to serious medical needs by Denver Health medical staff" and lack of training and supervision on the part of Denver Health. *Id.*, ¶ 157.

## II.  STANDARD OF REVIEW

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must allege facts, accepted as true and interpreted in the light most favorable to the plaintiff, to state a claim to relief that is plausible on its face.[4] *See, e.g.*, *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). A plausible claim is one that allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If a complaint's allegations are "so

---

[4] Defendants ask the Court to consider Mr. Taylor's autopsy and medical records, arguing that they are central to the complaint. ECF No. 36 at 2–3. Plaintiffs disagree, stating that these documents are not central to Plaintiffs' claims because they do not contain much information, and because they are not the only documents that Plaintiffs reference in the complaint. ECF No. 41 at 3. Other documents include the DSD sheriff deputy reports and recorded phone calls. *Id.* A "district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002). These documents are indisputably relevant, and the parties do not dispute their authenticity. The Court has discretion whether to consider these documents. If it does, the Court must still view them in the light most favorable to Plaintiffs, except where the document "blatantly contradicts" Plaintiffs' version of the events. *Est. of Ronquillo by & through Est. of Sanchez v. City & Cnty. of* Denver, No. 16-cv-01664-CA-KMT, 2016 WL 10843787, at *2 (D. Colo. Nov. 17, 2016), aff'd, 720 F. App'x 434 (10th Cir. 2017). Here, the documents do not blatantly contradict Plaintiffs' version of events, and so the Court considers Mr. Taylor's autopsy and medical records in the light most favorable to Plaintiffs, relying on the allegations in the complaint to supplement and interpret these records, as required at this stage of the pleadings.

general that they encompass a wide swath of conduct, much of it innocent," then a plaintiff has failed to "nudge [the] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quotation omitted). In assessing a claim's plausibility, "legal conclusions" contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation omitted).

### III.  DISCUSSION

Defendants move to dismiss Plaintiffs' Eight Amendment claim for failure to provide medical care and treatment against the individual Defendants, asserting a qualified immunity defense, and Plaintiffs' *Monell* claim against Denver Health for unconstitutional customs, trainings, and failure to supervise. Defendants also move to dismiss all state law claims. Having reviewed the First Amended Complaint, the motion to dismiss, the related briefing, and relevant legal authority, the Court denies the motion to dismiss.

### A.  Qualified Immunity as to Plaintiffs' Eighth Amendment Claims Against the Individual Defendants

Defendants argue that the individual Defendants are entitled to qualified immunity against Plaintiffs' Eighth Amendment claims brought under Section 1983. Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'" *Hale v. Duvall*, 268 F.Supp.3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Oklahoma,* 519 F.3d 1242, 1249 (10th Cir. 2008). When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted).

### 1. *Constitutional Violation Prong: Eight Amendment Deliberate Indifference Claims Against the Individual Defendants*

Under the Eighth Amendment, pretrial detainees have a constitutional right to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim for inadequate medical care under the Eighth Amendment, brought pursuant to 42 U.S.C. § 1983, is analyzed under the "deliberate indifference to serious medical needs" test of *Estelle. See Garcia v. Salt Lake Cnty.*, 768 F.2d 303 (10th Cir. 1985). Under this test, the detainee must show that a medical professional acted with deliberate indifference to the detainee's serious medical needs. *Id.*; *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (citation omitted). The test for deliberate indifference involves both "an objective and subjective component." *Sealock*, 218 F.3d at 1209 (citation omitted).

To satisfy the objective component, a plaintiff must allege facts demonstrating that their medical need was "sufficiently serious." *See Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (quotation omitted). A medical need is "sufficiently serious" if it has been diagnosed by a physician as mandating treatment or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id*. A delay in medical care satisfies the objective component if a plaintiff alleges facts showing that the delay "resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citation omitted).

To satisfy the subjective component, a plaintiff must allege that the medical provider (1) knew that the prisoner faced a substantial risk of serious harm and (2) disregarded that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

To establish knowledge, a prison official both (1) must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) must have drawn that inference. *Farmer*, 511 U.S. at 837. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence such as whether the risk was obvious." *Lucas v. Turn Key Health Clinics,* LLC, 58 F.4th 1127, 1137 (10th Cir. 2023) (citing *Farmer*, 511 U.S. at 842). If a risk is so obvious that a reasonable person would realize it, a court may infer that the defendant did, in fact, realize it. *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1263 (10th Cir. 2022) (quotation omitted). In a missed diagnosis or delayed referral context, such circumstantial

evidence of obviousness could include "(1) recognition of inability to treat and still declining or unnecessarily delaying referral; (2) condition is so obvious a layman would recognize it; or (3) complete denial of care in the face of a medical emergency." *Lucas*, 58 F.4th at 1139.

Additionally, a medical professional's "heightened knowledge and training can be highly relevant and may tend to show awareness of and disregard of a substantial risk," especially when the injuries are "impossible for a layman to surmise." *Id.* A plaintiff need not show that the defendant was aware of the *particular* illness to constitute knowledge that a substantial risk of harm exists. Being aware of the symptoms is sufficient. *See, e.g., id.* at 1141 ("[T]he complaint need not show [that the medical provider] was consciously aware [that the inmate] had a specific ailment . . . but rather that he was aware she faced a substantial risk of harm to her health and safety.").

