EXPERT WITNESS AFFIDAVIT AND REPORT OF SUSAN MINTER, DNP

RE: Review of Death of Leroy "Nicky" Taylor, by and through Derek Taylor, Personal Representative

Taylor v. Denver Health et. al

Civil Action No.: 23-cv-02355-CNS-KAS

## I. Introduction

Plaintiff's counsel has retained me as an expert on correctional nursing standards of medical care, and to render opinions regarding the care of Leroy Taylor, while in the care of the Downtown Denver Van Cise-Simonet Detention Center from November 7th, 2021, to his death on February 9th, 2022.

## II. Statement of Expertise and Qualifications

I am an Advanced Practice Registered Nurse (APRN), a double board-certified Family Nurse Practitioner, and Adult Nurse practitioner in Florida, Texas, Montana, Alaska, Washington, Nevada, Arizona, Virginia, California, and Oregon. I received my MSN from the University of Maryland at Baltimore in 2001, and my doctorate from East Carolina University in 2019, and my postdoctoral FNP from East Carolina University in 2020. I have been a registered nurse (RN) for 34 years and a nurse practitioner for 23 years. As an APRN, I have 8 years' experience providing care for individuals in correctional settings. My experience includes approximately 4 years of providing care in the Virginia prison system, and full-time 4 years providing care in Florida county jails. I am a regular speaker at the National Commission on Correctional Healthcare (NCCHC) national conferences and the American Association of Nurse Practitioners (AANP) national conferences on current topics affecting nursing and nurse practitioners around the country. I was an executive board member for the Florida Association of Nurse Practitioners until December 2023, and State Membership Chair. My published East Carolina University doctoral study topic was focused on hypertension patient medication adherence. These experiences form the basis of my knowledge regarding standards of care that I believe are relevant to the issues in this case.

## III. Materials Reviewed in Forming this Opinion

1. First Amended Complaint
2. Mr. Taylor's Jail Records
3. Mr. Taylor's medical records
4. Movement History
5. Mr. Taylor's Housing History
6. 2022.02.02 - 2022.02.09 3M Occupancy
7. Jail Video Recordings
8. Audio Recordings from the jail concerning Mr. Taylor's health

1 | Page

**EXHIBIT A**

9. Denver City and County Autopsy Report
10. DPD GO Report
11. DSD Deputy Incident Reports

## IV. Factual Background

On November 7, 2021, Mr. Taylor was booked into the Denver Van Cise-Simonet Detention Center ("DDC"). When he was booked into DDC, Mr. Taylor was seventy-one-years-old and had a documented history of hypertension, dating back to approximately 2018.

On January 24, 2022, Mr. Taylor tested positive for COVID-19.

On January 24, 2022, Denver staff determined that Mr. Taylor had a resolved positive COVID-19 case.

On January 29, 2022, Mr. Taylor was placed in "low risk housing" in the general population 5-D unit.

On February 1, 2022, at 1630, Mr. Taylor was seen for a chronic care appointment, with a follow up of 4 months.

On February 2, 2022, at 1755, Progress note from RN Rabon states that "many inmates concerned for patient stating he is throwing up and BM's on himself. Pt appears ill but downplaying symptoms. Swallowing own sputum makes him have the urge to throw up." Mr. Taylor was positive for nausea, vomiting, and diarrhea, and RN Rabon documented that he had been experiencing these symptoms for two days. RN Rabon's progress note further states that "lungs sound clear bilaterally but unable to auscultate clearly with provided stethoscope." Medical history of hypertension (HTN) is noted. Mr. Taylor was noted to have blood pressure of 168/73, O2 93%, HR 125. (DH 000035).

On February 2, 2022, Mr. Taylor was housed in 3 Medical per the order of Dr. Crum. RN Rabon's progress note indicates that Mr. Taylor's orthostatic vital signs were to be checked and to call for abnormal results. Mr. Taylor was prescribed a clear liquid diet and Zofran BID 4 mg for 48 hours. (DH 000035).

On February 4, 2022, at 1528, Mr. Taylor was seen by E. Dranginis, PA, when he was complaining of nausea, vomiting and diarrhea. Noted to have an audible productive cough, and decreased breath sounds. At the time of this visit, Mr. Taylor had been on Zofran for 2 days with no improvement in his symptoms of nausea, vomiting, and diarrhea. However, despite his lack of improvement, no additional interventions were added (such as injectable anti-emetics) to alleviate his symptoms. A chest Xray was ordered. (DH 000033).

**EXHIBIT A**

On February 6th, 2022, at 2000, Mr. Taylor was seen by I. Karugu, RN, for a headache and generalized aches. He was noted to have a blood pressure of 96/67, HR 72, Resp 18, O2 saturation of 94%.

