AMENDED EXPERT WITNESS AFFIDAVIT AND REPORT OF SUSAN MINTER, DNP

RE: Review of Death of Leroy "Nicky" Taylor, by and through Derek Taylor, Personal Representative

Taylor v. Denver Health et. al

Civil Action No.: 23-cv-02355-CNS-KAS

## I. Introduction

Plaintiff's counsel has retained me as an expert on correctional nursing standards of medical care, and to render opinions regarding the care of Leroy Taylor, while in the care of the Downtown Denver Van Cise-Simonet Detention Center from November 7th, 2021, to his death on February 9th, 2022.

## II. Statement of Expertise and Qualifications

I am an Advanced Practice Registered Nurse (APRN), a double board-certified Family Nurse Practitioner, and Adult Nurse practitioner in Florida, Texas, Montana, Alaska, Washington, Nevada, Arizona, Virginia, California, and Oregon. I received my MSN from the University of Maryland at Baltimore in 2001, and my doctorate from East Carolina University in 2019, and my postdoctoral FNP from East Carolina University in 2020. I have been a registered nurse (RN) for 34 years and a nurse practitioner for 23 years. As an APRN, I have 8 years' experience providing care for individuals in correctional settings. My experience includes approximately 4 years of providing care in the Virginia prison system, and full-time 4 years providing care in Florida county jails. I am a regular speaker at the National Commission on Correctional Healthcare (NCCHC) national conferences and the American Association of Nurse Practitioners (AANP) national conferences on current topics affecting nursing and nurse practitioners around the country. I was an executive board member for the Florida Association of Nurse Practitioners until December 2023, and State Membership Chair. My published East Carolina University doctoral study topic was focused on hypertension patient medication adherence. These experiences form the basis of my knowledge regarding standards of care that I believe are relevant to the issues in this case.

## III. Materials Reviewed in Forming this Opinion

1. First Amended Complaint
2. Mr. Taylor's Jail Records
3. Mr. Taylor's medical records
4. Movement History
5. Mr. Taylor's Housing History
6. 2022.02.02 - 2022.02.09 3M Occupancy
7. Jail Video Recordings
8. Audio Recordings from the jail concerning Mr. Taylor's health

1 | P a g e

**EXHIBIT B**

9. Denver City and County Autopsy Report
10. DPD GO Report
11. DSD Deputy Incident Reports
12. Denver Health Discovery (000001-936)
13. Inmate Interviews
14. Alice Mukamugemanyi, LPN Deposition Transcript
15. Bernice Chavarria Torres Deposition Transcript
16. Isaac Karugu, RN Deposition Transcript
17. Melissa Brokaw, RN Deposition Transcript
18. Sergeant Karen McGill Deposition Transcript
19. Deputy Serge Houmey Deposition Transcript
20. Derek Taylor Deposition Transcript
21. Sandra Manlove Deposition Transcript
22. Rajiv Panchal Deposition Transcript
23. Peter Crum, MD Deposition Transcript

## IV. Factual Background

On November 7, 2021, Mr. Taylor was booked into the Denver Van Cise-Simonet Detention Center ("DDC"). When he was booked into DDC, Mr. Taylor was seventy-one-years-old and had a documented history of hypertension, dating back to approximately 2018.

On January 24, 2022, Mr. Taylor tested positive for COVID-19.

On January 24, 2022, Denver staff determined that Mr. Taylor had a resolved positive COVID-19 case.

On January 29, 2022, Mr. Taylor was placed in "low risk housing" in the general population 5-D unit.

On February 1, 2022, at 1630, Mr. Taylor was seen for a chronic care appointment, with a follow up of 4 months.

