IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:23-cv-02355-CNS-KAS

ESTATE OF LEROY "NICKY" TAYLOR, by and through DEREK TAYLOR, Personal Representative,

      Plaintiff,

v.

DENVER HEALTH AND HOSPITAL AUTHORITY, a political subdivision of the State of Colorado;
PETER CRUM, M.D., in his individual capacity;
MELISSA BROKAW, RN, in her individual capacity;
BERNICE CHAVARRIA TORRES, LPN, in her individual capacity;
ISAAC KARUGU, RN, in his individual capacity;
ALICE MUKAMUGEMANYI, LPM; in her individual capacity;
JOHN DOES 1-20, in their individual and official capacities,

      Defendants.

---

# ORDER

---

Before the Court are Defendants Melissa Brokaw, Bernice Chavarria Torres, Alice Mukamugemanyi, Isaac Karugu, and Dr. Peter Crum's (the Medical Staff Defendants') Motion for Summary Judgment, ECF No. 88, and Defendant Denver Health and Hospital Authority's (Denver Health's) Motion for Summary Judgment, ECF No. 89. For the following reasons, the Court DENIES the Medical Staff Defendants' motion, and GRANTS IN PART and DENIES IN PART Denver Health's motion. In doing so, the Court presumes the parties' familiarity with this case's procedural background, the parties' summary

1

judgment briefing, and the legal standard governing the Court's analysis of their summary judgment motions. *See, e.g.,* Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). The Court addresses the parties' motions in turn.

## I.    BACKGROUND

A brief summary of material undisputed facts, drawn from the parties' briefing and evidentiary submissions attendant to both summary judgment motions, suffices. The Court discusses material factual disputes identified by the parties, as well as what a reasonable jury could find based on the summary judgment record, in the Court's analyses of both summary judgment motions below.

Denver Health has a hierarchy for jail medical staff. *See* ECF No. 89 at 2. Denver Health is responsible for providing inmates with medical care at the jail, reviewing medical care that is provided, supervising Denver Health employees, and disciplining its employees. *See* ECF No. 109 at 4. Denver Health's jail providers also receive some policies and protocols regarding inmate medical problems. *See* ECF No. 107 at 3. Some of these protocols are used to guide care for nursing staff. *See id.* It is not the practice at Denver Health for charge nurses to go to general population floors to check on patients. ECF No. 109 at 5. According to Denver Health, the Medical Staff Defendants' conduct was consistent with Denver Health's policies and protocols. *See* ECF No. 109 at 7.

Mr. Taylor began serving a sentence at the jail on November 7, 2021. ECF No. 106 at 2. In mid to late January 2022, Mr. Taylor tested positive for Covid-19. ECF No. 110 at 10. On February 1, 2022, Mr. Taylor was seen by the hypertension clinical care team. ECF No. 106 at 3. He was diagnosed with a history of hypertension and arthritis,

with his blood pressure, 114/83, in "good control." *Id.* He was prescribed and began taking Norvasc, Lisinopril and HCTZ. *Id.* Mr. Taylor's treatment plan included a follow-up in four months, a baseline EKG, monthly blood pressure checks, and follow-up care upon release. *Id.*

On February 2, 2022, Mr. Taylor was transferred from general population to the medical unit. *Id.* That same day, several general population inmates reported Mr. Taylor was experiencing diarrhea and vomiting. ECF No. 110 at 6. Based on this information, Denver Sheriff's Department Deputy Robert Ortiz requested medical attention for Mr. Taylor. *Id.* Nikki Rabon, RN, then contacted Dr. Peter Crum and informed Dr. Crum of Mr. Taylor's symptoms. ECF No. 110 at 7.

On February 4, 2022, Emily Dranginis, PA, ordered a chest x-ray for Mr. Taylor, continued nausea medication that he was prescribed, and added medication for diarrhea. ECF No. 110 at 8. Throughout February 5–8, 2022, Mr. Taylor's temperature, pulse, respiration rate, oxygen saturation, and blood pressure were assessed seven times. ECF No. 106 at 4. On February 6, 2022, Mr. Taylor was given a C. Diff test, the result of which were negative. *Id.* On February 6, 2022, Melissa Brokaw, RN, worked in the medical unit from 5:23 a.m. until 6:53 p.m.; Isaac Karugu, RN, worked from 5:31 p.m. until 6:33 a.m. on February 7, 2022. ECF No. 110 at 8. On February 8, 2022, Mr. Taylor was cleared to return to general population. ECF No. 106 at 5. That same day, Mr. Taylor complained to Alice Mukamugemanyi, LPN, that he was having difficulty breathing and was unable to swallow. ECF No. 110 at 10.  Based on Mr. Taylor medical records, LPN Mukamugemanyi knew Mr. Taylor's previous blood pressure readings, that Mr. Taylor had recently tested

positive for Covid-19, was on anti-hypertensive medications, and had just been in the medical unit. ECF No. 110 at 10. In response to Mr. Taylor's complaints that he was having trouble breathing and swallowing, LPN Mukamugemanyi encouraged Mr. Taylor to wear a mask, engage in proper hand hygiene, and drink plenty of fluid. ECF No. 110 at 10. Dr. Peter Crum, the "Responsible Physician" at the jail, is responsible for the oversight of clinical decisions. *See* ECF No. 109 at 5. On February 8, 2022, Dr. Crum cleared Mr. Taylor to return to the general population. *See id.* Dr. Crum did not do an in-person assessment of Mr. Taylor. *See id.*

On February 9, 2022, RN Karugu stated to LPN Mukamugemanyi that he would assess Mr. Taylor to see if Mr. Taylor should be transferred to the medical unit. ECF No. 110 at 10. On February 9, 2022, Mr. Taylor was transferred from Pod 5D to a holding cell of the jail's third floor by Sheriff's deputies at 10:00 a.m. *See* ECF No. 106 at 5. Dr. Christian Stob was working at the third floor at the jail on February 9, 2022. *Id.* at 6. Dr. Stob eventually asked Mr. Taylor what was "going on." *Id.* at 7. Mr. Taylor responded that his hands were blue. *Id.* Dr. Stob asked Mr. Taylor to remove the socks covering his hands. *Id.* At approximately 1:40 p.m., Mr. Taylor was escorted back to Pod 5D by the sheriffs. *Id.* Mr. Taylor was found unresponsive in his bunk at approximately 4:07 p.m. on February 9, 2022. *Id.*

## II.    ANALYSIS

### A. The Medical Staff Defendants' Motion

The Medical Staff Defendants seek summary judgment on Plaintiff's claims against them, essentially arguing Plaintiff cannot meet its burdens under the Eighth Amendment's

deliberate indifference *objective* and *subjective* components. *See, e.g.,* ECF No. 88 at 2, 10, 15; *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) ("The [d]eliberate indifference [standard] has objective and subjective components." (quotations omitted)). The Court analyses these components, and the parties' arguments attendant to them, in turn.

### 1. Objective Component

According to the Medical Staff Defendants, Plaintiff cannot meet its burden under the Eighth Amendment's *objective* component because "Mr. Taylor was [not] deprived of a sufficiently serious medical need." ECF No. 88 at 11; *see also* ECF No. 110 at 14. Plaintiff counters Mr. Taylor "suffered a serious medical condition" because "death is, without doubt, sufficiently serious to meet the objective component." ECF No. 106 at 25 (quotations omitted). The Court agrees with Plaintiff.

As Plaintiff observes, "'death, [is], without doubt, sufficiently serious to meet the objective component.'" *Burke*, 935 F.3d at 992 (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)). The Medical Staff Defendants seek distance from *Burke*, emphasizing Mr. Taylor's symptoms and "medical need[s] *prior to* his death." ECF No. 88 at 11 (emphasis added); *see also id.* ("Mr. Taylor's complaints were of nausea, diarrhea and vomiting."). But this emphasis is misplaced. "[T]he question raised by the objective prong of the deliberate indifference test is whether the alleged harm . . . is sufficiently serious . . . rather than whether *the symptoms* displayed to the prison employee are sufficiently serious . . . ." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005) (emphasis added). And here the Medical Staff Defendants do not—and cannot—dispute Mr. Taylor

ultimately died. *See* ECF No. 88 at 9; *Martinez*, 563 F.3d at 1088 ("[T]he *ultimate harm* to [the decedent was] his heart attack *and death* [and] was, without doubt, sufficiently serious to meet the objective component." (quotations omitted) (emphasis added)).