A medical provider disregards risk when they fail to take reasonable measures to abate the risk. *Id.* at 1137. Plaintiffs can sufficiently plead disregard of a risk in two ways: by alleging that the medical providers failed to properly treat a serious medical condition (the failure to properly treat theory) or that they prevented treatment or denied access to a medical professional capable of evaluating the need for treatment (the gatekeeper theory). *Id.* at 1138. Under the failure to properly treat theory, the Tenth Circuit looks to whether "there was a functional denial of care at the time the need for treatment obviously arose." *Id.* It is not necessary to prove that the inmate received no care; a provider can be held liable for "woefully inadequate" treatment, like prescribing over the counter medicines for serious symptoms indicating substantial risk to health. *See id.; Oxendine v.*

*Kaplan*, 241 F.3d 1272, 1279 (10th Cir. 2001) (finding liability where the medical provider only prescribed Tylenol for a gangrenous hand). However, "[d]isagreement with a doctor's particular method of treatment, without more, does not rise to the level of an Eighth Amendment violation." *Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010).

The gatekeeper theory applies when a medical professional knows that their role in a medical emergency is solely to refer the patient to a more qualified medical professional. *Id.* A prison medical professional who serves "as a gatekeeper for other medical personnel capable of treating the condition may be held liable under the deliberate indifference standard if she delays or refuses to fulfill that gatekeeper role." *Mata*, 427 F.3d at 751; *Est. of Jensen v. Clyde*, 989 F.3d 848, 860 (10th Cir. 2021). A gatekeeper fails in their duty if they "den[y] access to someone capable of evaluating the inmate's need for treatment." *Lucas*, 58 F.4th at 1137. "Even a brief delay in treatment can be unconstitutional." *Id.*

### a.  Objective Component

Defendants do not appear to dispute that the objective component is satisfied. ECF No. 36 at 10. Death is, "without a doubt, sufficiently serious to meet the objective component." *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009). Additionally, Mr. Taylor's symptoms were sufficiently serious: chest pain, difficulty breathing, continuous nausea and diarrhea, and blue hands and feet are all sufficiently severe symptoms that require a doctor's attention, and these intermediate harms resulted in death. *See id*; *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) (holding that the objective component would also be satisfied if the symptoms that eventually led to death were severe enough

to prompt a layperson to seek immediate medical attention). The Court finds that the objective component is satisfied for all individual Defendants. It now turns to the subjective component for each.

### b. Subjective Component

Defendants argue that none of the individual Defendants met the subjective component of the deliberate indifference standard, meaning that they lacked a culpable state of mind.

First, Defendants argue that Mr. Taylor's death was due to "natural causes" that were "the result of an advanced age," and so "a failure of a medical professional to attempt to intervene in some fashion to reverse or avert that process cannot, as a matter of law, rise to a level of deliberate indifference." ECF No. 43 at 2. Defendants go on to argue that "the symptoms must have alerted the medical staff that the prisoner was at a substantial risk of the specific harm claimed, which here, is death of natural causes." ECF No. 36 at 9. It is unclear exactly what Defendants are arguing. First, it is not a correct statement of the law; it is not necessary for medical personnel to know what particular illness an inmate is dying from, nor is it necessary for them to be aware that the inmate is dying. Being aware of relevant symptoms, when they indicate a substantial risk of harm or a potential medical emergency, is sufficient. *See, e.g., Lucas*, 58 F.4th at 1141 ("[T]he complaint need not show [that the medical provider] was consciously aware [that the inmate] had a specific ailment . . . but rather that he was aware she faced a substantial risk of harm to her health and safety."). Here, it is not necessary that the medical providers knew that Mr. Taylor was going to die from "natural causes." It only matters that the medical providers

knew of his symptoms and knew that they indicated a substantial risk of harm or a potential medical emergency.

Additionally, it is unclear what Defendants mean by "natural causes." Typically, the statement that someone has died of natural causes indicates that they did not die as a result of injuries. *See, e.g., Est. of Stieb v. Johnson*, No. 16-cv-02548-KLM, 2018 WL 4111018 at *5 (D. Colo. Aug. 29, 2018) (finding that the coroner's report that the inmate died of natural causes cannot be construed as evidence that he had been injured). It appears that Defendants are using this language to imply that there was nothing that could be done to prevent Mr. Taylor's death. However, whether Mr. Taylor's death was preventable is a factual determination, and Plaintiffs sufficiently plead that Mr. Taylor's death was caused by a lack of timely and adequate medical care; based on the pleadings, it is plausible that he may not have died had he received adequate treatment. *See* ECF No. 33, ¶ 2.

Regardless, whether Mr. Taylor's death was preventable is not the focus: the proper analysis is whether Defendants showed deliberate indifference to his serious medical needs by not adequately treating his symptoms or referring him for necessary emergency care. While his death demonstrates the seriousness of his condition, preventing death is not the standard for assessing whether the care was adequate. More importantly, Defendants do not cite to any caselaw, nor has the Court found any, that would support their statement that a failure to intervene in a death by natural causes "cannot, as a matter of law, rise to a level of deliberate indifference."

Next, Defendants argue that the individual medical providers made reasonable judgments concerning Mr. Taylor's medical care and that he was provided "significant" care prior to his death, arguing that Plaintiffs simply disagree with the course of treatment. ECF No. 36 at 10; *Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006) (holding that a plaintiff's disagreement regarding a course of treatment does not satisfy the subjective prong). Defendants cite *Self v. Crum*, 439 F.3d 1227 (10th Cir. 2006), which states that a misdiagnosis, even if it would constitute medical malpractice, is insufficient. ECF No. 36 at 8; *Callahan*, 471 F.3d at 1234 ("Where a doctor faces symptoms that could suggest either indigestion or stomach cancer, and the doctor mistakenly treats indigestion, the doctor's culpable state of mind is not established even if the doctor's medical judgment may have been objectively unreasonable."). However, Mr. Taylor's condition was not one that could be adequately treated by the course of treatment he was provided: his symptoms, including continuous vomiting and diarrhea, chest pains, weakness, and blue hands and feet, were so obviously alarming that a reasonable person would recognize them as serious symptoms indicating a need for emergency care rather than anti-nausea medications, particularly after the medications failed to treat those symptoms. These circumstances are more like prescribing Tylenol for a gangrenous hand, *Oxendine*, 241 F.3d at 1277, than to a disagreement over a course of treatment.