On February 7, 2022, Mr. Taylor received the chest Xray.

On February 7, 2022, Mr. Taylor made several calls which captured his difficulty breathing and deterioration, and the calls were made during the same day that Mr. Taylor saw multiple medical staff members, therefore his deteriorating condition should have been apparent to them at the time. Additionally, Mr. Taylor left a voicemail for his public defender to ask if he "can be released to go to the hospital because he felt like he was dying". After hearing Mr. Taylor's voicemail, his attorney filed an emergency motion for his release, so he could go to the hospital.

On February 7, 2022, at 0850, Mr. Taylor's BP was 120/76, P96, 02 94%, Resp 18. (DH 000030).

On February 7, 2022, at 2005, RN Karugu recorded Mr. Taylor's BP as 98/72, HR 78, Resp 20. O2 sat of 92%. (DH 000030).

On February 8, 2022, at 0910, RN Brokaw recorded Mr. Taylor's BP as 104/54, T 96.8, Resp 18, HR 67, O2 sat of 96%. (DH 000030).

On February 8, 2022, at 1425, Mr. Taylor was cleared to return to general population (GP) per Dr. Crum. (DH 000031).

On February 8, 2022, at 2316, Mr. Taylor was seen by LPN Mukamugamanyi, where he complained of difficulty breathing and being unable to swallow. LPN Mukamugamanyi crushed the medication, but Mr. Taylor was still unable to swallow it. (DH 000029).

On February 8, 2022, several recorded phone calls to non-medical professionals capture Mr. Taylor audibly breathless and unable to complete his sentences. Mr. Taylor reportedly was still experiencing diarrhea and chest pain. These complaints do not appear in the medical records but are consistent with his complaints to medical staff on other occasions. The audio recordings also provide some evidence that Mr. Taylor was complaining that medical staff were not treating or monitoring him. (TAYLOR 000393, TAYLOR 000392).

On February 9, 2022, at 0413, Deputy Hourmey informed the fifth-floor nurse that Taylor appeared to be physically weak, and it also seemed like he had breathing difficulty. He could barely walk. The fifth-floor nurse responded that she already checked him early on, and there was not much she could do for him." (TAYLOR 000316). Sergeant McGill reported that she spoke with "the night Charge Nurse Isaac regarding Taylor. Nurse Isaac informed me that Inmate Taylor was cleared by Dr. Crum yesterday, that he was seeking to stay in 3MED." (TAYLOR 000316).

On February 9, 2022, at 0445, LPN Mukamugamanyi again saw Mr. Taylor for complaints of "feeling very weak, having nausea, and unable to swallow". LPN Mukamugamanyi was not able

3 | Page

**EXHIBIT A**

to obtain Mr. Taylor's BP due to his frequent movements. His pulse was recorded as 80, R 20, and 02 95%. Charge Nurse Isaac was contacted to determine if Mr. Taylor could be housed in the medical unit. (DH 000028). However, there are no records indicating that the Charge Nurse ever evaluated Mr. Taylor.

On February 9, 2022, at 0824, in audio recordings made to non-medical staff, Mr. Taylor and his cellmate call Mr. Taylor's sister. Mr. Taylor struggles to speak, and his cellmate has to speak on his behalf. (TAYLOR 000394).

On February 9, 2022, between 0950 and 1020, Deputy Panchal noticed Mr. Taylor during his rounds and reported that "Taylor did not look good, he seems delirious, the other inmates were helping him out when he needed to use the bathroom." Taylor's hands and feet are blue, Nurse Bernice said that there is nothing that she can do." Panchal also reported that "Nurse Bernice said that her Charge Nurse said that inmate Taylor will not be going to medical Sergeant McGill spoke to Nurse Brokaw, who explained that Taylor was in medical last week and Dr. Crum cleared him yesterday. (TAYLOR 000317).

On February 9, 2022, at 1000, there was a "disturbance in the pod" related to Mr. Taylor, but he was cleared to stay in the current pod.

On February 9, 2022, at 1515, Sergeant McGill reported that she "spoke to Charge Nurse Melissa again regarding Inmate Taylor, she stated there was nothing wrong with him, he will only get morning and evening medication." (TAYLOR 000317).

On February 9, 2022, at 1604, Mr. Taylor was found on the floor by the deputy, and a Code Blue was called.

On February 9, 2022, at 1700, Mr. Taylor was declared dead.

On February 10, 2022, at 0857, an autopsy was performed by the Denver Medical Examiner. Cause of death was hypertensive and atherosclerotic cardiovascular disease, severe atherosclerosis of the aorta, severe arteriolonephrosclerosis, and left ventricular hypertrophy of the heart. Additional findings were marked anthrocosis of the lungs with emphysematous-type changes, mild cerebral edema, testicular atrophy, and sternal and rib fractures consistent with resuscitative efforts with no additional evidence of significant recent trauma.