On February 2, 2022, at 1755, Progress note from RN Rabon states that "many inmates concerned for patient stating he is throwing up and BM's on himself. Pt appears ill but downplaying symptoms. Swallowing own sputum makes him have the urge to throw up." Mr. Taylor was positive for nausea, vomiting, and diarrhea, and RN Rabon documented that he had been experiencing these symptoms for two days. RN Rabon's progress note further states that "lungs sound clear bilaterally but unable to auscultate clearly with provided stethoscopee." Medical history of hypertension (HTN) is noted. Mr. Taylor was noted to have blood pressure of 168/73, O2 93%, HR 125, and temperature of 98.9. (DH 000035). Several inmates stated that when Mr. Taylor left the general population unit, he had a fever of 105. (TAYLOR 000357 at 03:50; TAYLOR 000358 at 02:05).

2 | P a g e

On February 2, 2022, Mr. Taylor was housed in 3 Medical per the order of Dr. Crum. RN Rabon's progress note indicates that Mr. Taylor's orthostatic vital signs were to be checked and to call for abnormal results. Mr. Taylor was prescribed a clear liquid diet and Zofran BID 4 mg for 48 hours. (DH 000035).

On February 4, 2022, at 1528, Mr. Taylor was seen by E. Dranginis, PA, when he was complaining of nausea, vomiting and diarrhea. Noted to have an audible productive cough, and decreased breath sounds.  At the time of this visit, Mr. Taylor had been on Zofran for 2 days with no improvement in his symptoms of nausea, vomiting, and diarrhea. However, despite his lack of improvement, no additional interventions were added (such as injectable anti-emetics) to alleviate his symptoms. A chest Xray was ordered. (DH 000033).

On February 6, 2022, at 2000, Mr. Taylor was seen by I. Karugu, RN, for a headache and generalized aches. He was noted to have a blood pressure of 96/67, HR 72, Resp 18, O2 saturation of 94%.

On February 7, 2022, Mr. Taylor received the chest Xray.

On February 7, 2022, Mr. Taylor made several calls which captured his difficulty breathing and deterioration, and the calls were made during the same day that Mr. Taylor saw multiple medical staff members, therefore his deteriorating condition should have been apparent to them at the time. Additionally, Mr. Taylor left a voicemail for his public defender to ask if he "can be released to go to the hospital because he felt like he was dying." After hearing Mr. Taylor's voicemail, his attorney filed an emergency motion for his release, so he could go to the hospital.

On February 7, 2022,  at 0850, Mr. Taylor's BP was 120/76, P96, 02 94%, Resp 18. (DH 000030).

On February 7, 2022, at 2005, RN Karugu recorded Mr. Taylor's BP as 98/72, HR 78, Resp 20. O2 sat of 92%. (DH 000030).

On February 8, 2022, at 0910, RN Brokaw recorded Mr. Taylor's BP as 104/54, T 96.8, Resp 18, HR 67, O2 sat of 96%.  (DH 000030).

On February 8, 2022, at 1425, Mr. Taylor was cleared to return to general population (GP) per Dr. Crum. (DH 000031).

On February 8, 2022, at 2316, Mr. Taylor was seen by LPN Mukamugamanyi, where he complained of difficulty breathing and being unable to swallow. LPN Mukamugamanyi crushed the medication, but Mr. Taylor was still unable to swallow it. (DH 000029).

Again on February 8, 2022, several recorded phone calls to non-medical professionals capture Mr. Taylor audibly breathless and unable to complete his sentences. Mr. Taylor reportedly was still experiencing diarrhea and chest pain. These complaints do not appear in the medical records but are consistent with his complaints to medical staff on other occasions. The audio recordings

3 | P a g e

**EXHIBIT B**

also provide some evidence that Mr. Taylor was complaining that medical staff were not treating or monitoring him. (TAYLOR 000393, TAYLOR 000392).

On February 9, 2022, at 0413, Deputy Hourmey informed the fifth-floor nurse that Taylor appeared to be physically weak, and It also seemed like he had breathing difficulties. He could barely walk. The fifth-floor nurse responded that she already checked him early on, and there was not much she could do for him." (TAYLOR 000316). Sergeant McGill reported that she spoke with "the night Charge Nurse Isaac regarding Taylor. Nurse Isaac informed me that Inmate Taylor was cleared by Dr. Crum yesterday, that he was seeking to stay in 3MED." (TAYLOR 000316). Review of death investigation video with Inmate Kirkendall (who was housed in the same unit as Mr. Taylor), stated that "the charge nurse whoever was on at five this morning promised to come up and check on him. She [sic] never showed up. The deputy kept calling her, kept calling down to medical. They never came." (Taylor 000358).