Accordingly, given this undisputed material fact, and death's undoubted seriousness, *see, e.g., Burke*, 935 F.3d at 992, Plaintiff has satisfied the *objective* component, and the Court need not indulge the Medical Staff Defendants' remaining arguments. *See, e.g.,* ECF No. 88 at 12 (arguing Plaintiff cannot meet *objective* component because "Mr. Taylor was not compliant with the medical staff").

### 2. *Subjective Component*

The Medical Staff Defendants argue Plaintiff cannot satisfy its *subjective* component burden as to each Medical Staff Defendant. *See, e.g.,* ECF No. 88 at 14. The Court addresses each Medical Staff Defendant, and the parties' arguments attendant to them, in turn. *See Johnson v. Sanders*, 121 F.4th 80, 90 (10th Cir. 2024) ("[T]he deliberate indifference standard . . . demands an individualized assessment."). As a preliminary matter, Plaintiff asserts the Medical Staff Defendants may be liable under both the *subjective* component's "failure to properly treat" and "gatekeeper" theories of liability. *See generally* ECF No. 106; *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023) (explaining how "subjective component can be satisfied under two theories"). The Medical Staff Defendants do not dispute they may be found liable under either or both theories, challenging only the evidentiary support on the summary judgment record for Plaintiff's claims against them. *See, e.g.,* ECF No. 110 at 1 ("[T]here is no genuine issue of material fact and summary judgment is warranted."); *Johnson v.*

*Sanders*, 121 F.4th at 94–95 (observing "gatekeeping liability can apply to medical professionals" (quotations omitted)).

> ### i.    Alice Mukamugemanyi, LPN

The Medical Staff Defendants argue Plaintiff cannot meet its *subjective* component burden as to Nurse Mukamugemanyi because:

- She saw Mr. Taylor on February 8 and February 9, 2022,

- She only "took his blood pressure, pulse rate, oxygen level, respiration rate and listened to his lungs,"

- At the time these vital signs were "reassuring,"

- Although Mr. Taylor "complained of feeling weak and having nausea" on February 9, 2022, he was taking his nausea medication and still recovering from Covid-19, and

- On February 9, 2022, Nurse Mukamugemanyi "confirmed" Mr. Taylor "was not in any distress and was stable."

ECF No. 88 at 16–17; *see also* ECF No. 110 at 18. Plaintiff resists, arguing evidence shows that on February 8, 2022, Nurse Mukamugemanyi was aware Mr. Taylor "was having trouble swallowing," that his deteriorating physical condition was "obvious" on both February 8 and 9, that she ignored Mr. Taylor's distress, and failed to "escalate" his medical care "to a provider." ECF No. 106 at 32. Therefore, Plaintiff argues Nurse Mukamugemanyi "can be found liable [under] both theories," ECF No. 106 at 33, of deliberate indifference: the "failure to properly treat" theory and the "gatekeeper" theory. The Court agrees with Plaintiff that a reasonable jury could find that her conduct amounted to deliberate indifference under both *subjective* component theories.

*Failure to Properly Treat*. As to Nurse Mukamugemanyi's "failure to properly treat," Mr. Taylor on February 8 and 9, 2022, *see id.*, Plaintiff has created a sufficient factual dispute to survive summary judgment on its claim against Nurse Mukamugemanyi under this *subjective* component theory. Plaintiff marshals evidence showing Mr. Taylor complained to Nurse Mukamugemanyi that he was having difficulty breathing and swallowing, and that she had knowledge of Mr. Taylor's relevant and complex medical history. *See* ECF No. 106 at 13; *see also* ECF No. 88-2 at 3–4; ECF No. 106-34 at 4. Crucially, Plaintiff has identified evidence showing Nurse Mukamugemanyi had actual knowledge of Mr. Taylor's serious medical conditions—difficulty breathing and an inability to swallow—and failed to take steps to treat *those* conditions—instead telling Mr. Taylor to "wear a mask and [engage in] proper hand hygiene [and] drink plenty [of] fluid." ECF No. 88-2 at 4; ECF No. 106-28 at 7; *Lucas*, 58 F.4th at 1140 ("[P]roviding some modicum of treatment does not per se insulate [a defendant.]"). Indeed, Nurse Mukamugemanyi testified "[Mr. Taylor] *wasn't able* to take medication." ECF No. 106-34 at 7 (emphasis added); *Est. of Jensen by Jensen v. Clyde*, 989 F.3d 848, 859 (10th Cir. 2021) ("We believe that these circumstances — particularly [the detainee's] self-report that she had been vomiting for four days and could not keep down water — present a risk of harm that would be obvious to a reasonable person.").

Thus, Plaintiff has created a triable issue of material fact as to whether Nurse Mukamugemanyi "was aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and that Nurse Mukamugemanyi actually drew such an inference—but nonetheless disregarded the risk of medical harm Mr. Taylor

faced. *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1264 (10th Cir. 2022) (quotations omitted); *Prince v. Sheriff of Carter Cnty*., 28 F.4th 1033, 1046 (10th Cir. 2022) ("[V]iewing the evidence in the light most favorable to the plaintiff . . . the record reflects that [an official] both knew of and *disregarded a serious risk* to [the inmate's] health.") (emphasis added); *Jensen*, 989 F.3d at 859. Contrary to the Medical Staff Defendants' arguments, based on the summary judgment record, and construing it in the light most favorable to Plaintiff, there is at a minimum a factual dispute as to whether Mr. Taylor's condition was "reassuring," ECF No. 88 at 16, and whether Mr. Taylor was in "*any distress* [or] stable" for purposes of analyzing Nurse Mukamugemanyi's knowledge and disregard of the risk to Mr. Taylor's health and safety on February 8 and 9, 2022, *id.* (emphasis added). *Cf. Est. of Hurtado by & through Hurtado v. Smith*, 119 F.4th 1233, 1238 (10th Cir. 2024) ("[T]he factual record contains *no evidence* from which a jury could infer conscious disregard." (citation omitted) (emphasis added)). A reasonable jury could find, based on the evidence discussed above, Nurse Mukamugemanyi was deliberately indifferent based on her failure to properly treat Mr. Taylor.

**Gatekeeping Theory**. Plaintiff also argues Nurse Mukamugemanyi can be found "liable" under a gatekeeping theory of deliberate indifference. *See* ECF No. 106 at 33; *Lucas*, 58 F.4th at 1137 ("The [gatekeeper] theory can apply to medical professionals when the professional knows that his or her role in a medical emergency is solely to refer the patient to another." (citation omitted)); *Johnson*, 121 F.4th at 94–95. The Medical Staff Defendants disagree, arguing "Mr. Taylor did not present with the need for additional

medical care nor was he in an emergent medical situation." ECF No. 110 at 18. The Court agrees with Plaintiff.

Discussed above, Plaintiff has created a triable issue of fact as to whether on February 8 and 9, 2022—when evidence shows he could not breathe or swallow—Mr. Taylor presented with the need for additional medical care. To be sure, Plaintiff does not dispute Nurse Mukamugemanyi contacted Nurse Karugu about Mr. Taylor and whether Mr. Taylor "[could] be housed in the medical [unit.]" *See* ECF No. 106 at 33; ECF No. 106-34 at 7. But simply because Nurse Mukamugemanyi "called" Nurse Karugu about Mr. Taylor's medical complaints and whether he "can be housed in the medical," *id.*, does not immunize her from liability under a theory of gatekeeper liability. *See, e.g., Lucas*, 58 F.4th at 1139 ("[I]t is possible to have *some* medical care and still state a claim under the gatekeeper theory.") (emphasis added). Especially where in his own deposition, Nurse Karugu testified that he was Nurse Mukamugemanyi's supervisor, and that when she came to him for "advice" regarding Mr. Taylor being "housed in medical," he directed her to "contact the [medical] provider." ECF No. 106-5 at 16.

Thus, Plaintiff has created a triable issue of fact as to whether Nurse Mukamugemanyi failed to fulfill her obligation "to refer or otherwise afford [Mr. Taylor] access to medical personnel *capable* of evaluating [his] treatment needs . . ." *Lucas*, 58 F.4th at 1139 (citation omitted) (emphasis added). At bottom, a reasonably jury could find there "was the functional equivalent of a complete denial of care" in light of Nurse Mukamugemanyi's failure to notify a medical provider of Mr. Taylor's medical needs— rather than simply "call" Nurse Karugu about housing Mr. Taylor in the medical unit. *Id.*;

*see also Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1160 (10th Cir. 2022) ("[A] reasonable jury could find that [an individual defendant] abdicated her gatekeeping duties by failing to obtain *medical assistance* for [the plaintiff].") (emphasis added).