Similarly, Defendants argue that Mr. Taylor received some care, stating that Mr. Taylor was "treated by the hypertension chronic care team, his vital signs were frequently checked and recorded, he was given medications twice daily, a chest x-ray was performed, he was prescribed an EKG, a stool sample was collected to check for antigens

and toxins, and he was housed in a medical unit." ECF No. 43 at 3. They also state that Mr. Taylor had refused recommended labs from the medical staff. *Id.* While these facts may be true, they are not relevant at the motion to dismiss stage. When ruling on a motion to dismiss, "the Court limits itself to the facts stated in a complaint."[5] *E.E.O.C.*, 918 F. at 1173. Factual disputes, like what treatment Mr. Taylor received, are resolved in favor of Plaintiffs. *Id.* Additionally, Plaintiffs mention most of these treatments in the complaint; minimal amounts of care can still be constitutionally inadequate. The Court will analyze the adequacy of the alleged treatments below with respect to each individual Defendant.

Defendants also state that Denver Health and its medical staff do not have the ability to dictate where inmates are housed in the jail. *Id.* at 5. Defendants argue that "if such a medical emergency was present, the Sherrif's [sic] themselves have the authority to take Plaintiff to the hospital or call 911." *Id.* It is unclear how this argument relates to the deliberate indifference claims against Denver Health. Plaintiffs did not sue the Sherrif, so any allegations about the Sherrif not transporting Mr. Taylor to a hospital are irrelevant. Plaintiffs made numerous allegations indicating that the decision to refer Mr. Taylor to emergency care is within the purview of the Denver Health medical staff, which is what is relevant to this case, so it does not matter whether the Sheriff also had the ability to transfer Mr. Taylor. *See, e.g.,* ECF No. 33 ¶¶ 65, 113, 143, 145, 147, 180.

* * *

---

[5] There are some exceptions to this rule, none of which apply here. *See E.E.O.C. v. Original Honeybaked Ham Co. of Georgia, Inc.*, 918 F. Supp. 2d 1171, 1173 (D. Colo. 2013) (describing an exception where a motion to dismiss raises jurisdictional issues, so the court could consider outside evidence).

Before analyzing the actions of each individual Defendant, the Court will examine Plaintiffs' allegations that apply to all of the individual Defendants. First, Plaintiffs sufficiently allege that if an individual Defendant knew about Mr. Taylor's symptoms, they knew that he faced a substantial risk of serious harm. A medical professional's subjective awareness can be inferred from circumstantial evidence, including whether the risk would be obvious to a reasonable person in the provider's position. *Lucas*, 58 F.4th at 1137. That the symptoms were "obviously alarming" is enough to support an inference of knowledge of the risk of harm, so pleading the obviousness of the symptoms is sufficient. *Id.* Here, the symptoms were so obviously dangerous that laypeople did recognize them: multiple prisoners and DDC staff members commented on Mr. Taylor's need for medical attention, indicating that the seriousness of the symptoms was obvious and would be especially obvious to a medical professional. *Id.*, ¶¶ 21, 89, 99, 105, 129. Plaintiffs allege that Mr. Taylor was "showing objective and subjective signs of a serious medical condition, which were so obvious that lay people perceived his dire need for medical care without setting eyes on him." *Id.*, ¶ 73. Therefore, Plaintiffs sufficiently alleged that any Defendant who knew about Mr. Taylor's symptoms knew about a substantial risk of serious harm to Mr. Taylor.

Plaintiffs also allege that the medical staff generally disregarded the substantial risk of harm. Plaintiffs allege that "all reasonably trained healthcare workers are aware that **anyone** who complains of chest discomfort, shortness of breath, fatigue, weakness, vomiting, and diarrhea for days must be immediately medically evaluated by a doctor," and that such evaluation should include an EKG, bloodwork, and targeted imaging, at a

minimum.[6] *Id.*, ¶ 29. Plaintiffs emphasized that a proper examination is especially important for elderly patients who have other medical conditions, like Mr. Taylor. *Id.*, ¶ 30. They allege that, as of February 4, Denver Health staff knew or should have known that observing Mr. Taylor and giving him medication was not reasonable, "given his ongoing deadly symptoms of decline." *Id.*, ¶ 48.

Plaintiffs further allege that Mr. Taylor's symptoms should have prompted evaluation, but instead, Dr. Crum, Nurse Brokaw, and other Denver Health medical staff continued to use a "wait and watch" approach. *Id.*, ¶¶ 50–51. Plaintiffs allege that, "[b]y Defendants' own admissions, they knew that there was nothing that they could do for Mr. Taylor in the jail," and yet "refused to hospitalize Mr. Taylor outside of the jail." *Id.*, ¶¶ 64–65. Plaintiffs characterize the failure to perform follow-up tests in light of these recommendations as "blatant and egregious breaches of the standard of care by the medical team" that occurred "over and over again, over the course of several days." *Id.*, ¶¶ 61–62. Plaintiffs also allege that Defendants had "done nothing to rule out serious causes of his medical symptoms," and did not hospitalize him "despite knowing that Mr. Taylor's treatment during the past several days was ineffective, and he needed medical care outside of the jail's ability," and "despite knowing that Mr. Taylor was at serious risk of death if he did not immediately receive a proper assessment and treatment." *Id.*, ¶ 65.