## V.   Expert Opinions

My opinions are based upon my knowledge, education, training and experience, and the records, and videos I reviewed regarding this matter. All opinions outlined below are given to a reasonable degree of medical certainty. Additionally, discovery in this matter is ongoing and my opinions may be supplemented and modified in accordance with the evidence as it develops.

1. The accepted national standard regarding the medical care of inmates in jails is the National Commission on Correctional Health Care (NCCHC). Per their statement: The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system. These standards have helped jails improve the health of inmates and the communities to which they return, increase the efficiency of their health services delivery, strengthen their organizational effectiveness, and reduce their risk of adverse patient outcomes and legal judgments (NCCHC, 2018, p. vi).

2. Standard of care regarding inmates with acute medical conditions: Standard J-D-07, Emergency Services and Response Plan. The standard states: "planning for emergency health care ensures that all staff are prepared to effectively respond during emergencies". The standard further states "individual emergency planning differs from mass disaster planning. Policies and procedures for individual emergencies address on-site access to care, timeliness of response, and appropriate on-site and off-site interventions, including calling an ambulance and alerting the community emergency room" (NCCHC, 2018, pp. 80-81).

3. The responsibilities and duties of charge nurses may vary in some settings. Charge nurses for Denver Health, such as RN Melissa Brokaw and RN Isaac Karugu, are responsible for providing supervisory direction and guidance to nursing staff on their unit. They are charged with the duty to establish nursing care plans, evaluating outcome of patient care, consulting with other professionals as required, and adjusting nursing care processes as necessary to ensure quality patient care. They are also responsible for making emergency assessments in critical situations and providing necessary interventions to stabilize patient's medical conditions.[1]

4. The nursing staff breached the standard of care regarding Mr. Taylor. Starting on February 2, 2022, the nursing staff documented "pt appears ill but downplaying symptoms". Mr. Taylor complained of nausea, vomiting and diarrhea (n/v/d in progress note), and note that they were unable to auscultate his lungs clearly. If the staff was unable to auscultate his lungs clearly with the stethoscope they had, this should have been communicated to the physician on call. They should have also sought to get another stethoscope.

On February 5, 2022, at 2100, Mr. Taylor had a low oxygen level of 93%, and initially a blood pressure "unable to be obtained". The rest of his vital signs were T97.4, P94, R18, later a BP of 139/78 at 0430. (DH 000030). With his complaints of a productive cough, his oxygen saturation of 93% should have been addressed by RN Calaway, who took the vital signs. There is no indication in the chart that she addressed the issue with any licensed provider.

---

[1] https://www.denvergov.org/content/dam/denvergov/Portals/672/documents/JobSpecifications/Unit_Charge_Nurse_CO1599.pdf

5 | P a g e

**EXHIBIT A**

On February 6, 2022, at 2000, Mr. Taylor is seen by RN Karugu, where he was found to be hypotensive with a blood pressure of 96/67, and an oxygen saturation of 94%. Knowing Mr. Taylor had a history of hypertension and recently had significantly elevated blood pressure readings, combined with the fact that he also was on multiple blood pressure medications, combined with the slightly low oxygen saturation of 94%, should have prompted RN Karugu to contact a licensed provider to seek guidance regarding Mr. Taylor's complaint and his vital sign readings. There is no indication RN Karugu did so, which breaches the NCCHC standard of care.

On February 7, 2022, at 2005, Mr. Taylor's BP was 98/72, HR 78, R 20, Sat 97%, T 97.2. Despite being hypotensive, a provider was not called regarding his blood pressure, or to obtain an order to hold his blood pressure medications if needed. Again, this breaches the NCCHC standard of care, as the physical exam findings (in this case his blood pressure) was not escalated to a higher level of care.

On February 8, 2022, at 2316, Mr. Taylor was complaining of having difficulty breathing and being unable to swallow. Even though his medications were crushed by the nurse, he still was unable to swallow them. LPN Mukamugamanyi had a duty to contact a licensed provider, as when a patient complains of inability to swallow where they previously were able to swallow without difficulty, would be considered an alarming physical exam finding, and would warrant referral to a provider. However, LPN Mukamugamanyi did not contact a provider regarding Mr. Taylor's dysphagia complaint, and instead "encouraged to wear mask and proper hand hygiene, with drinking plenty of fluid". With the complaint of not being able to swallow, LPN Mukamugamanyi's instructions to Mr. Taylor to "drink plenty of fluid" is not an appropriate intervention and breaches the standard of care.