On February 9, 2022, at 0445, LPN Mukamugamanyi again saw Mr. Taylor for complaints of "feeling very weak, having nausea, and unable to swallow". LPN Mukamugamanyi was not able to obtain Mr. Taylor's BP due to his frequent movements. His pulse was recorded as 80, R 20, and 02 as 95%. Charge Nurse Isaac was contacted to determine if Mr. Taylor could be housed in the medical unit. (DH 000028). LPN Mukamugemanyi testified that she talked to Charge Nurse Isaac Karugu about Mr. Taylor's condition after he made his second complaint on February 8, 2022 and reported her concerns to RN Karugu. LPN Mukamugemanyi reported that Mr. Taylor was not able to take his medication and that it was obvious that Mr. Taylor needed to be monitored since he called her twice in a shift. According to LPN Mukamugemanyi, RN Karugu indicated that he was going to assess Mr. Taylor. (Mukamugemanyi Depo., pgs. 83-85). RN Karugu testified that he would not have evaluated Mr. Taylor when LPN Mukamugemanyi contacted him, and he told her to contact the provider. RN Karugu never evaluated Mr. Taylor.

On February 9, 2022 at 0824, in audio recordings made to non-medical staff, Mr. Taylor and his cellmate call Mr. Taylor's sister. Mr. Taylor struggles to speak, and his cellmate has to speak on his behalf. (TAYLOR 000394).

On February 9, 2022 between 0700 and 0900, RN Brokaw testified the floor nurse Angelica told her that Mr. Taylor had an erection lasting several hours. RN Brokaw testified that "LPN Torres took his vital signs, and they looked great."(Brokaw, pg. 160). LPN Torres testified she did not have a conversation with RN Brokaw regarding Mr. Taylor having an erection, and she did not do any independent assessment on him. (Torres, pgs. 75-76).

On February 9, 2022 between 0950 and 1020, Deputy Panchal noticed Mr. Taylor during his rounds and reported that "Taylor did not look good, he seemed delirious, the other inmates were helping him out when he needed to use the bathroom." Taylor's hands and feet are blue, Nurse Bernice said that there is nothing that she can do." Panchal also reported that "Nurse Bernice said that her Charge Nurse said that inmate Taylor will not be going to medical Sergeant McGill.

4 | Page

**EXHIBIT B**

spoke to Nurse Brokaw, who explained that Taylor was in Medical last week and Dr. Crum cleared him yesterday. (TAYLOR 000317).

On February 9, 2022 at 1000, there was a "disturbance in the pod" related to Mr. Taylor, but he was cleared to stay in the current pod.

On February 9, 2022 at 1515, Sergeant McGill reported that she "spoke to Charge Nurse Melissa again regarding Inmate Taylor, she stated there was nothing wrong with him, he will only get morning and evening medication." (TAYLOR 000317).

On February 9, 2022 at 1604, Mr. Taylor was found on the floor by the deputy, and a code blue was called.

On February 9, 2022 at 1700, Mr. Taylor was declared dead.

On February 10, 2022 at 0857, an autopsy was performed by the Denver Medical Examiner. Cause of death was hypertensive and atherosclerotic cardiovascular disease, severe atherosclerosis of the aorta, severe arteriolonephrosclerosis, and left ventricular hypertrophy of the heart. Additional findings were marked anthrocosis of the lungs with emphysematous-type changes, mild cerebral edema, testicular atrophy, and sternal and rib fractures consistent with resuscitative efforts with no additional evidence of significant recent trauma.

## V.      Expert Opinions

My opinions are based upon my knowledge, education, training and experience, and the records, and videos I reviewed regarding this matter. All opinions outlined below are given to a reasonable degree of medical certainty. Additionally, discovery in this matter is ongoing and my opinions may be supplemented and modified in accordance with the evidence as it develops.