Fundamentally, Plaintiff has created sufficient factual disputes as to

- the seriousness and obviousness of Mr. Taylor's medical needs on February 8 and 9, 2022,

- Nurse Mukamugemanyi's awareness of them,

- her failure to properly treat Mr. Taylor's needs, and

- her failure to otherwise afford Mr. Taylor access to medical assistance for his medical needs.

*Lucas*, 58 F.4th at 1139; *see also id.* ("[D]oing nothing in the face of serious medical needs is obviously sufficient to state a claim under both theories."). And based on the evidence giving rise to these disputes, a reasonable jury could find Nurse Mukamugemanyi  was deliberately indifferent under both "failure to properly treat" and "gatekeeper" *subjective* component theories. Accordingly, Plaintiff survives the Medical Staff Defendants' summary judgment motion as to its deliberate indifference claim against Nurse Mukamugemanyi under both "failure to properly treat" and "gatekeeper" *subjective* component theories.

## ii.    *Berenice Chavarria Torres, LPN*

Seeking summary judgment on Plaintiff's deliberate indifference claim against Nurse Torres, the Medical Staff Defendants argue

- Mr. Taylor ignored Nurse Torres when she "tried to talk to [him] directly" on February 9, 2022,

- she did "not see [him] in any distress,"

11

- No one reported "Mr. Taylor was sick," and

- Nurse Torres "spoke to the floor nurse" and "went to medical
  to get the records."

ECF No. 88 at 17; *see also* ECF No. 110 at 18. Plaintiff identifies contrary evidence it
contends shows—or at least creates a triable issue of fact as to whether—on February 9,
2022, Nurse Torres "knew the seriousness of Mr. Taylor's condition" and that "he was at
risk of harm," but nonetheless was deliberately indifferent to this risk "under [both] the
failure to properly treat and gatekeeper theories." ECF No. 106 at 35. The Court agrees
with Plaintiff.

  ***Failure to Properly Treat.*** As to Nurse Torres's "failure to properly treat" Mr.
Taylor on February 9, 2022, Plaintiff has created a sufficient factual dispute under this
theory to survive the Medical Staff Defendants' summary judgment motion. As to Nurse
Torres's knowledge and disregard of an "excessive risk" to Mr. Taylor's health and safety,
*Beauford*, 35 F.4th at 1263, Plaintiff has identified the following evidence:

- Video footage showing inmates presented Mr. Taylor to
  Nurse Torres, who examined Mr. Taylor's blue feet,

- Video footage of Nurse Torres calling the medical unit after
  this examination,

- Statements from Floyd Kirkendoll that Nurse Torres
  "called down to medical and told them [Mr.] Taylor's arms,
  hands, and feet were purple", and

- Statements from Officer Panchal that he "tried to explain
  to Bernice [Torres] that inmate Taylors [sic] Hands and
  Feet are blue, Nurse [Torres] said that there is nothing that
  she can do."

ECF No. 88-6; ECF No. 106-13 at 12; ECF No. 106-12 at 1.

This evidence, if credited by a factfinder, could support a finding that Nurse Torres was deliberately indifferent in failing to provide treatment for the substantial risk of serious harm that Mr. Taylor faced on February 9, 2022. *See, e.g., Beauford*, 35 F.4th at 1263. And this evidence certainly undermines the Medical Staff Defendants' argument that no one reported Mr. Taylor was "sick" or that Nurse Torres observed no signs of "distress" when she saw Mr. Taylor on February 9, 2022. ECF No. 88 at 17. Accordingly, Plaintiff survives the Medical Staff Defendants' summary judgment motion on a "failure to treat" *subjective* component theory. *See, e.g., Lucas*, 58 F.4th at 1139–40; *Prince*, 28 F.4th at 1046; *Jensen*, 989 F.3d at 859 ("Despite this obvious risk to Ms. Jensen, [the defendant] failed to take any reasonable measures.").

**Gatekeeper Theory.** Plaintiff also argues that a "reasonably jury could conclude that [Nurse] Torres was deliberately indifferent under the . . . gatekeeper" theory. ECF No. 106 at 35. The Medical Staff Defendants reiterate that Nurse Torres "did not see Mr. Taylor in any distress." ECF No. 110 at 18. But the Court agrees with Plaintiff that, at a minimum, there are triable issues of material fact as to whether Nurse Torres failed to "afford access to medical personnel capable of evaluating [Mr. Taylor']s treatment needs." *Johnson*, 121 F.4th at 94.

Discussed above, Plaintiff has put forth evidence showing a reasonably jury could find Nurse Torres saw Mr. Taylor was in distress. *Cf.* ECF No. 110 at 18; ECF No. 88 at 17. Indeed, contrary to the Medical Staff Defendants' arguments, Mr. Taylor was in *more* than mere distress. *See, e.g.,* ECF No. 88-6; ECF No. 106-13 at 12; ECF No. 106-12 at 1. As such, the Court asks whether a reasonable jury could find, based on the summary

judgment record, Nurse Torres's conduct amounted to the "functional equivalent of a complete denial of care in light of the specific circumstances" on February 9, 2022. *Lucas*, 58 F.4th at 1139 (citation omitted). It could. Recall Officer Panchal reported that Nurse Torres "said that there [was] *nothing* that she [could] do" regarding Mr. Taylor. ECF No. 106-12 at 1 (emphasis added). And there is no evidence that, upon examining Mr. Taylor, Nurse Torres took any action beyond calling the medical unit—despite evidence showing that Mr. Taylor's hands and feet were discolored, he had a medical history of additional, serious conditions, and other inmates were raising concerns of a medical emergency at the time Nurse Torres examined him. *See* ECF No. 88-6; ECF No. 106-13 at 12; *Lucas*, 58 F.4th at 1139 ("[I]t is possible to have *some* medical care and still state a claim under the gatekeeper theory.") (emphasis added); *Jensen*, 989 F.3d at 859–60.

Accordingly, reading the record as a whole and construing it in the light most favorable to Plaintiff, a reasonable jury could find that Nurse Torres did not adequately "afford access to medical personnel capable of evaluating" Mr. Taylor's treatment needs when he was presented to Nurse Torres. *Lucas*, 58 F.4th at 1139. This is sufficient, at this stage, to survive the Medical Staff Defendants' summary judgment motion.

For the reasons set forth above, Plaintiff has created sufficient factual disputes as to

- the seriousness and obviousness of Mr. Taylor's medical needs on February 9, 2022,

- the severe risks they posed to Mr. Taylor's health,

- Nurse Torres's awareness of Mr. Taylor's medical needs and the risks they posed,

- Her failure to properly treat Mr. Taylor's medical needs on February 9, 2022, and

- Her failure to adequately relay Mr. Taylor's medical problems, and the severe risks they posed, to medical staff, on February 9, 2022.

*Lucas*, 58 F.4th at 1139; *see also id.* ("[D]oing nothing in the face of serious medical needs is obviously sufficient to state a claim under both theories."). And based on the evidence giving rise to these disputes, a reasonable jury could find Nurse Torres was deliberately indifferent under both "failure to properly treat" and "gatekeeper" *subjective* component theories. Plaintiff survives the Medical Staff Defendants' summary judgment motion as to its deliberate indifference claim against Nurse Torres under both "failure to properly treat" and "gatekeeper" *subjective* component theories.

        *iii.*     *Melissa Brokaw, RN*

The Medical Staff Defendants seek summary judgment on Plaintiff's claim against Nurse Brokaw, arguing

- Dr. Crum determined there was "no reason" to house Mr. Taylor in medical,

- Mr. Taylor's prior vital signs "looked great,"

- Mr. Taylor "never complained to Nurse Brokaw about any kind of nausea, vomiting, or diarrhea,"

- Mr. Taylor never complained of any "chest pain" to Nurse Brokaw,

- Sergeant McGill stated Mr. Taylor was making a "disturbance" and Dr. Crum told Nurse Brokaw that a "disturbance is not a medical issue," and

- While "in the holding cell," Mr. Taylor "declined his vital signs being taken."