---

[6] The Tenth Circuit has applied a reasonable person standard to nurses who were not authorized to diagnose patients. See *Lucas*, 58 F.4th at 1139; *Quintana v. Santa Fe Cnty. Board of Comm'rs*, 973 F.3d 1022, 1041 n.3 (10th Cir. 2020) (concurring) ("[T]he proper subjective inquiry is whether . . . a substantial risk . . . would have been obvious to a reasonable person in the defendant's shoes.").

*i. Defendant Peter Crum, M.D.*

Plaintiffs have adequately pleaded that Dr. Crum had knowledge of and disregarded a substantial risk of serious harm to Mr. Taylor. Dr. Crum was aware of facts from which the inference could be drawn that Mr. Taylor faced a substantial risk of serious harm, and he drew that inference. By February 2, 2022, Dr. Crum knew that, for about two days, Mr. Taylor had been vomiting regularly, making bowel movements on himself, complaining of chest pains, unable to swallow his spit, and generally appearing physically ill. ECF No. 33, ¶ 23, 24, 27, 32. Additionally, Dr. Crum knew that Mr. Taylor's blood pressure was 168/73 and his heart rate was 125 bpm when he arrived at the medical unit. *Id.*, ¶ 33. By February 4, Dr. Crum knew that Mr. Taylor was still experiencing persistent vomiting and diarrhea, he was having more difficulty breathing, and he had lost his ability to swallow, so he could not easily take his medications or stay hydrated. *Id.*, ¶¶ 41–44. Dr. Crum knew that anti-nausea medication could not cure or treat his underlying conditions, and that they had had no effect in the past few days. *Id.*, ¶ 49. By February 8, Dr. Crum knew that Mr. Taylor's condition had not improved. *Id.*, ¶ 73. By February 9, Dr. Crum also knew that Mr. Taylor had blue hands and feet. *Id.*, ¶ 106.

As established above, knowledge of these symptoms is sufficient to establish knowledge of a substantial risk of serious harm. Plaintiffs allege that Dr. Crum knew about Mr. Taylor's symptoms, and a reasonable doctor would have recognized the obvious risk of harm that those symptoms pose. Plaintiffs also allege that Dr. Crum knew of "several serious symptoms that should have prompted additional tests," and that Dr. Crum knew that Mr. Taylor was at an elevated risk of cardiac or pulmonary complications, including

pneumonia, pulmonary embolism, pericarditis, and myocarditis, because of his recent COVID-19 infection. *Id.*, ¶ 35. Thus, Plaintiffs sufficiently allege that Dr. Crum knew about a substantial risk of serious harm to Mr. Taylor.

Plaintiffs also adequately plead that Dr. Crum disregarded the substantial risk of serious harm to Mr. Taylor, thereby meeting the subjective component of the deliberate indifference test. Dr. Crum did not do any independent evaluation of Mr. Taylor; he simply ordered anti-nausea medication and checks of his vitals. *Id.*, ¶ 31. By February 4, when Dr. Crum knew that his anti-nausea medications were not working, he did not change the course of treatment and instead continued to follow a "wait and see" approach. *Id.*, ¶ 49. On February 8, knowing that Mr. Taylor was worsening, Dr. Crum sent him back to the general population unit. *Id.*, ¶ 73. On February 9, knowing Mr. Taylor had worsening symptoms including blue hands and feet, he failed to perform any assessment on him, only spent 40 seconds with him, and did not check his vital signs. *Id.*, ¶¶ 106–07.

Dr. Crum disregarded Mr. Taylor's serious medical needs both under the gatekeeper and the failure to treat theories. Under the gatekeeper theory, Dr. Crum was the gatekeeper for outside emergency medical care. Plaintiffs allege that he "recklessly refused to hospitalized Mr. Taylor outside of the jail" despite knowing that they had not obtained an EKG, that his treatment was ineffective, and that he needed medical care beyond the jail's ability. *Id.*, ¶ 65.

Plaintiffs also adequately plead disregard based on the "failure to treat" theory. Dr. Crum only gave Mr. Taylor anti-nausea medications. He was not given a cardiovascular evaluation or medication to treat his chest pains. *Id.*, ¶ 31. After Dr. Crum's initial visit, he

did not provide any additional treatment or evaluation to Mr. Taylor, even after his symptoms worsened and showed no response to the medications. *Id.*, ¶¶ 50–51. Instead of providing more care on February 8, Dr. Crum released Mr. Taylor back to the general population unit. As in *Lucas*, prescribing anti-nausea medication for such serious symptoms may constitute woefully inadequate treatment. Additionally, the remaining symptoms—inability to swallow, dehydration, difficulty breathing, blue hands and feet— were left untreated. This treatment amounted to a functional equivalent of a complete denial of care. Plaintiffs plead sufficient facts to support their claim of deliberate indifference against Dr. Crum.

### ii. Defendant Melissa Brokaw, RN

Plaintiffs allege sufficient facts that Nurse Brokaw had knowledge of and disregarded an excessive risk to Mr. Taylor's health. First, she was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she drew that inference. She was aware of Mr. Taylor's symptoms based on her review of his medical records and her observations of him. As described above, these symptoms are all obvious enough that a layperson would infer a risk of substantial harm to Mr. Taylor, so Nurse Brokaw, as a medical professional, should have made that inference.