On February 9, 2022, at 0445, again, LPN Mukamugamanyi evaluates Mr. Taylor for his complaint of feeling very weak, nausea, and inability to swallow. LPN Mukamugamanyi documented that she was unable to obtain a blood pressure "due to frequent movements done by the patient". Without a full set of vital signs, and a recent history episode of hypotension, LPN Mukamugamanyi did not contact a provider, but contacted the charge nurse "Nurse Issac" to "check on the patient" and have Mr. Taylor "housed in the medical [sic]", however, it is unclear whether this was done, as there is no further documentation by LPN Mukamugamanyi or Nurse Issac regarding follow up, or any interventions provided to Mr. Taylor to address his symptoms. Instead, it appears that nothing was done for him, and instead he was left without definitive medical care that could have ameliorated his symptoms and eased his suffering.

On February 9, 2022, LPN Bernice Chavarria Torres charts about a "disturbance in the pod". Rather than finding out what the issue was with Mr. Taylor, LPN Torres just states Mr. Taylor is cleared to stay in the current pod. For this same incident, Deputy Panchal also wrote in his report that "Nurse Bernice said that her Charge Nurse said that Mr. Taylor will not be going to medical." The deputy told LPN Torres that Mr. Taylor's hands and feet were blue, but she said that there was nothing she could do. The acceptable standard of care would be to evaluate the

**EXHIBIT A**

patient as the "urgency of symptoms must be based on the patient's perceptions. This is for situations where the patient tells an officer about a problem and then the officer contacts health services. Qualified health care professionals' response must entail performing an assessment in a clinically appropriate time frame; it is counterproductive for the nurse to tell a patient to sign up for sick call" (NCCHC, pg. 101). LPN Torres should have reviewed Mr. Taylor's chart and realized he was continuing to have serious medical issues and referred him to a provider. Instead, she did nothing, and did not evaluate him in person, which would have been the standard of care, as Mr. Taylor was clearly experiencing continued, serious medical problems which were not being addressed.

On February 9, 2022, at 10am, RN Brokaw documented that "the pt (patient) be housed in 3M due to the disturbance he was creating in the pod". There is no indication RN Brokaw evaluated him in person either, just states that "pt was not reporting any medical issues to Sgt. McGill". Acceptable practice would have been to evaluate Mr. Taylor in person, including a full set of vital signs and physical assessment, and make the appropriate referral to a licensed provider regarding his condition. Coupled with the fact that Mr. Taylor did not have any housing disturbance history in his history at the correctional facility, should have warranted further investigation as to why suddenly there was a perceived issue, as it was clearly out of character for this patient.

Because Nurse Torres said that there was nothing she could do for Mr. Taylor, Sgt. McGill wheeled him to the medical unit, and Nurse Torres, Brokaw, and Dr. Crum met about Mr. Taylor. None of the medical staff evaluated Mr. Taylor. Surveillance of the incident shows Dr. Crum at the cell for less than a minute before leaving Mr. Taylor. The medical staff left Mr. Taylor in a holding cell for several hours until he was eventually taken back to general population.

   5. RN Brokaw and RN Karugu failed in their responsibilities as Charge Nurses to properly oversee, monitor, and train the nurses that reported to them about Mr. Taylor's declining health. They failed to do any independent assessments of Mr. Taylor on February 8 and February 9 and directed their subordinates not to evaluate or treat Mr. Taylor.

   6. The nursing staff of the Downtown Denver Van Cise-Simonet Detention Center breached the applicable standard of care when they failed to appropriately assess Mr. Taylor starting on February 2, 2022, to the date of his death on February 9, 2022. By their own admission as stated above, they did not have adequate equipment (a stethoscope) to evaluate Mr. Taylor, and in another instance, they were unable to obtain a blood pressure due to "patient movement". This is not an acceptable practice, and another attempt (either with a manual blood pressure cuff or another staff member) should have been made to obtain Mr. Taylor's blood pressure. As Mr. Taylor continued to decline, and became weaker and unable to swallow, and increased difficulty breathing, the nursing staff had an obligation to accurately assess, treat, and refer Mr. Taylor for appropriate care. This was not done. If Mr. Taylor was appropriately

7 | P a g e

**EXHIBIT A**

assessed and communicated, and transferred to an ER, his worsening symptoms could have been addressed, and his life saved, versus suffering and dying in a jail housing unit alone days after his initial health complaints.

VI. **Compensation**

My hourly rate for records review and report drafting is $500/hr.

VII. **Prior Publications and Testimony**

Please see my CV for a list of publications and presentations in the last 10 years. I have not testified in any trial or deposition in the last 4 years.

References

National Commission on Correctional Health Care. Standards for Health Services in Jails. (2018). NCCHC.

*[signature: Susan Minter]*

Susan Minter, DNP, NP-C

8 | P a g e

**EXHIBIT A**