 1. The accepted national standard regarding the medical care of inmates in jails is the National Commission on Correctional Health Care (NCCHC). Per their statement: The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system. These standards have helped jails improve the health of inmates and the communities to which they return, increase the efficiency of their health services delivery, strengthen their organizational effectiveness, and reduce their risk of adverse patient outcomes and legal judgments (NCCHC, 2018, p. vi).

 2. Standard of care regarding inmates with acute medical conditions: Standard J-D-07, Emergency Services and Response Plan. The standard states: "planning for emergency health care ensures that all staff are prepared to effectively respond during emergencies". The standard further states "individual emergency planning differs from mass disaster planning. Policies and procedures for individual emergencies address on-site access to care, timeliness of response, and appropriate on-site and off-site interventions, including calling an ambulance and alerting the community emergency room" (NCCHC, 2018, pp. 80-81).

**EXHIBIT B**

    3.      The responsibilities and duties of charge nurses may vary in some settings. Charge nurses for Denver Health, such as RN Melissa Brokaw and RN Isaac Karugu, are responsible for providing supervisory direction and guidance to nursing staff on their unit. They are charged with the duty to establish nursing care plans, evaluating outcome of patient care, consulting with other professionals as required, and adjusting nursing care processes as necessary to ensure quality patient care. They are also responsible for making emergency assessments in critical situations and providing necessary interventions to stabilize patient's medical conditions.[1]

    4.      The nursing staff breached the standard of care regarding Mr. Taylor. Starting on February 2, 2022, the nursing staff documented "pt appears ill but downplaying symptoms." Mr. Taylor complained of nausea, vomiting and diarrhea (n/v/d in progress note), and nursing staff note that they were unable to auscultate his lungs clearly. If the staff was unable to auscultate his lungs clearly with the stethoscope they had, this should have been communicated to the physician on call. They should have also sought to get another stethoscope.

On February 5, 2022, at 2100, Mr. Taylor had a low oxygen level of 93%, and initially a blood pressure "unable to be obtained." The rest of his vital signs were T97.4, P94, R18, later a BP of 139/78 at 0430. (DH 000030). With his complaints of a productive cough, his oxygen saturation of 93% should have been addressed by RN Calaway, who took the vital signs. There is no indication in the chart that she addressed the issue with any licensed provider.

On February 6, 2022, at 2000, Mr. Taylor is seen by RN Karugu, where he was found to be hypotensive with a blood pressure of 96/67, and an oxygen saturation of 94%. RN Karugu testified that Mr. Taylor's blood pressure fluctuations of 121/55, 139/78, 117/83, 96/67, 120/76 98/72, and 104/54 were not a cause for concern, and were in fact normal blood pressures for someone with hypertension, and he did not contact a provider about Mr. Taylor on February 6th or February 7 (Karugu, p. 162-163).

Mr. Taylor's fluctuations in blood pressure were a cause of concern that RN Karugu should have contacted a licensed provider about. Knowing Mr. Taylor had a history of hypertension and recently had significantly elevated blood pressure readings, combined with the fact that he also was on multiple blood pressure medications, combined with the slightly low oxygen saturation of 94%, should have prompted RN Karugu to contact a licensed provider to seek guidance regarding Mr. Taylor's complaint and his vital sign readings. There is no indication RN Karugu did so, which breaches NCCHC standard of care which states "the patient is referred to a provider to be evaluated" when necessary (NCCHC, p. 101).