ECF No. 88 at 18; *see also* ECF No. 110 at 18. Plaintiff identifies contrary evidence it contends shows—or at least creates a triable issue of fact as to whether—Nurse Brokaw "was aware of facts from which the inference could be drawn" that Mr. Taylor was at serious risk of harm from February 3 through February 9, 2022, ECF No. 106 at 29, and moreover she "never escalated [his] care to a provider when confronted with obvious and objective signs of an emergency," *id.* at 30. Therefore, Plaintiff argues, a reasonable jury could find Nurse Brokaw failed to treat Mr. Taylor and failed to discharge her gatekeeping responsibility. *See id.* Explained below, the Court agrees with Plaintiff.

*Failure to Properly Treat.* Plaintiffs have created triable issues of material fact regarding Nurse Brokaw's failure to properly treat Mr. Taylor. There is sufficient evidence demonstrating Nurse Brokaw had knowledge of Mr. Taylor's serious medical needs and the risks they posed during the period of February 3 through 9, 2022. *See, e.g.,* ECF No. 88-2 at 6. Ms. Taylor testified herself that "[Mr. Taylor] tested positive for COVID" and experienced "nausea, vomiting, and diarrhea." ECF No. 106-6 at 19. And given Mr. Taylor's medical history—including Nurse Brokaw's own recording of Mr. Taylor's blood pressure as "121/55" on February 5, 2022, ECF No. 88-2 at 5—a reasonable jury could certainly find Nurse Brokaw "was aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and that Nurse Brokaw actually drew such an inference—but nonetheless disregarded the risk of medical harm Mr. Taylor faced. *Beauford*, 35 F.4th at 1264 (quotations omitted); *Prince*, 28 F.4th at 1046 ("[V]iewing the evidence in the light most favorable to the plaintiff . . . the record reflects

that [an official] both knew of and *disregarded a serious risk* to [the inmate's] health.")
(emphasis added); *Jensen*, 989 F.3d at 859. *See also* ECF No. 106-6 at 13–14; ECF No.
106-12 at 1. Particularly given Seargent McGill's testimony that she notified Nurse Brokaw
on February 9, 2022, that Mr. Taylor presented with blue hands and feet, indicators of
cyanosis, which bolster—rather than diminish—how a reasonable jury could conclude the
medical risks Mr. Taylor faced were obvious, as was Nurse Brokaw's knowledge of them.
*See* ECF No. 106-11 at 6; ECF No. 106-14 at 2; ECF No. 106-12 at 1. *See also Prince*,
28 F.4th at 1046; *Lucas*, 58 F.4th at 1141 ("[W]orsening symptoms in conjunction with
their severity and prolonged nature sharply undercut [d]efendants' obviousness
arguments.").

  ***Gatekeeper Theory.*** Plaintiff presents two "gatekeeper" arguments against Nurse
Brokaw, that

> - She never "never escalated" Mr. Taylor's care "to a
>   provider when confronted with obvious and objective signs
>   of an emergency," and
>
> - She either "refused to tell [Dr.] Crum critical information
>   about Mr. Taylor, or she told [him] and he refused to act."

ECF No. 106 at 30.

  As to the first argument, and consistent with the Court's discussion of her "failure
to properly treat" liability, Plaintiff has created triable issues of material fact as to whether
Nurse Brokaw's "failure to escalate" and provide adequate follow-up care for Mr. Taylor
throughout February 2 through 8, 2022—despite the risks Mr. Taylor's medical conditions
posed—constituted a violation of her "gatekeeping" obligations. *See, e.g., Lucas*, 58 F.4th
at 1139 ("[D]oing nothing in the face of serious medical needs is obviously sufficient to

state a claim under both theories."). This is especially true as to the incidents that occurred on February 9, 2022, when Mr. Taylor additionally presented to Nurse Brokaw with cyanosis. *See* ECF No. 106-11 at 6; ECF No. 106-14 at 2; *Jensen*, 989 F.3d at 860. Fundamentally, as to the incidents of February 9, 2022, Plaintiff has created sufficient factual disputes as to whether—notwithstanding her actual knowledge of Mr. Taylor's cyanosis presentation and its severity—Nurse Brokaw "fail[ed] to obtain medical assistance for" Mr. Taylor. *Paugh*, 47 F4th at 1160. *See also Burke*, 935 F.3d at 994 ("Despite his obvious need, [officers and providers] either dismissed [the detainee] as a malingerer without undertaking any investigation into his condition or abdicated their gatekeeping roles by failing to relay the problem to medical staff."). And based on the record giving rise to these disputes, a reasonable jury could find that Nurse Brokaw was deliberately indifferent to Mr. Taylor's medical needs.

As to the second argument, the Court agrees that, for substantially the same reasons discussed above, there is a sufficient factual dispute as to whether Nurse Brokaw's failure to escalate Mr. Taylor's medical needs to Dr. Crum amounts to a violation of her "gatekeeper" responsibility. Sargent McGill stated in her investigation that on February 9, 2022, Nurse Brokaw simply reported to Dr. Crum that Mr. Taylor was "back [there]" when Dr. Crum "came in to the nursing office area." ECF No. 106-14 at 5; *see also* ECF No. 106-12 at 1. Fundamentally, Plaintiff has created a factual dispute as to whether Nurse Brokaw failed to disclose to Dr. Crum "critical information" about Mr. Taylor's health in the week preceding the events of February 9, 2022, as well as on February 9 itself, when there is sufficient evidence indicating that Nurse Brokaw "fail[ed]

to relay the problem" of Mr. Taylor's cyanosis to Dr. Crum to survive summary judgment on a "gatekeeping" theory under the *subjective* component, *Burke*, 935 F.3d at 994. However, to the extent that Plaintiff premises its argument on Dr. Crum's own failure to act, this is an improper basis for arguing Nurse Brokaw failed *her* "gatekeeping" obligations.

Accordingly, for the reasons set forth above, Plaintiff has created sufficient factual disputes as to

- the seriousness and obviousness of Mr. Taylor's medical needs from February 2 through 9, 2022,

- the severe risks they posed to Mr. Taylor's health,

- Nurse Brokaw's awareness of Mr. Taylor's medical needs and the risks they posed,

- Her failure to properly treat Mr. Taylor's medical needs throughout February 2 to 9, 2022, and

- Her failure to adequately relay Mr. Taylor's medical problems, and the severe risks they posed, to medical staff, throughout February 2 through 8, and on February 9, 2022.

*Lucas*, 58 F.4th at 1139; *see also id.* ("[D]oing nothing in the face of serious medical needs is obviously sufficient to state a claim under both theories."). And based on the evidence giving rise to these disputes, a reasonable jury could find Nurse Brokaw was deliberately indifferent under both "failure to properly treat" and "gatekeeper" *subjective* component theories. Plaintiff survives the Medical Staff Defendants' summary judgment motion as to its deliberate indifference claim against Nurse Brokaw under both "failure to properly treat" and "gatekeeper" *subjective* component theories.

       *iv.    Isaac Karugu, RN*

The Medical Staff Defendants seek summary judgment on Plaintiff's claim against Nurse Karugu, arguing

- "At no point" did Mr. Taylor "present" to Nurse Karugu in "medical distress",

- On February 6, 2022, Mr. Taylor did not report nausea or vomiting,

- Mr. Taylor's subjective complaints were "refuted by his vitals," and

- Mr. Taylor "did not exhibit anything medically that would require him to go to the hospital."

ECF No. 88 at 19; *see also* ECF No. 110 at 18. Plaintiff resists, arguing record evidence shows Nurse Karugu "knew of a substantial risk" to Mr. Taylor's health from February 6 through 9, 2022, and that notwithstanding this knowledge Nurse Karugu "failed to escalate Mr. Taylor's care." ECF No. 106 at 33–34. The Court agrees with Plaintiff that this evidence precludes summary judgment as to its claim against Nurse Karugu.

**Failure to Properly Treat.** Plaintiff has created triable issues of material fact regarding Nurse Karugu's failure to properly treat Mr. Taylor. Plaintiff has produced evidence showing

- On February 6, 2022, as reflected in Mr. Taylor's medical records, Nurse Karugu knew Mr. Taylor's blood pressure was 96/97,

- That this blood pressure reading was indicative of hypotension,

- Nurse Karugu thought a hypertensive patient's fluctuation to hypotension warranted contacting a provider, and

- Nurse Kaurgu did not contact a provider about Mr. Taylor after taking his hypotensive blood pressure on February 6 or 7, 2022.