On February 4, she acknowledged Mr. Taylor's treatment plan of anti-nausea medications. *Id.*, ¶ 46. Plaintiffs allege that she knew that anti-nausea medications could not treat Mr. Taylor's underlying condition, and that she knew that the anti-nausea medications had had no effect on Mr. Taylor. *Id.*, ¶ 49. On February 5, Nurse Brokaw assessed Mr. Taylor and took his vital signs (a pulse of 101, oxygen saturation of 96%,

and a blood pressure of 121/55), which indicated hypotension. *Id.*, ¶ 52. These are sufficient facts to indicate Nurse Brokaw's knowledge of the substantial risk of serious harm that Mr. Taylor faced.

Plaintiffs also adequately plead that Nurse Brokaw disregarded that risk, under both the gatekeeper and failure to treat theories. Nurses can be liable for providing minimal treatment for serious symptoms without referring the inmate to a more qualified provider. *See, e.g., Est. of Jensen*, 989 F.3d at 854, 860 (finding deliberate indifference for "refusing to fulfill her duty as gatekeeper" when the inmate exhibited serious symptoms for four days—vomiting, diarrhea, and a sickly appearance—and the nurse only gave her Gatorade and did not escalate her treatment to a more qualified medical professional).

Nurse Brokaw initially recommended that Mr. Taylor be transferred out of the medical unit, based on Dr. Crum's order. *Id.*, ¶ 75. On February 9, Nurse Brokaw was the Charge Nurse who did not allow Mr. Taylor to be returned to the medical unit, even though Mr. Taylor's hands and feet were blue. *Id.*, ¶¶ 99–101. She also instructed her subordinates that there was nothing they could, or should, do for Mr. Taylor, and rejected Deputy Pachal's request for medical attention for Mr. Taylor. *Id.* ¶¶ 101–02. At that time, Mr. Taylor was displaying serious symptoms, including his blue hands and feet. Nurse Brokaw also reported to Sergeant McGill that "there was nothing wrong with him." *Id.*, ¶ 105. Additionally, Nurse Brokaw documented that the reason Sergeant McGill had requested Mr. Taylor be transferred to the medical unit was "because of the disturbance he was creating in the pod," when the "disturbance" was caused by other prisoners attempting to get help for Mr. Taylor. *Id.*, ¶¶ 108–09. She also noted that Mr. Taylor was

30

not reporting any medical issues to Sergeant McGill, which Plaintiffs allege is false. *Id.*, ¶ 110. Following this incident, DSD Sheriff Elias Diggins revoked Nurse Brokaw's access to the jail. *Id.*, ¶ 148.

This denial of follow-up care in the face of Mr. Taylor's obviously serious symptoms, and her insistence that no one else could help Mr. Taylor, amounts to Nurse Brokaw's refusal to fulfill her duty as gatekeeper. She also failed to adequately treat Mr. Taylor because she did not provide him any medical care beyond the anti-nausea medications, which were clearly ineffective. Plaintiffs plead sufficient facts to satisfy the subjective component and to support their claim of deliberate indifference against Nurse Brokaw.

### iii.  Defendant Alice Mukamugemanyi, LPN

Plaintiffs have alleged sufficient facts to support that Nurse Mukamugemanyi knew of a significant risk of serious harm to Mr. Taylor. On February 8, Mr. Taylor told Nurse Mukamugemanyi that he was having difficulty breathing and was unable to swallow. *Id.*, ¶ 81. As described above, medical professionals should know that anyone who presents with Mr. Taylor's symptoms, including difficulty breathing and swallowing, requires immediate medical attention from a doctor. On February 9, Mr. Taylor again complained to Nurse Mukamugemanyi that he was feeling very weak and nauseous, and was not able to swallow. *Id.*, ¶ 86. Again, these allegations are enough to show Nurse Mukamugemanyi's knowledge of a serious medical need.

Plaintiffs also adequately plead that Nurse Mukamugemanyi disregarded a serious risk under both the gatekeeper theory and the failure to treat theory. In response to Mr.

Taylor's complaints on February 8, Nurse Mukamugemanyi just encouraged him to wear a mask, use proper hand hygiene, and drink plenty of fluid. *Id.*, ¶ 82. She did not treat Mr. Taylor or refer him to anyone. *Id.* A delay in care can be sufficient to meet the deliberate indifference standard. Additionally, Nurse Mukamugemanyi "recklessly and erroneously" concluded that Mr. Taylor had refused his medications. *Id.*, ¶ 83. Plaintiffs allege that this notation was "clearly misleading and designed to excuse the lack of care given to Mr. Taylor." *Id.* Additionally, on February 9, Nurse Mukamugemanyi referred him to the charge nurse. *Id.*, ¶ 88. However, because the gatekeeper theory applies when a gatekeeper denies access to someone capable of evaluating the inmate's need for treatment, a referral to someone without the ability to properly evaluate the inmate's need for treatment still constitutes a denial of care. *See Lucas*, 58 F.4th at 1138; *see also Crowson v. Wash. Cnty.*, 983 F.3d 1166, 1179 (10th Cir. 2020) (finding that the nurse knew that the detainee "had potentially alarming symptoms [seeming dazed and confused] and suspected there was a medical issue . . . and [t]hat knowledge was sufficient to trigger [the nurse's] duty as a gatekeeper to provide [the detainee] access to medical personnel who could provide care"). Because Plaintiffs allege that Nurse Mukamugemanyi did not treat Mr. Taylor, delayed referral, and did not refer him to someone capable of evaluating his need for emergency care, Plaintiffs adequately plead that she disregarded a substantial risk of serious harm to Mr. Taylor under both theories.