---

[1] https://www.denvergov.org/content/dam/denvergov/Portals/672/documents/JobSpecifications/Unit_Charge_Nurse_CO1599.pdf

**EXHIBIT B**

On February 7, 2022, at 2005, Mr. Taylor's BP was 98/72, HR 78, R 20, Sat 97%, T 97.2. RN Karugu knew that a person like Mr. Taylor, who typically experienced hypertension, suddenly experiencing hypotension was alarming and warranted contacting a provider. (Karugu, p. 141-142). A blood pressure change from a high of 139/78 to a low of 96/67, would be a concerning physical assessment sign, as Mr. Taylor had a history of elevated blood pressure, and no recent changes to his blood pressure medication. Therefore, the sudden drop in blood pressure would be an objective and obvious sign of declining condition that the nursing staff should have realized and addressed with a provider.   Despite Mr. Taylor being hypotensive, a provider was not called regarding his blood pressure, or to obtain an order to hold his blood pressure medications if needed, as RN Karugu testified there was no indication of doing so. (Karugu, p. 176).  This also breaches the same NCCHC standard of care, as the physical exam findings (in this case his blood pressure) was not escalated to a higher level of care.

On February 8, 2022, at 2316, Mr. Taylor was complaining of having difficulty breathing and being unable to swallow. Even though his medications were crushed by the nurse, he still was unable to swallow them. LPN Mukamugamanyi had a duty to contact a licensed provider, as when a patient complains of inability to swallow where they previously were able to swallow without difficulty, would be considered an alarming physical exam finding, and would warrant referral to a provider. However, LPN Mukamugamanyi did not contact a provider regarding Mr. Taylor's dysphagia complaint, and instead "encouraged to wear mask and proper hand hygiene, with drinking plenty of fluid." With the complaint of not being able to swallow, LPN Mukamugamanyi's instructions to Mr. Taylor to "drink plenty of fluid" is not an appropriate intervention and was not a sufficiently appropriate response to his complaint, and  breaches acceptable nursing standards of care. New onset difficulty swallowing is a concerning symptom, often with more ominous consequences. Nurse Mukamugamanyi stated in her note on 2/8/2022 that Mr. Taylor "refused his medication because he stated he can't swallow them". There is a difference between a "refusal" and "inability," which in this case, is the latter. A patient has the right to refuse treatment (and medications). However, in this instance, the issue is the inability of the patient to swallow. A thorough nursing assessment would consist of reviewing the patient's medication adherence, and if there was a change in the adherence for instance, if a previously compliant patient suddenly stopped taking prescribed medication (as in this instance) nursing judgement would dictate the nurse investigate what the reason was (patient states he can't swallow-a new complaint), and conduct a thorough physical exam, and report the subjective and objective findings to a licensed provider, which was not done. A sudden inability to swallow, without a previous history of such, constitutes a "red flag" symptom- a warning sign that may indicate a serious underlying health condition, which may require urgent evaluation and assessment.  A licensed practical nurse should have the background, training, and assessment skills to recognize this, and escalate care to the appropriate provider. This was not done, which breaches the nursing standard of care in this instance.

**EXHIBIT B**

On February 9, 2022 at 0445, again, LPN Mukamugamanyi evaluated Mr. Taylor for his complaint of feeling very weak, nausea, and inability to swallow. LPN Mukamugamanyi documented that she was unable to obtain a blood pressure "due to frequent movements done by the patient." Without a full set of vital signs, and a recent history episode of hypotension, LPN Mukamugamanyi did not contact a provider, but contacted the charge nurse "Nurse Issac" to "check on the patient" and have Mr. Taylor "housed in the medical [sic]," however, This was not done. RN Karugu testified he did not evaluate Mr. Taylor, nor any interventions provided to Mr. Taylor to address his symptoms. Instead, it appears that nothing was done for him, and he was left without definitive medical care that could have ameliorated his symptoms and eased his suffering. RN Karugu testified he was indeed contacted by LPN Mukamugamanyi around 4:45am regarding Mr. Taylor. Instead of evaluating Mr. Taylor himself as the charge nurse ultimately responsible for the nursing care in the DDC, he told LPN Mukamugamanyi to "check the patient again, reassess. If the assessment, you know, is pointing like the patient getting worse or something is happening, she needed to contact the provider." (Karugu, p. 189).

As the charge RN, the accepted standard of care would be for the charge RN to evaluate the patient after being notified by a lower licensed staff member (in this case, a licensed practical nurse), and not instruct the LPN to reassess the patient, and to contact the provider herself. The actions and lack thereof by RN Karugu placed Mr. Taylor at significant risk of serious harm.