*See* ECF No. 88-2 at 6; ECF No. 106-28 at 6; ECF No. 106-5 at 9–10. This evidence, at a bare minimum, creates a triable dispute of material fact as to whether Nurse Karugu knew of and disregarded an excessive risk to Mr. Taylor's health and safety. *See, e.g., Beauford*, 35 F.4th at 1263; *Prince,* 28 F.4th at 1045–46. A reasonable jury could infer that Nurse Karugu knew the substantial risks that Mr. Taylor faced by swinging into hypotension, and that—despite these risks—Nurse Karugu declined to contact a medical provider about Mr. Taylor's blood pressure. Moreover, Nurse Karugu testified that "there [was] a protocol" for contacting medical providers in cases of significant drops or changes in blood pressure. *See* ECF No.106-5 at 10; *Prince*, 28 F.4th at 1046 (concluding plaintiff met *subjective* component burden where defendant "made no effort to order that [inmate] be transported" and "failed to follow the jail's" emergency medical plan); *Paugh*, 47 F.4th at 1156 ("[I]t is enough that an official . . . declined to confirm inferences of risk that he strongly suspected to exist." (quotations omitted)). Thus, in light of this evidence, and what a reasonable jury could infer from it, the Court rejects the Medical Staff Defendants' argument that Mr. Taylor never presented to Nurse Karugu in "medical distress," or that Mr. Taylor's vitals "refute" his complaints or the obviousness of his medical risks, and therefore they are entitled to summary judgment. ECF No. 88 at 19. *Cf. Hurtado*, 119 F.4th at 1238 ("[T]he factual record contains *no evidence* from which a jury could infer conscious disregard." (citation omitted) (emphasis added)).

21

***Gatekeeper Theory.*** Plaintiff argues Nurse Karugu "abdicated his role as a gatekeeper." ECF No. 106 at 34. The Medical Staff Defendants disagree, arguing, consistent with their arguments outlined above, Mr. Taylor never presented "with the need for additional medical care." ECF No. 110 at 18.

The Court agrees with Plaintiff that a reasonable jury could conclude Nurse Karugu is liable under a "gatekeeper" theory based on his "fail[ure] to escalate" Mr. Taylor's care given Mr. Taylor's abnormal blood pressure readings. ECF No. 106 at 34. Discussed above, and drawing all inferences from the factual record in Plaintiff's favor, evidence shows Nurse Karugu knew it was alarming that Mr. Taylor's blood pressure was hypotensive, but he testified that he "did not" contact a provider about Mr. Taylor on February 6 or 7, 2022. ECF No. 106-5 at 11. A reasonable jury could find this is a paradigmatic failure to discharge the gatekeeping obligation. *See, e.g., Paugh*, 47 F.4th at 1160 ("[A] reasonable jury could find that [the defendant] was aware that [the inmate] was in obvious need for medical attention, and . . . abdicated her gatekeeping role by not relay[ing] the problem to medical staff." (quotations omitted)); *Burke*, 935 F.3d at 993 ("[T]hey . . . abdicated their gatekeeping roles by failing to relay the problem to medical staff."); *Jensen*, 989 F.3d at 859.

The Court also agrees with Plaintiff that a reasonable jury could find Nurse Karugu abdicated his gatekeeping role on February 9, 2022. Plaintiff has put forth evidence showing that

- Nurse Mukamugemanyi spoke to Nurse Karugu on or around the night of February 8, 2022 or early morning of February 9, 2022,

- That Nurse Karugu told Nurse Mukamugemanyi he would do his own assessment of Mr. Taylor, and

- Nurse Karugu did not conduct such an assessment or refer or escalate Mr. Taylor to a medical provider for treatment.

*See, e.g,* ECF No. 106-34 at 7–9; 106-5 at 16; ECF No. 106-28 at 8. Indeed, Sergeant McGill stated in one of her reports that, on February 9, 2022, "Nurse Issac [Karugu] informed me that [Mr.] Taylor was cleared by Dr. Crum yesterday, that he was seeking to stay in 3MED. The dayshift deputies have been briefed to *keep an eye* on him." ECF No. 106-35 at 2 (emphasis added). A reasonable jury could infer from this evidence that Nurse Karugu "fail[ed] to obtain medical care" on February 9, 2022, which "led to [Mr. Taylor's death." *Paugh*, 47 F.4th at 1155; *see also id.* at 1160 ("[A] reasonable jury could find that [the defendant] was aware that [the inmate] was in obvious need for medical attention, and . . . abdicated her gatekeeping role by not relay[ing] the problem to medical staff." (quotations omitted)); *Burke*, 935 F.3d at 993; *Jensen*, 989 F.3d at 859. Accordingly, Plaintiff has put forth sufficient evidence to survive the Medical Staff Defendants' summary judgment motion as to its gatekeeper theory of liability based on Nurse Karugu's conduct on February 9, 2022.

For the reasons set forth above, Plaintiff has created sufficient factual disputes as to

- the seriousness and obviousness of Mr. Taylor's medical needs from February 2 through 9, 2022,

- the severe risks they posed to Mr. Taylor's health,

- Nurse Karugu's awareness of Mr. Taylor's medical needs and the risks they posed,

- His failure to properly treat Mr. Taylor's medical needs throughout February 2 to 9, 2022, and

- His failure to adequately relay Mr. Taylor's medical problems, and the severe risks they posed, to medical staff, throughout February 2 through 8, and on February 9, 2022.

*Lucas*, 58 F.4th at 1139; *see also id.* ("[D]oing nothing in the face of serious medical needs is obviously sufficient to state a claim under both theories."). And based on the evidence giving rise to these disputes, a reasonable jury could find Nurse Karugu was deliberately indifferent under both "failure to properly treat" and "gatekeeper" *subjective* component theories. Plaintiff survives the Medical Staff Defendants' summary judgment motion as to its deliberate indifference claim against Nurse Karugu under both "failure to properly treat" and "gatekeeper" *subjective* component theories.

       *v.*    *Peter Crum, MD*

      The Medical Staff Defendants seek summary judgment on Plaintiff's claim against Dr. Crum, arguing

- Mr. Taylor received treatment while "housed in the medical unit," including Zofran for nausea,

- "At no point" was Mr. Taylor in an "emergent medical situation,"

- "[N]o sheriff's deputy indicated to Dr. Crum" that Mr. Taylor was "delirious or had blue hands and feet,"

- Mr. Taylor did "not present with a medical problem" on February 9, 2022,

- Dr. Crum "consistently inquired if there was a medical problem" with Mr. Taylor and was "advised there was none."

ECF No. 88 at 19–20; *see also* ECF No. 110 at 18. This evidence, the Medical Staff Defendants argue, "supports the reasonableness of the care provided to Mr. Taylor." *Id.* at 20. Plaintiff disagrees, arguing that record evidence shows as of February 2, 2022, Dr. Crum was aware of Mr. Taylor's medical history and substantial health risks but "never did any independent evaluation of [him]," and on February 9, 2022, Dr. Crum knew of the severity of Mr. Taylor's condition but "recklessly chose not to verify underlying facts that he strongly suspected to be true" as to the severity of Mr. Taylor's condition. ECF No. 108 at 31–32. The Court agrees with Plaintiff that, based on this evidence, a reasonably jury could conclude Dr. Crum was deliberately indifferent to Mr. Taylor's medical needs, and therefore summary judgment is improper. *See id.*; *see also Paugh*, 47 F.4th at 1159.

**Failure to Properly Treat.** Plaintiff has created triable issues of material fact regarding Dr. Crum's failure to properly treat Mr. Taylor. There is sufficient evidence from which a reasonable jury could conclude Dr. Crum had knowledge of Mr. Taylor's serious medical needs and the risks they posed during the period of February 3 through 9, 2022. In a "Problem Oriented Record" (Record) dated February 2, 2022, Nurse Rabon noted that "[m]any inmaters [were] concerned" for Mr. Taylor. ECF No. 88-2 at 9. She documented these inmates "stat[ed] he [was] throwing up and BM's on himself." *Id.* Mr. Taylor, according to Nurse Rabon's notes in the Record, state Mr. Taylor

> Appears ill but downplaying symptoms . . . swallowing own sputum makes him have the urge to throw up . . . denies abd pain and body aches. Cough with sputum, Lungs sound clear bilaterally but unable to auscultate clearly with provided stethoscope. Symptoms x 2 days.