### iv.  Defendant Isaac Karugu, RN

Plaintiffs also adequately plead a deliberate indifference claim against Nurse Karugu. Nurse Karugu was the Charge Nurse on February 9, when Nurse

Mukamugemanyi asked whether Mr. Taylor could be housed in the medical unit, and Nurse Karugu refused. ECF No. 33, ¶ 88. Sergeant McGill also spoke to Nurse Karugu, who responded by saying that Dr. Crum had cleared Mr. Taylor. *Id.*, ¶ 90. Based on Mr. Taylor's medical records, his complaints to Nurse Karugu, Sergeant McGill's conversation with Nurse Karugu, and Nurse Karugu's own observations, Nurse Karugu had knowledge of Mr. Taylor's symptoms. Plaintiffs adequately plead that Nurse Karugu knew of a substantial risk of serious harm to Mr. Taylor based on his knowledge of these symptoms.

Plaintiffs also adequately plead that Nurse Karugu disregarded the risk of harm under the failure to treat theory and the gatekeeper theory because he did not provide any medical care whatsoever, did not evaluate him, did not allow Mr. Taylor to go to the medical unit or to a hospital, and did not refer him to another provider more capable of evaluating his care. *Id.*, ¶¶ 89–92. Instead, Nurse Karugu relied on Dr. Crum's clearance of Mr. Taylor, despite it being days old and despite Nurse Karugu's knowledge of Mr. Taylor's symptoms. *Id.* Plaintiffs adequately alleged Nurse Karugu's subjective deliberate indifference.

### v. Defendant Bernice Chavarria Torres, LPN

Plaintiffs also sufficiently plead that Nurse Chavarria Torres knew of and disregarded an excessive risk of harm to Mr. Taylor's health. She had the requisite knowledge: she was aware of all of Mr. Taylor's symptoms that were recorded in his medical chart, as previously described. She noted that Dr. Crum had denied Mr. Taylor's request to stay in the medical unit, which indicates that she had some involvement with Mr. Taylor's care. *Id.,* ¶¶ 110–11. Additionally, Plaintiffs allege that when "Sergeant McGill

took Mr. Taylor to the medical unit for the second time, none of the Denver Health personnel—including Dr. Crum, Nurse Brokaw, and Defendant Nurse Bernice Chaverria Torres ("Nurse Chaverria Torres") [sic]—performed any assessment of Mr. Taylor even though he presented with blue hands and feet." *Id.*, ¶ 107. These allegations indicate that Nurse Chavarria Torres was working in the medical unit when Mr. Taylor arrived, and so she had knowledge of his condition upon his arrival. These symptoms would be obviously alarming to a reasonable layperson, and were obviously alarming to Mr. Taylor's cell mates, other prisoners, and DDC staff, so a reasonable nurse should have made the inference that these symptoms put Mr. Taylor at a substantial risk of harm. Plaintiffs also alleged that Nurse Chavarria Torres "carelessly determined that nothing was wrong with Mr. Taylor," which indicates that she had knowledge of his condition. *Id.*, ¶ 122. Additionally, Deputy Pachal reported that "Nurse Bernice said that her Charge Nurse said that inmate Taylor will not be going to Medical. I tried to explain to Bernice that inmate Taylors Hands and Feet are blue, Nurse Bernice said that there is nothing that she can do." *Id.*, ¶ 99.

Plaintiffs adequately plead that Nurse Chavarria Torres disregarded a substantial risk under both theories. Under the gatekeeper theory, she did not refer Mr. Taylor to a hospital or to receive emergency care. Under the failure to treat theory, she did not perform any test or assessment on Mr. Taylor and did not provide him any medical treatment while he was in the medical unit. Plaintiffs allege that nothing in Mr. Taylor's medical record indicates that he ever received appropriate evaluation or testing to

determine the causes of his deterioration. *Id.*, ¶ 140. Plaintiffs plead sufficient facts to establish Nurse Chavarria Torres's subjective deliberate indifference.

* * *

Overall, Plaintiffs plead sufficient facts to support deliberate indifference claims against each of the individual Defendants, so Plaintiffs have satisfied their burden of showing that the individual Defendants have plausibly violated Mr. Taylor's constitutional rights.

### 2.  *"Clearly Established" Prong*

Having found that Plaintiffs have plausibly pleaded an Eighth Amendment violation, the Court turns to the second prong of the qualified immunity analysis: whether that right was clearly established at the time of the individual Defendants' conduct. The Court concludes that it was.

A right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (quoting *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1196–97 (10th Cir. 2010)). The relevant inquiry in determining whether a right is clearly established is whether it would be clear to every reasonable official that their conduct violates that right. *See Reichle v. Howard*, 566 U.S. 658 (2012); *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). While plaintiffs need not cite a case directly on point, they still must show that the law would have informed a reasonable official in the defendant's position that his conduct was

unlawful in that situation. *See Knopf v. Williams*, 884 F.3d 939, 949 (10th Cir. 2018) (citation omitted).

In the medical care context, a "prison official's deliberate indifference to an inmate's serious medical needs is a violation of" the detainee's Eighth Amendment rights. *Mata*, 427 F.3d at 745; *Sealock*, 213 F.3d at 1210–11 (holding that a prison official plausibly violated a detainee's rights by failing to address the detainee's symptoms, even when he knew that they might be related to a heart attack). Within this category, the Tenth Circuit has recognized numerous fact patterns that constitute deliberate indifference, and so are violations of clearly established rights.

Since at least 2016, "it was clearly established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights." *Quintana v. Santa Fe County Board of Commissioners*, 973 F.3d 1022, 1033 (10th Cir. 2020). Similarly, it "has been clearly established in this circuit since at least 2006 that a deliberate indifference claim will arise when a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency . . . and the prison official, knowing that medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sends the inmate back to his cell." *Kellum v. Mares*, 657 F. App'x 763, 768 (10th Cir. 2016) (internal citations omitted). Delaying medical care also violates a prisoner's Eight Amendment rights if the delay resulted in substantial harm. *Id.* The Court finds that a reasonable jury could find that the individual Defendants were on notice that their conduct, inaction in the face of Mr. Taylor's obviously alarming symptoms, violated clearly established law.