On February 9, 2022, LPN Bernice Chavarria Torres charts about a "disturbance in the pod." There is conflicting testimony about whether there was truly a disturbance in the pod. The DSD employees deny that there was ever a disturbance before Mr. Taylor passed away, and they deny ever reporting to Denver Health employees that there was a disturbance. (Panchal, pgs. 54-55, 62; McGill, pgs. 68-69, 73). The video of LPN Torres does not show that there was a disturbance in the pod, but that inmates brought Mr. Taylor to her in a wheelchair. (TAYLOR 500, 501). Inmate Wasnak reported to LPN Chavarria Torres that Mr. Taylor could not go to the bathroom, eat, and hadn't drank anything. He stated that inmates wheeled Mr. Taylor to LPN Torres and begged her to help Mr. Taylor. Mr. Wasnak stated that it was obvious that Mr. Taylor was dehydrated and delirious (TAYLOR 000357). Another inmate, Mr. Kirkendall, stated that when they wheeled Mr. Taylor to the nurse, Mr. Taylor's hands were purple from his elbow to his fingertips, and his feet were also purple. (TAYLOR 000358). Mr. Kirkendall stated that he observed LPN Torres call down to medical and inform the person she spoke with that Mr. Taylor's hands were purple. Security footage captures LPN Torres make a phone call after the inmates brought Mr. Taylor to her in a wheelchair. (TAYLOR 500, 501). For this same incident, Deputy Panchal also wrote in his report that "Nurse Bernice said that her Charge Nurse said that Mr. Taylor will not be going to medical." The deputy told LPN Torres that Mr. Taylor's hands and feet were blue, but she said that there was nothing she could do. Because RN Brokaw told LPN Torres that there was nothing they could do for Mr. Taylor, Deputy Panchal felt that he needed to escalate the situation to his sergeant so that Mr. Taylor could get medical care. (Panchal, pg. 26). LPN Torres and RN Brokaw egregiously deviated from the standard of

8 | P a g e

**EXHIBIT B**

nursing care when they ignored the very serious signs and symptoms displayed by Mr. Taylor. LPN Torres should have done an independent evaluation of Mr. Taylor but failed to do so and instead ignored him. RN Brokaw likewise failed to do any independent evaluation of Mr. Taylor. The failure of both nurses to notify a provider about Mr. Taylor's serious symptoms or to even obtain vital signs is a significant deviation from the standard of nursing care. The failure to act when presented with Mr. Taylor's serious symptoms placed him at significant risk or serious harm. Both nurses failed to document this conversation, another deviation from the standard of care.

Rather than finding out what the issue was with Mr. Taylor, LPN Torres just states Mr. Taylor is cleared to stay in the current pod. LPN Torres should have reviewed Mr. Taylor's chart and realized he was continuing to have serious medical issues, and done a physical assessment on him immediately, and contacted her supervisor/charge RN with any concerns. Instead, she did nothing, and did not evaluate him in person, which would have been the standard of care, as Mr. Taylor was clearly experiencing continued, serious medical problems which were not being addressed.

In her testimony, LPN Torres stated Mr. Taylor "refused to speak to her on February 9 (Torres, p. 94). She stated she did not get a written refusal of treatment for Mr. Taylor. She stated to obtain a refusal as "it is a big process since there's over a thousand inmates in there. So marking every refuse [sic] for each person, it wasn't going to be exactly possible (Torres, p. 95). This description by LPN Torres of why she did not obtain a refusal for treatment from Mr. Taylor is a breach of both Denver Health's standards, and NCCHC standards of care. NCCHC standard J-G-05 states "all examinations, treatments, and procedures are governed by informed consent practices applicable in the jurisdiction." Additionally, the standard states either the inmate signs the refusal or "if the patient does not sign the refusal form, it is to be noted on the form by a second health or custody staff witness" (NCCHC, p. 137). By applying erroneous judgement to what should or should not constitute a need for a documented refusal, LPN Torres violated the accepted standard of care by not obtaining either (1) a signed refusal for evaluation and treatment from Mr. Taylor, or (2) double signing with a witness and herself the refusal.