ECF No. 88-2 at 9. Nurse Rabon's Record also indicates, underneath these notes, that "*Dr. Crum called back* [for Mr. Taylor] to be housed in 3M." *Id.* (emphasis added). Thus, even though Dr. Crum testified he did not "recall if [Nurse Rabon] passed" the Record "along to [him] or not," Dr. Crum's testimony does not undermine the factual dispute Plaintiff creates as to whether Dr. Crum knew of Mr. Taylor's severe medical needs as of February 2, 2022—especially where he also testified that Nurse Rabon "may have" reported this to him. ECF No. 106-21 at 20. And while the Record appears to prescribe a "Clear liquid diet" and "Zofran BID 4 mg x 48 hours," *id.*, the Court rejects the Medical Staff Defendants' argument that this is sufficient to warrant summary judgment in their favor on Plaintiff's claim against Dr. Crum. *See, e.g., Lucas*, 58 F.4th at 1140 ("[P]roviding some modicum of treatment does not per se insulate [a defendant.]"). Especially where, at this stage, the Court construes the record in the light most favorable to Plaintiff. *See, e.g., Prince*, 28 F.4th at 1043. *Cf.* ECF No. 110 at 17.

Yet despite Plaintiff's evidence from which a reasonable jury could conclude Dr. Crum drew the inference that Mr. Taylor faced substantial risks to his health and safety, *see Beauford*, 35 F.4th at 1264, Plaintiff has also marshalled evidence showing Dr. Crum failed to provide medical treatment for Mr. Taylor. Dr. Crum offered the following testimony in his deposition:

> Q. Did you do anything to independently determine whether he had improved?
>
> A. No. He had been there for long enough with loose stools, hadn't developed anything serious. What was most important to me is that he had not gotten worse and nothing – no sentinel signs were presented to me.

Q. How did you determine that he had not gotten worse?

A. Nobody told me.

Q. But did you do anything to independently determine whether he had gotten worse?

A. Such as . . .

Q. I'm asking whether you did – anything.

A. Then I don't know what you're referring to, so no.

ECF No. 106-21 at 8. This testimony creates a triable issue of fact regarding Dr. Crum's failure to examine and treat Mr. Taylor. The Court's conclusion is bolstered by Nurse Brokaw's notation that, on February 8, 2022, Mr. Taylor was "[c]lear to GP per Crum," from which a reasonable jury could infer Dr. Crum cleared Mr. Taylor to return to the general population without independently examining or treating him. ECF No. 88-2 at 42.

As to Dr. Crum's conduct on February 9, 2022, the Court agrees with Plaintiff that it has created a sufficient factual dispute as to whether Dr. Crum knew of the medical risks Mr. Taylor faced that day and yet "recklessly chose not to verify underlying facts that he strongly suspected to be true." ECF No. 106 at 32. Sergeant McGill stated Dr. Crum was present when she was "presenting Mr. Taylor to be examined in 3-Medical" on February 9, 2022. ECF No. 106-14 at 5. In a Problem Oriented Record dated February 9, 2022, Nurse Brokaw noted that after "Sgt. McGill requested that" Mr. Taylor "be housed in 3M . . . *Dr. Crum*, Sgt. McGill, Berenice [Torres] and this writer [Nurse Brokaw] *discussed the issue.*" ECF No. 88-2 at 1 (emphases added). Nurse Brokaw's note in the Record continued: "Dr. Crum cleared the pt [Mr. Taylor] to stay in the pod." *Id.* And Dr. Crum testified in his deposition he did not independently examine Mr. Taylor on February

9, 2022. *See* ECF No. 106-21 at 2. A reasonable jury could infer from this evidence that Dr. Crum knew of Mr. Taylor's health risks, based on Sergeant McGill's statements regarding her concerns for his wellbeing, *see* ECF No. 106-14 at 4, and nonetheless failed to provide treatment, based on his own testimony and Nurse Brokaw's notes in the Problem Oriented Record dated February 9, 2022.

Thus, in light of this evidence, the Court rejects the Medical Staff Defendants' arguments that summary judgment in their favor is proper because Mr. Taylor received *some* treatment between February 2 through 9, 2022, and that Mr. Taylor was "at no point" in an "emergent medical situation" during this period, including on February 9, 2022. ECF No. 88 at 19–20. Plaintiffs have created sufficient factual disputes as to the *subjective* component on a "failure to properly treat" theory regarding Dr. Crum to survive the Medical Staff Defendants' summary judgment motion on this theory.

***Gatekeeping Theory.*** Plaintiff's theory of "gatekeeping" liability as to Dr. Crum is straightforward: he "failed in his role as gatekeeper by refusing to send Mr. Taylor to the hospital." ECF No. 106 at 32. The Medical Staff Defendants argue Mr. Taylor showed "no symptoms of worsening" and was "[a]t no point" in a "serious medical situation." ECF No. 110 at 18. As the evidence discussed above indicates, a reasonable jury could infer that Dr. Crum "knew about and disregarded a substantial risk" based on his conduct—i.e., by returning Mr. Taylor to the general population without an individualized examination—and that his "gatekeeping" amounted to a "delay in seeking specialized treatment" for Mr. Taylor's serious and dangerous medical condition. *Lucas*, 58 F.4th at 1143.

At bottom, based on Dr. Crum's behavior on February 9, 2022, a reasonably jury could find that Dr. Crum delayed or refused to obtain medical care for Mr. Taylor by returning him to general population—rather than escalating his medical treatment to a specialist or additional provider—and therefore that Dr. Crum's conduct amounted to deliberate indifference under a "gatekeeper" theory of liability. *See Paugh*, 47 F.4th at 1154 (noting an official's "delay or refusal to obtain medical care for an inmate may constitute deliberate indifference" (citation omitted)); *id.* at 1159 ("When [an official] knows, or refuses to verify underlying facts that he strongly suspected to be true, or declines to confirm inferences of risk that he strongly suspected to exist about an inmate's serious medical need, the official's failure to obtain medical assistance constitutes deliberate indifference." (citations and alterations omitted)); *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (observing "delayed referral" gives rise to deliberate indifference liability where "a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency"). Given the evidence Plaintiff has put forward and discussed above, the Medical Staff Defendants' contrary arguments fail to persuade otherwise.

For the reasons set forth above, Plaintiff has created sufficient factual disputes as to

- the seriousness and obviousness of Mr. Taylor's medical needs from February 2 through 9, 2022,

- the severe risks they posed to Mr. Taylor's health,

- Dr. Crum's awareness of Mr. Taylor's medical needs and the risks they posed,

- His failure to properly treat Mr. Taylor's medical needs throughout February 2 to 9, 2022, and

- His failure to refer or obtain medical care for Mr. Taylor on February 9, 2022.

*Lucas*, 58 F.4th at 1139; *see also id.* ("[D]oing nothing in the face of serious medical needs is obviously sufficient to state a claim under both theories."). And based on the evidence giving rise to these disputes, a reasonable jury could find Dr. Crum was deliberately indifferent under both "failure to properly treat" and "gatekeeper" *subjective* component theories. Plaintiff survives the Medical Staff Defendants' summary judgment motion as to its deliberate indifference claim against Dr. Crum under both "failure to properly treat" and "gatekeeper" *subjective* component theories.

* * *

For the reasons set forth above, Plaintiff has put forth evidence from which a reasonable jury could find that the Medical Staff Defendants were deliberately indifferent to Mr. Taylor's medical needs under both "failure to properly treat" and "gatekeeper" *subjective* component theories of liability. Accordingly, the Court DENIES the Medical Staff Defendants' summary judgment motion.

## B. Denver Health's Motion for Summary Judgment

Denver Health seeks summary judgment on Plaintiff's *Monell* claim for municipal liability against it, essentially arguing

- Denver Health cannot be "held liable" because "no underlying constitutional violation exists" on the part of any Medical Staff Defendant,

- There is "no evidence in the record that an unconstitutional informal custom amounting to a widespread practice exists," and

- There is no evidence to support Plaintiff's failure to train theory.

ECF No. 89 at 7, 10, 13. The Court considers these arguments in turn.