* * *

The Court finds that Plaintiffs adequately plead that the individual Defendants violated Mr. Taylor's Eighth Amendment rights, and that that right was clearly established at the time of the individual Defendants' actions. For that reason, the Court denies the motion to dismiss related to these Defendants.

### B. Eight Amendment *Monell* Claim Against Denver Health

Defendants also move to dismiss the Eight Amendment claim against Denver Health. To establish an entity's liability, the plaintiff must first plausibly allege that one or more of its employees violated a plaintiff's constitutional rights. *See Est. of Beauford*, 35 F.4th at 1275. The plaintiff must then show that the entity is liable for the employee's violation of a plaintiff's constitutional rights by showing (1) the existence of a policy or custom; (2) a "direct causal link between the policy or custom and the injury alleged," meaning that the policy or custom was the "moving force" behind the violation of the plaintiff's constitutional rights; and (3) that the private entity enacted or maintained the policy with "deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013); *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993); *Hollingsworth v. Hill*, 110 F.3d 733, 744 (10th Cir. 1997).

A plaintiff satisfies the "official policy or custom" element by plausibly alleging the existence of:

      (1) a formal regulation or policy statement;
      (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express

37

> municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law;
>
> (3) the decisions of employees with final policymaking authority;
>
> (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or
>
> (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotations and formatting omitted). The "official policy or custom" requirement is intended to distinguish "acts of the municipality from acts of employees of the municipality," making clear that municipal liability is limited to actions "for which the municipality is actually responsible." *Cacioppo v. Town of Vail, Colo.*, 528 F. App'x 929, 932 (10th Cir. 2013).

The "deliberate indifference" element may be satisfied where the entity has actual or constructive knowledge that its acts or failure to act is "substantially certain to result in a constitutional violation," and the entity "consciously or deliberately" chooses to disregard the risk of harm. *Schneider*, 717 F.3d at 771 (quotation omitted). Notice can be established either by a "pattern of tortious conduct" or if a violation of rights is a "highly predictable" or "plainly obvious" consequence of the entity's action or inaction. *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

Plaintiffs bring an Eighth Amendment claim against Denver Health based on its allegedly unconstitutional policies and practices.[7] Defendants argue that Plaintiffs cannot plausibly suggest that Denver Health allowed unconstitutional policies that resulted in Mr.

---

[7] Denver Health is a political subdivision of Colorado. ECF No. 33, ¶ 8.

Taylor's death, because the allegations of the existence of a policy are only conclusory. ECF No. 36 at 12. Plaintiffs, however, plausibly allege two theories of municipal liability under *Monell*: (1) maintaining an informal custom amounting to a widespread practice, and (2) failure to train.

As established above, Plaintiffs have adequately pleaded the first element of *Monell* liability: that the entity's employees—the individual Defendants—violated Mr. Taylor's constitutional rights. The remaining three elements will be analyzed below, based on the two sources of entity liability that Plaintiffs allege.

### 1. *Informal Custom Amounting to Widespread Practice*

Plaintiffs first allege *Monell* liability based on Denver Health's informal customs, amounting to widespread practices, of: (1) taking a "wait and see" approach to providing medical care to people in prison who are suffering from obvious, serious medical needs that require immediate attention; (2) failing to provide care based on automatic assumptions that prisoners, particularly Black prisoners, are lying about, faking, or exaggerating their symptoms; (3) failing to provide care due to prioritizing convenience over necessary medical treatment; (4) failing to discipline jail medical personnel, or even find that the jail medical personnel engaged in wrongdoing, in the face of obvious constitutional violations (thereby ensuring that medical personnel would repeatedly, and customarily, violate the constitutional rights of prisoners); (5) failing to adequately train their jail medical providers; and (6) failing to adequately staff its detention facilities. ECF No. 33, ¶ 149.

Plaintiffs point to the individual Defendants' actions regarding Mr. Taylor and to four similar alleged constitutional violations at the DDC, involving the care of Mr. Marshall, Mr. Moore, Ms. Trujillo, and Mr. Booker, to plead the existence of these widespread practices. To establish the existence of a widespread practice, plaintiffs need only plead "a pattern of multiple similar instances of misconduct," with no set number required to "render the alleged policy plausible." *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015). Here, the numerous instances of Denver Health personnel following a "wait and see" approach toward Mr. Taylor, and toward the four other DDC inmates described above, is enough to establish a pattern such that the alleged policy is plausible. The same is true for the failure to provide care on the assumption that inmates are exaggerating and failure to provide care due to prioritizing convenience. For instance, the allegations that Nurse Mukamugemanyi falsely stated that Mr. Taylor had refused his medications, that Nurse Karugu and Nurse Brokaw refused to send Mr. Taylor to the medical unit, that Nurse Brokaw stated that there was nothing she or anyone else could or should do for Mr. Taylor, that Nurse Brokaw stated that there was nothing wrong with Mr. Taylor, and that Nurse Brokaw reported that Mr. Taylor was only in the medical unit because of the disturbance he was creating in the pod, indicates the plausible existence of these two policies. The remaining alleged practices can be grouped into a "failure to train and supervise" theory, which will be analyzed separately.