On February 9, 2022, at 10am, RN Brokaw documented that "the pt (patient) be housed in 3M due to the disturbance he was creating in the pod." There is no indication RN Brokaw evaluated him in person either, just states that "pt was not reporting any medical issues to Sgt. McGill". Acceptable practice would have been to evaluate Mr. Taylor in person, including a full set of vital signs and physical assessment, and make the appropriate referral to a licensed provider regarding his condition. Coupled with the fact that Mr. Taylor did not have any housing disturbance history in his history at the correctional facility, should have warranted further investigation as to why suddenly there was a perceived issue, as it was clearly out of character for this patient. As a registered nurse, RN Brokaw had the foundational nursing education and training to identify that Mr. Taylor was presenting with aberrant and concerning signs and symptoms that required a higher level of care that could not be provided at the Denver Jail but

9 | P a g e

**EXHIBIT B**

instead of contacting the provider or sending Mr. Taylor out, RN Brokaw chose to ignore these very disconcerting signs and symptoms and directed LPN Torres to do the same. RN Brokaw failed to conduct the thorough and appropriate assessment that Mr. Taylor's presenting condition required. Instead, RN Brokaw merely kept Mr. Taylor in the housing unit. RN Brokaw also failed to document her conversation with LPN Torres, another significant deviation in the standard of nursing care. The actions and lack thereof by RN Brokaw placed Mr. Taylor at significant risk of serious harm.

Because Nurse Torres said that there was nothing she could do for Mr. Taylor, Sgt. McGill wheeled him to the medical unit, and Nurse Torres, Brokaw, and Dr. Crum met about Mr. Taylor. None of the medical staff evaluated Mr. Taylor. Surveillance of the incident shows Dr. Stob at the cell for less than a minute before leaving Mr. Taylor. The medical staff left Mr. Taylor in a holding cell for several hours until he was eventually taken back to general population.

   5. RN Brokaw and RN Karugu failed in their responsibilities as Charge Nurses to properly oversee, monitor, and train the nurses that reported to them about Mr. Taylor's declining health. They failed to do any independent assessments of Mr. Taylor on February 8th and February 9th, and directed their subordinates not to evaluate or treat Mr. Taylor.

The nursing staff of the Downtown Denver Van Cise-Simonet Detention Center breached the applicable standard of care when they failed to appropriately assess Mr. Taylor starting on February 2, 2022, to the date of his death on February 9, 2022. By their own admission as stated above, they did not have adequate equipment (a stethoscope) to evaluate Mr. Taylor, and in another instance, they were unable to obtain a blood pressure due to "patient movement." This is not an acceptable practice, and another attempt (either with a manual blood pressure cuff or another staff member) should have been made to obtain Mr. Taylor's blood pressure. As Mr. Taylor continued to decline, and became weaker and unable to swallow, and increased difficulty breathing, the nursing staff had an obligation to accurately assess, treat, and refer Mr. Taylor for appropriate care. This was not done. If Mr. Taylor was appropriately assessed and communicated, and transferred to an ER, his worsening symptoms could have been addressed, and his life saved, versus suffering and dying in a jail housing unit alone days after his initial health complaints.

Reviewing the care and treatment rendered to Mr. Taylor and the depositions in this case indicates that healthcare staff grossly departed from the treatment and standards of care that Mr. Taylor desperately needed. The repeated failures to escalate care to medical staff indicates failure to properly train and supervise.

VI. <u>Compensation</u>

My hourly rate for records review and report drafting is $500/hr.

VII.   **Prior Publications and Testimony**

Please see my CV for a list of publications and presentations in the last 10 years. I have not testified in any trial or deposition in the last 4 years.

References

National Commission on Correctional Health Care. Standards for Health Services in Jails. (2018). NCCHC.

Susan Minter, DNP, NP-C

11 | P a g e

**EXHIBIT B**