### 1. *Underlying Constitutional Violations*

Denver Health argues it cannot be held liable because "[w]ithout [any] underlying constitutional violation" of Medical Staff Defendants, "liability cannot attach to Denver Health and summary judgment" on Plaintiff's claim against it "are warranted." ECF No. 89 at 8. In advancing this argument, Denver Health recycles many arguments the Court rejected in its analysis of the Medical Staff Defendants' summary judgment motion. *See, e.g., id.* at 8. Regardless, because, as discussed in the Court's analysis of the Medical Staff Defendants' summary judgment motion, a reasonably jury could find that the Medical Staff Defendants were deliberately indifferent to Mr. Taylor's medical needs, and thus violated his constitutional rights, Denver Health fails to persuade it is entitled to summary judgment on this basis.

Moreover, because a reasonable jury could find that the Medical Staff Defendants were deliberately indifferent to Mr. Taylor's medical needs, the Court need not address Plaintiff's argument that Denver Health is liable "even if the Court finds no individual defendant violated Mr. Taylor's rights." ECF No. 107 at 13 (capitalization omitted). And to the extent that Plaintiff argues "the fact that five Individual Defendants . . . failed to provide Mr. Taylor with medical care *supports* that there is a custom of failing to provide adequate medical care in the jail," the Court construes this argument as attendant to whether factual

disputes regarding the Medical Staff Defendants' deliberate indifference provide underlying constitutional violations for Plaintiff's municipal liability claim against Denver Health. ECF No. 107 at 14 (emphasis added). Which, noted above, they do.

### 2. Informal Custom

Plaintiff asserts an "informal custom policy theory" of *Monell* liability, ECF No. 107 at 13 (capitalization omitted), against Denver Health on the following bases:

- Denver Health "customarily allows medical staff to point the finger at other staff to avoid liability",

- Denver Health has "unconstitutional customs based on its historical treatment of prisoners,"

- Denver Health takes an impermissible "wait and see" approach to medical care,

- Denver Health "fail[s] to provide care based on the automatic assumption that prisoners are lying, faking, or exaggerating their symptoms", and

- Denver Health fails to provide care due to "prioritizing convenience over necessary medical treatment."

ECF No. 107 at 14–15; *see also Monell v. Dep't of Social Services of N.Y.*, 436 U.S. 658 (1978). Denver Health challenges these bases for Plaintiff's informal custom theory of *Monell* liability, arguing fundamentally that "[t]here is no evidence in the record that an unconstitutional informal custom amounting to [a] widespread practice exists." ECF No. 89 at 10. The Court agrees with Plaintiff that it has created sufficient factual disputes on the "finger pointing" basis supporting its informal custom theory of liability to survive Denver Health's summary judgment motion, but otherwise agrees with Denver Health that Plaintiff's other asserted bases for "informal custom" liability do not survive summary

judgment. *See, e.g., Schneider v. City of Grand Junction Police Dep't,* 717 F.3d 760, 769 (10th Cir. 2013) (setting forth elements of municipal liability); *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (explaining a "municipal policy or custom may take the form of . . . an informal custom amounting to a widespread practice" (alterations and quotations omitted)); *Monell*, 436 U.S. 658.

*Finger Pointing.* Plaintiff argues that Denver Health allows medical staff to "point the finger" at other staff "without anyone taking responsibility for a patient's care," which "creates an environment where prisoners suffer from untreated or inadequately treated medical conditions, in violations of the Eighth Amendment." ECF No. 107 at 14–15. As to this basis for "informal custom" liability, *see Bryson*, 627 F.3d at 788, the Court agrees with Plaintiff it has identified sufficient evidence to survive Denver Health's summary judgment motion. Dr. Crum testified he "talk[ed] to the nursing staff" as to whether Mr. Taylor's medical conditions had progressed, but that he did not conduct an independent examination of Mr. Taylor himself to determine the scope and deterioration of Mr. Taylor's condition. ECF No. 107-1 at 5. Although Dr. Crum testified one of his "responsibilit[ies] [was] to make sure that the care provided [was] adequate," ECF No. 107-1 at 3, he also testified that Mr. Taylor was "not my patient," ECF No. 106-21 at 9. And according to Dr. Crum, regarding his supervisory responsibility, "when you say that my responsibility is to oversee the [patient] care, that *doesn't* mean that I'm overseeing *everything* that *everybody* does when they do it." *Id.* ay 10 (emphases added). Dr. Crum further testified, in response to the question, "Whose patient was he," that "It depends on what day it was." *Id.*

From this evidence, and drawing all inferences from the record in Plaintiff's favor, a reasonable jury could conclude that the Medical Staff Defendants "rel[ied] on each other in a manner" that led to "delays, denials of care, or lack of attention," ECF No. 107 at 14, to serious medical conditions, such as Mr. Taylor's conditions and medical risks, and that the delays resulting from these denials were "an informal custom amounting to a widespread practice," *Bryson*, 627 F.3d at 788 (quotations omitted), of "running an inadequate medical program," *Duran v. Wellpath, LLC*, No. 1:23-cv-02853-CNS-NRN, 2024 WL 2939167, at *8 (D. Colo. June 11, 2024).

*Remaining Theories.* As for Plaintiff's remaining theories of "informal custom" *Monell* liability—historical treatment; the "wait and see" approach; making improper assumptions; and prioritizing convenience—Plaintiff premises these theories of liability on the same evidence in the summary judgment record: Evidence of prior "prisoner injuries." *See, e.g.,* ECF No. 107 at 15–16.

The Court agrees with Denver Health that this evidence is insufficient to sustain Plaintiff's *Monell* claim against it on these four remaining theories of "informal custom" liability. *See* ECF No. 89 at 12 ("*The allegations* do not involve similar factual claims or conduct at issue in this case.") (emphasis added); ECF No. 109 at 10. As Plaintiff's summary judgment briefing and attendant evidence demonstrates, this evidence—except for a report regarding the 2022 death of Isaac Valdez—is largely premised on allegations contained in previously filed prisoner complaints, the most recent of which stem from incidents in 2018. *See, e.g.,* ECF No. 107 at 9; ECF No. 107-2 at 35. *Allegations* regarding "prisoner injuries" from incidents that occurred, most recently, approximately four years

prior to Mr. Taylor's death are insufficient to establish03 an "informal custom" under any remaining theory that Plaintiff puts forward, particularly where one such suit was resolved through settlement. *See* ECF No. 107 at 10; *See, e.g., Est. of Lobato by & through Montoya v. Correct Care Sols., LLC*, No. 15–cv–02718–PAB–STV, 2017 WL 1197295, at *8 (D. Colo. Mar. 31, 2017) (concluding at motion to dismiss stage that ("[u]nsubstantiated allegations from complaints filed against the [] defendants, without more, do not put the [] defendants on notice that the training of their nursing staff is deficient regarding opiate withdrawal" (citations omitted)); *Morris v. City of New York*, No. 12-CV-3959, 2013 WL 5781672, at *11 (E.D.N.Y. Oct. 28, 2013), *aff'd sub nom. Morris v. Silvestre*, 604 F. App'x 22 (2d Cir. 2015). And to the extent that a reasonable jury could conclude Mr. Valdez's death configured into an "informal custom" on the part of Denver Health, one additional incident, standing alone, is insufficient to establish this municipal liability requirement. *See, e.g., Sexton v. City of Colorado Springs*, 530 F. Supp. 3d 1044, 1071 (D. Colo. 2021) (collecting cases).

Accordingly, the Court agrees with Denver Health that it is entitled to summary judgment, *see* ECF No. 109 at 9, to the extent Plaintiff's municipal liability claim against it is premised on an "informal custom" of

- The historical mistreatment of prisoners;

- A "wait and see" approach;

- The failure to provide adequate medical care based on making improper assumptions; and

- Prioritizing convenience.

*See* ECF No. 107 at 15–16.

3. *Failure to Train*

Denver Health seeks summary judgment on Plaintiff's *Monell* claim based on Plaintiff's failure to train theory because "there is no record evidence to support Plaintiff's failure to train theory." ECF No. 89 at 13. In support of this argument, Denver Health contends

- The medical staff at the jail are "licensed by their various boards and regulated through" the Department of Regulatory Agencies of Colorado,

- Staff, including the Medical Staff Defendants, "undergo significant training and evaluations,"

- Mr. Taylor received "continuous care throughout his incarceration,"

- Denver Health protocols "provide guidance to the medical staff at the jail," and

- Medical staff are "trained" on these protocols.

ECF No. 89 at 14–15. Plaintiff identifies evidence that it argues create factual disputes as to "Denver Health's failure to adequately train its medical staff," ECF No. 107 at 17, from which a reasonable jury could conclude Denver Health's training deficiencies were "closely related" to and "caused Mr. Taylor's death," *id.* at 18. The Court agrees with Plaintiff, but only as to two of its three bases for "failure to train" liability, discussed further below.