Plaintiffs have also adequately plead causation. Mr. Taylor's condition worsened because of Denver Health medical staff following a wait and see approach, assuming that he was exaggerating, and prioritizing convenience over providing him care. Plaintiffs

alleged that these customs "have caused Denver Health medical personnel to provide deliberately indifferent medical care and have resulted in prisoner deaths, serious injuries, and unnecessary pain, suffering, humiliation, and emotional trauma," including Mr. Taylor's. ECF No. 33, ¶ 151. If Denver Health medical staff had believed Mr. Taylor and provided him timely care, it is plausible that he would not have died, or that his pain and suffering before his death could have been mitigated. Mr. Taylor's treatment was "consistent with the chronic deficiencies" in medical care that amounted to a widespread policy. *Burke*, 935 F.3d at 999. The "execution" of the policy—delaying and denying Mr. Taylor medical care, because they were "waiting and seeing," believed he was exaggerating, and were prioritizing convenience—"inflicted" his injury by causing his condition to worsen. *See Hollingsworth*, 110 F.3d at 744. Plaintiffs sufficiently plead causation because a reasonable jury could find that the systemic deficiencies resulted in Mr. Taylor's death.

Plaintiffs also satisfied the deliberate indifference element by adequately alleging that Denver Health was on notice that its customs would result in Mr. Taylor's injuries. The implementation of the customs carried an obvious risk of harm to detainees' health because of the likelihood that it would result in delayed or denied necessary medical care. The individual Defendants' multiple instances of alleged constitutional violations, as well as the four other instances of alleged violations, are enough to establish a "pattern of tortious conduct" sufficient to put Denver Health on notice. Plaintiffs sufficiently plead all three elements of the unconstitutional informal custom theory of *Monell* liability.

### 2. Failure to Train and Supervise

As with entity liability premised on a policy, to establish entity liability based on inadequate training, plaintiffs must allege that the defendant "has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307. Under a failure to train theory, liability attaches when the "need for more or different training was so obvious, and the inadequacy so likely to result in [the constitutional violation] that the policymakers of [the county] can reasonably be said to have been deliberately indifferent to the need for additional training." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). Liability under a failure to train theory turns on whether the defendants had "[n]otice of particular deficiencies in a training program." *Est. of Lobato v. Correct Care Sols., LLC*, No. 15-CV-02718-PAB-STV, 2017 WL 1197295, at *7 (D. Colo. Mar. 31, 2017); *Zartner v. City and Cnty. of Denver*, 242 F. Supp. 3d 1168, 1173 (D. Colo. Mar. 13, 2017) (finding that plaintiffs had failed to state a claim against the defendant municipality for failure to train because the complaint made "no reference to . . . training protocols, inadequate or otherwise"). The causation inquiry "focuses on whether the injury could have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Est. of Lobato,* 2017 WL 1197295, at *7. Entity liability is at its "most tenuous" when premised on a failure-to-train theory. *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

Here, Plaintiffs allege that Denver Health's training program was inadequate in two ways: Denver Health failed to adequately train and supervise its employees on the proper

procedures for the evaluation and treatment of prisoners' serious medical needs, and failed to take corrective action against Denver Health medical staff who have committed violations. ECF No. 30, ¶¶ 142–48. Specifically, Plaintiffs allege that Denver Health has failed to discipline its staff after Mr. Taylor's death or after the other four previously discussed incidents. The only provider to face corrective action after Mr. Taylor's death was Nurse Brokaw, whose access to the jail was revoked by a DDC deputy—not by Denver Health. Plaintiffs also allege that Denver Health "failed to adequately train and supervise its employees with respect to proper procedures for the evaluation and treatment of prisoners' serious medical needs." ECF No. 33, ¶ 142. Failing to discipline employees who have engaged in wrongdoing and failing to train employees on the proper procedures for evaluation and treatment are specific deficiencies.

Plaintiffs adequately plead causation and deliberate indifference as to the inadequate training and supervision theory. If the medical providers had been trained to provide immediate evaluation and medical care, Mr. Taylor's prolonged suffering and death may have been prevented. Plaintiffs established deliberate indifference by pleading the obviousness of the deficiency in the training protocol, which is enough to plausibly put Denver Health on notice. Failing to properly train on the evaluation and treatment of inmates is obviously likely to result in failing to properly evaluate and treat inmates.

Additionally, Plaintiffs cite four incidents of serious adverse health outcomes at the DDC that were allegedly caused by Denver Health failing to provide adequate training and supervision. These incidents occurred years apart and years before Mr. Taylor's death. While these incidents do not provide substantial evidence that Denver Health was

on notice of training deficiencies, when combined with the evidence of obvious deficiencies in the training protocols, Plaintiffs have plausibly alleged that Denver Health was on notice of the training deficiencies.

However, Plaintiffs do not adequately plead causation for the failure to discipline theory because there are no allegations that the providers involved in Mr. Taylor's care had engaged in previous instances of misconduct, and so there is no causal link between a lack of discipline and his death. Thus, the failure to train and supervise claim should only proceed on the inadequate training theory, not the failure to discipline theory. Since Plaintiffs adequately plead *Monell* liability based on unofficial custom and failure to train theories, the Court declines to dismiss these claims.

### C. Construed State Law Claims Against Denver Health

Defendants also move to dismiss any state law claims Plaintiffs brought against it, including claims of negligent training and supervision. However, as Plaintiffs' complaint and response make clear, Plaintiffs are not bringing any state law claims. *See* ECF No. 33; ECF No. 41 at 15.

### IV. CONCLUSION

Consistent with the above analysis, Defendants' Motion to Dismiss, ECF No. 36, is DENIED as to Denver Health and each of the individual Defendants.

DATED this 20th day of August 2024.

BY THE COURT:

_____

Charlotte N. Sweeney
United States District Judge