To be sure, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted); *see also Schwartz for Est. of Finn v. City & Cnty. of Denver*, No. 1:21-cv-02160-CNS-SKC, 2023 WL 1879305, at *4 (D. Colo. Feb. 10, 2023) (explaining

"failure to train" municipal liability) (citing *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010)). But, nonetheless, Plaintiff argues it has identified evidence from which a reasonable jury could conclude there was a "specific deficiency" in Denver Health's training regarding "the proper evaluation and treatment of prisoners' serious medical needs," including

- Denver Health's failure to train that a patient who presents with blue hands and feet is at a serious risk of harm,

- Denver Health's failure to train its nursing staff on what authority the staff has to escalate a patient's care and to whom to escalate those concerns, and

- Denver Health's failure to train its nursing staff on proper evaluation protocols after a doctor has "cleared a patient," including a failure to train staff as to an "independent obligation to give necessary care."

ECF No. 107 at 18. The Court considers these bases of Denver Health's failure to train, and whether they survive Denver Health's summary judgment motion, below.

Regarding this first point, Nurse Brokaw testified that there is *no* protocol on patients who "present with blue hands and feet." ECF No. 107-3 at 4. The absence of such a specific protocol is certainly related to a specific medical condition—cyanosis—and its presentation such that a reasonably jury could conclude, as discussed in the Court's analysis of the Medical Staff Defendant's motion, a failure to train as to presentations of blue hands and feet is "closely related" to Mr. Taylor's death. *See Huff v. Reeves*, 996 F.3d 1082, 1093 (10th Cir. 2021) ("[A] plaintiff must identify a specific deficiency in the entity's training program closely related to his ultimate injury." (quotations omitted)); *Lynch v. Bd. of Cnty. Commissioners of Muskogee Cnty., Oklahoma*, 786 F.

App'x 774, 785 (10th Cir. 2019) ("[I]t is not enough for a plaintiff to show *general* deficiencies in training." (quotations omitted) (emphasis added)). *Cf. Porro*, 624 F.3d at 1329 (affirming summary judgment where "any reasonable fact finder would *have* to conclude that—far from exhibiting deliberate indifference to [plaintiff's] due process rights against the use of excessive force or causing his injury—the county actively sought to *protect* those rights") (emphasis added).

Regarding the second point, Nurse Mukamugemanyi testified that, although she discussed Mr. Taylor's medical condition with Nurse Karugu, that "the doctors did all, everything," and that once she raised her concerns to Nurse Karugu that "*he* was going to do that," ECF No. 107-4 at 3 (emphasis added). Although Nurse Karugu testified that "[i]n [a] worst-case scenario we always tell [nurses] to send [patients] to medical," that "the charge nurse has to go and we do another nurse assessment to, like, *outplay* the other nurse." ECF No. 107-5 at 2 (emphasis added). Moreover, as discussed in the Court's analysis of the Medical Staff Defendants' motion and Plaintiff's "gatekeeper" theory of liability for the Medical Staff Defendants, a reasonable jury could conclude the Medical Staff Defendants failed to "escalate" Mr. Taylor's care throughout February 2 and 9, 2022 to various medical staff members. *See also* ECF No. 107 at 18 ("After encountering Mr. Taylor with blue hands and feet, LPN Torres and RN Brokaw had no training on the need to escalate [Mr. Taylor's] care emergently and *continued to ignore him*.") (emphasis added). A reasonable jury could conclude from this evidence that there was a "specific deficiency" in Denver Health's training that was closely related to Mr. Taylor's injury. *See, e.g., Prince*, 28 F.4th at 1049 ("Viewing the evidence in the light most

favorable to [the plaintiff], a reasonable jury could find that Carter County had unofficial policies or customs of failing to medically train jail employees, inadequately staffing the jail, and delaying inmate medical attention."). And although there is *some* guidance in the "Access to Care" document regarding "Standard Policy and Procedures" for patients' access to care, *see* ECF No. 107-2 at 9, Plaintiff has created a triable issue of material fact as to whether this document and the guidance it provides to medical staff amounts to adequate specific *training* regarding staff's *escalation of emergency* medical situations and specifically to whom they should be escalated, *cf.* ECF No. 89-2 at 1. *Cf. Porro*, 624 F.3d at 1329.

As for the third point, upon review of Plaintiff's summary judgment briefing, at most Plaintiff appears to put forth evidence indicating that certain Medical Staff Defendants did not provide Mr. Taylor care following Dr. Crum "clearing" Mr. Taylor. *See, e.g.,* ECF No. 107 at 6; ECF No. 107 at 18. Although some evidence in support of this failure to train theory may support Plaintiff's *gatekeeping* theories of deliberate indifference liability against Medical Staff Defendants, this evidence is insufficient to create triable issues of material fact from which a reasonable jury could conclude there was a "specific deficiency" in Denver Health's training regarding the "independent obligation to provide necessary care." ECF No. 107 at 18. Plaintiff's argument that "had Torres, Karugu, Mukamugemanyi, or Brokaw had the *training and confidence* required to know that Mr. Taylor needed an independent assessment," ECF No. 107 at 18 (emphasis added), bolsters the Court's conclusion that, while the evidence is such that a reasonable jury could arrive at many conclusions precluding summary judgment in Denver Health and the

Medical Staff Defendants' favor across the board, Plaintiff's "independent care" theory is more akin to the "generalized [training] deficiencies" the Tenth Circuit has determined are insufficient to sustain a failure to train theory of municipal liability, *Lynch*, 786 F. App'x 774 at 785 (quotations omitted). Simply put, unlike Plaintiff's other failure to train theories of municipal liability, its "independent assessment" theory is insufficiently specific, *see id.*, and lacks sufficient evidentiary support to survive Denver Health's summary judgment motion.

Accordingly, the Court agrees with Plaintiff that factual disputes preclude summary judgment on "failure to train" theory of municipal liability, but only as to two of the three bases upon which this theory of municipal liability is based. *Cf.* ECF No. 89 at 14–15.

In light of this evidence, and that, from it, a reasonable jury could conclude there was at least one "specific deficiency" in Denver Health's training regarding "the proper evaluation and treatment of prisoners' serious medical needs, *see* ECF No. 107 at 18, the Court agrees with Plaintiff that Denver Health falters in arguing summary judgment in its favor is proper based on its *licensure* protocols, *cf.* ECF No. 89 at 14–15. The extent to which nursing staff and the Individual Medical Staff Defendants are *regulated* as professionals lacks relevance in the Court's analysis of whether there is a specific deficiency in *Denver Health's* own training to staff regarding prisoner's serious medical needs, and whether Plaintiff has created material factual disputes from which a reasonable jury could conclude there was such a deficiency. *See, e.g., Schwartz,* 2023 WL 1879305, at *4.

Accordingly, for the reasons set forth above, Plaintiff survives Denver Health's summary judgment motion as to its "failure to train" theory of *Monell* liability, but only on its "blue hands and feet" and "failure to escalate" bases of liability.

* * *

For the reasons set forth above, Plaintiff has put forth evidence from which a reasonable jury could conclude Denver Health maintained an "informal custom" of "finger pointing" for which it may be liable. However, summary judgment as to Plaintiff's remaining theories of "informal custom" *Monell* liability is proper, given that the evidence upon which these theories are premised fails to create material factual disputes sufficient to survive Denver Health's motion. As to Plaintiff's "failure to train" theory of *Monell* liability, Plaintiff has identified record evidence from which—at the summary judgment stage, where the Court must construe the record in Plaintiff's favor—a reasonable jury could find Denver Health failed to train its nursing staff as to inmates' presentation of blue hands and feet and how to escalate inmates' serious medical needs in such a manner that gives rise to its municipal liability, thus surviving Denver Health's summary judgment motion as to these bases of liability. However, Plaintiff has failed to create sufficient factual disputes to survive Denver Health's motion as to its "independent assessment" basis for its failure to train theory of municipal liability.

## III.    CONCLUSION

Consistent with the above analysis, the Court DENIES the Medical Staff Defendants' Motion for Summary Judgment. ECF No. 88. The Court GRANTS IN PART and DENIES IN PART Denver Health's Motion for Summary Judgment. ECF No. 89.

DATED this 16th day of July 2025.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge